1 | Bill Lann Lee (SBN 108452)
2 | Kelly M. Dermody (SBN 171716)
   | Eve H. Cervantez (SBN 164709)
   | Elizabeth A. Alexander (pro hac vice)
3 | Jahan C. Sagafi (SBN 224887)
   | Nirej S. Sekhon (SBN 213358)
4 | LIEFF, CABRASER, HEIMANN &
   | BERNSTEIN, LLP
5 | 275 Battery Street, 30th Floor
   | San Francisco, CA  94111-3339
6 | Telephone:  (415) 956-1000
   | Facsimile:  (415) 956-1008
7 |
   | Thomas A. Saenz (SBN 159430)
8 | Shaheena Ahmad Simons (SBN 225520)
   | MEXICAN AMERICAN LEGAL DEFENSE
9 | AND EDUCATIONAL FUND
   | 634 South Spring Street
10| Los Angeles, CA  90014
   | Telephone:  (213) 629-2512
11| Facsimile:  (213) 629-0266

Joseph C. Kohn
Martin J. D'Urso
Hilary Cohen
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone:  (215) 238-1700
Facsimile:  (215) 238-1968

Jack W. Lee, Esq. (SBN 071626)
Lisa Duarte, Esq. (SBN 169750)
John Ota, Esq. (SBN 195532)
MINAMI, LEW & TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Telephone:  (415) 788-9000
Facsimile:  (415) 398-3887

12

13 | *Attorneys for Plaintiffs* [Additional counsel listed on signature page]

14 | UNITED STATES DISTRICT COURT
   | NORTHERN DISTRICT OF CALIFORNIA

15

16 | EDUARDO GONZALEZ, ANTHONY
   | OCAMPO, ENCARNACION GUTIERREZ,
17 | JOHAN MONTOYA, JUANCARLOS GÓMEZ-
   | MONTEJANO, JENNIFER LU, AUSTIN CHU,
18 | IVY NGUYEN, ANGELINE WU, ERIC FIGHT,
   | CARLA GRUBB, DAVID CULPEPPER,
19 | PATRICE DOUGLASS, and ROBAIR
   | SHERROD, BRANDY HAWK and ANDRE
20 | STEELE, on behalf of themselves and all others
   | similarly situated,

21 | Plaintiffs,

22 | v.

23 | ABERCROMBIE & FITCH STORES, INC., A&F
   | CALIFORNIA, LLC, A&F OHIO, INC., and
24 | ABERCROMBIE & FITCH MANAGEMENT
   | CO.,

25 | Defendants.

Case Nos.  03-2817 SI, 04-4730 and
04-4731

**NOTICE OF MOTION AND
PLAINTIFFS' MOTION FOR
ORDER GRANTING  FINAL
APPROVAL OF THE
CONSENT DECREE AND
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT
THEREOF**

Hearing Date:  April 14, 2005
Hearing Time:  4:00 p.m.

Courtroom of Hon. Susan Illston

26

27 | *[Continued on next page]*

28

425190.1

ELIZABETH WEST and JENNIFER LU,

            Plaintiffs,

      v.

ABERCROMBIE & FITCH STORES, INC., A&F
CALIFORNIA, LLC, A&F OHIO, INC., and
ABERCROMBIE & FITCH MANAGEMENT
CO.,

            Defendants.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

      v.

ABERCROMBIE & FITCH STORES, INC., A&F
CALIFORNIA, LLC, A&F OHIO, INC., and
ABERCROMBIE & FITCH MANAGEMENT
CO.

            Defendants.

425190.1

1

# TABLE OF CONTENTS

2

**Page**

3      MEMORANDUM OF POINTS AND AUTHORITIES ................................................1

4      I.      INTRODUCTION ..........................................................................................1

       II.     PROCEDURAL  BACKGROUND.................................................................3

5      III.    ADEQUATE NOTICE WAS GIVEN TO THE CLASS OF THE PROPOSED
6              CONSENT DECREE AND THE OPPORTUNITY TO OPT OUT. ...................5

               A.      Legal Standard ...................................................................................5

7              B.      Adequate Notice Was Given.................................................................6

8      IV.     THE PROPOSED CONSENT DECREE SATISFIES THE REQUIREMENTS
               FOR FINAL APPROVAL BECAUSE IT IS FAIR, REASONABLE, AND
9              ADEQUATE. ...............................................................................................7

               A.      The Consent Decree Provides Exceptional Injunctive And Monetary Relief
10                     for the Class. .....................................................................................9

11             B.      This Litigation Involved Substantial Potential Risks.............................10

12             C.      The Discovery Completed and the Stage of Proceedings Support Final
                       Approval. ...........................................................................................11

13             D.      The Experience and Views of Class Counsel, the EEOC, and Mediator
                       Support the Proposed Consent Decree..................................................12

14             E.      The Reaction of Class Members Supports the Proposed Settlement ...................13

15             F.      The Settlement Is a Product of Extensive, Arm's-Length Negotiations...............14

16     V.      THE OBJECTIONS ARE WITHOUT MERIT. ................................................15

               A.      Objections of Three Minority Class Members with Disabilities. .........................15

17             B.      Late Objections of Amani J. King and Efe Agindotan. ........................................16

18             C.      Objection of Elizabeth Guleke. ...........................................................16

19             D.      The Objection of Rachel Potter.............................................................17

                       1.      The Proposed Consent Decree Is Sufficiently Clear.................................18

20                     2.      The Court Retains Jurisdiction Over the Parties And Has Sole
21                             Authority To Modify the Terms of the Consent Decree. ..........................20

22                     3.      The Release Is Narrow, Protecting Class Members' Rights To the
                               Maximum Extent Feasible. ........................................................21

23                     4.      Plaintiffs Agree that the Single-Letter Typographical Error Should
                               Be Corrected. ...........................................................................21

24                     5.      The Monitoring Mechanisms Are Adequate.............................................22

25                     6.      The 125% Opt-Out Credit Is Reasonable. ...............................................23

       VI.     THE PROPOSED CLASS REPRESENTATIVE AND CHARGING PARTY
26             AWARDS ARE FAIR, REASONABLE, AND ADEQUATE. .........................23

27     VII.    THE PROPOSED FEE IS LIKEWISE FAIR, REASONABLE, AND
               ADEQUATE. ...............................................................................................26

28             A.      The Time and Labor Required Were Substantial..................................29

1

## **TABLE OF CONTENTS**
(continued)

2
**Page**

3    B.    The Questions Involved Were Novel and Difficult. ...............................................30

4    C.    The Case Required Significant Skill to Perform the Legal Service Properly. .......30

     D.    Class Counsel Were Precluded From Other Employment Due to
5          Acceptance of the Case. ........................................................................................30

6    E.    The Customary Fee and Awards in Similar Cases, Whether Measured
           Under the Lodestar Method or the Percentage Method, Support the Fee
7          Application. ............................................................................................................30

8          1.    The fee is reasonable under the lodestar-multiplier method. ....................31

           2.    The fee is also reasonable under the percentage method. .........................33

9    F.    The Contingent Nature of the Fee Supports the Proposed Award. ........................34

10   G.    The Time Limitations Imposed by the Client and the Circumstances
           Support the Fee Award. .........................................................................................35

11   H.    The Amount Involved Was Substantial and the Results Obtained Were
           Exceptional, Including $40 million for the Class as Well as Robust
12         Injunctive Relief. ...................................................................................................35

13   I.    Class Counsel Have a High Degree of Experience, Reputation, and Ability. .......36

14   J.    The Case Was Somewhat Undesirable. ..................................................................36

     K.    Class Counsel's Professional Relationship with the Class Representatives
15         Was Longstanding. .................................................................................................36

     CONCLUSION.................................................................................................................36
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### CASES

4

*Alaniz v. California Processors, Inc.*,
    73 F.R.D. 269 (N.D. Cal. 1976) ............................................................................20

5

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .............................................................................................24

6

*Bebchick v. Wash. Metro. Area Transit Comm'n*,
    805 F.2d 396 (D.C. Cir. 1986) ............................................................................35

7

*Behrens v. Wometco Enterprises, Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988) .........................................................................32

8

*Blum v. Stenson*,
    465 U.S. 886 (1984) .............................................................................................27

9

*Bogosian v. Gulf Oil Corp.*,
    621 F.Supp. 27 (E.D. Pa. 1985) ..........................................................................25

10

11

*Bouman v. Block*,
    940 F.2d 1211 (9th Cir. 1991) ............................................................................31

12

*Boyd v. Bechtel Corp.*,
    485 F. Supp. 622 (N.D. Cal. 1979) .............................................................12, 13, 14

13

*Bryan v. Pittsburgh Plate Glass Co.*,
    59 F.R.D. 616 (W.D. Pa. 1973), *aff'd*,
    494 F.2d 799 (3d Cir.) .........................................................................................25

14

15

*Butler v. Home Depot*,
    Case Nos. C-94-4335 SI, C-95-2182 SI (N.D. Cal.) .............................................20

16

*Carson v. American Brands, Inc.*,
    450 U.S. 79 (1981) .................................................................................................7

17

*Chalmers v. City of Los Angeles*,
    796 F.2d 1205 (9th Cir. 1986) ............................................................................27

18

19

*Churchill Village, L.L.C. v. General Elec.*,
    361 F.3d 566 (9th Cir. 2004) ............................................................................7, 8

20

*Cimarron Pipeline Const., Inc. v. National Council on Compensation Ins.*,
    1993 WL 355466 (W.D. Okla. June 8, 1993) .......................................................25

21

*City of Detroit v. Grinnell Corp.*,
    356 F. Supp. 1380 (S.D.N.Y. 1972), *aff'd in part*,
    *rev'd in part on other grounds*, 495 F.2d 448 .......................................................16

22

23

*City of Oakland v. Oakland Raiders*,
    203 Cal. App. 3d 78 (1988) .................................................................................32

24

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ...........................................................................7, 8

25

*Coalition for Los Angeles County Planning in the Pub. Interest v. Bd. of
    Supervisors of Los Angeles County*,
    76 Cal. App. 3d 241 (1977) .................................................................................32

26

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Cook v. Niedert,*
   142 F.3d 1004 (7th Cir. 1998) ...................................................................................26

4

*County of Suffolk v. Long Island Lighting Co.,*
   710 F. Supp. 1428 (E.D.N.Y. 1989) .........................................................................13

5

*Deposit Guar. Nat'l Bank v. Roper,*
   445 U.S. 326 (1980) ...................................................................................................28

6

*Ellis v. Naval Air Rework Facility,*
   87 F.R.D. 15 (N.D. Cal. 1980) ......................................................................7, 12, 19

7

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,*
   137 F.R.D. 240 (S.D. Ohio 1991) .............................................................................25

8

*Florida v. Dunne,*
   915 F.2d 542 (9th Cir. 1990) ....................................................................................27

9

*Glicken v. Bratford,*
   35 F.R.D. 144 (S.D.N.Y. 1964) ..................................................................................9

10

*Gottlieb v. Wiles,*
   11 F.3d 1004 (10th Cir. 1993) ..................................................................................19

11

*Grant v. Bethlehem Steel Corp.,*
   823 F.2d 20 (2d Cir. 1987)........................................................................................13

12

*Guardians Ass'n of New York City Police Dept. v. Civil Service Commission of*
   *City of New York,*
   527 F. Supp. 751 (S.D.N.Y. 1981) ...........................................................................14

13

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1988) .......................................................................8, 15, 28

14

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ..................................................................................................27

15

*Huguley v. General Motors Corp.,*
   128 F.R.D. 81 (E.D. Mich. 1989), *aff'd,*
   925 F.2d 1464 (6th Cir. 1991) ..................................................................................14

16

*In re Anthracite Coal Antitrust Litig.,*
   79 F.R.D. 707 (M.D. Pa. 1978), *aff'd in part,*
   612 F.2d 576 (3rd Cir. 1979) ....................................................................................13

17

*In re Baldwin-United Corp.,*
   770 F.2d 328 (2d Cir. 1985)......................................................................................21

18

*In re Cement and Concrete Antitrust Litigation,*
   817 F.2d 1435 (9th Cir. 1987) ....................................................................................6

19

*In re Cont'l Ill. Sec. Litig.,*
   962 F.2d 566 (7th Cir. 1992) ....................................................................................34

20

*In re Corrugated Container Antitrust Litig.,*
   643 F.2d 195 (5th Cir. 1981) ....................................................................................21

21

*In re Dun & Bradstreet Credit Services Customer Litig.,*
   130 F.R.D. 366 (S.D. Ohio 1990) .............................................................................25

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3rd Cir. 1995) ...............................................................................34

4

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 57 (S.D.N.Y. 1993) ..........................................................................18

5

*In re NASDAQ Market-Makers Anti-trust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................10

6

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ................................................................................33

7

*In Re S. Ohio Correctional Facility*,
   175 F.R.D. 270 (S.D. Ohio 1997) .......................................................................25

8

*In re Safety Components Int'l, Inc.*,
   166 F. Supp.2d 72 (D.N.J. 2001) ........................................................................28

9

10

*In re Saxon Sec. Litig.*,
   644 F. Supp. 465 (S.D.N.Y. 1985) ......................................................................12

11

*In re Shell Oil Refinery*,
   155 F.R.D. 552 (E.D. La. 1993) ..........................................................................35

12

*In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*,
   886 F. Supp. 445 (E.D. Pa. 1995) .......................................................................32

13

*In re Warner Communications Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*,
   798 F.2d 35 (2d Cir. 1986) ..................................................................................28

14

15

*In re Washington Public Power Supply Systems Securities Litigation*,
   720 F. Supp. 1379 (D. Ariz. 1989) .........................................................10, 27, 34

16

*Ingram v. Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001)....................................................................24, 26

17

18

*Kerr v. Screen Extras Guild, Inc.*,
   526 F.2d 67 (9th Cir. 1975) ................................................................................29

19

*Ketchum v. Moses*,
   24 Cal. 4th 1122 (2001) ......................................................................................35

20

*Kyriazi v. Western Elec. Co.*,
   527 F. Supp. 18 (D.N.J. 1981) ............................................................................25

21

22

*League of Martin v. City of Milwaukee*,
   588 F. Supp. 1004 (E.D. Wis. 1984)....................................................................25

23

*Lealao v. Beneficial Cal., Inc.*,
   82 Cal. App. 4th 19 (2002) .................................................................................32

24

*Linney v. Cellular Alaska P'ship*,
   1997 WL 450064 (N.D. Cal. July 18, 1997).........................................................12

25

*Loring v. City of Scottsdale, Ariz.*,
   721 F.2d 274 (9th Cir. 1983) ..............................................................................29

26

27

*Mangold v. Cal. Pub. Utils. Comm'n*,
   67 F.3d 1470 (9th Cir. 1995) .........................................................................28, 32

28

# TABLE OF AUTHORITIES
### (continued)

*Manners v. American Gen. Life Ins. Co.*,
1999 WL 33581944 (M.D. Tenn., Aug. 11, 1999) ...................................................28

*Marshall v. Holiday Magic, Inc.*,
550 F.2d 1173 (9th Cir. 1977) ...........................................................................8, 10

*Martens v. Smith Barney*,
No. 96 Civ. 3779, 1998 WL 1661385 *4 (S.D.N.Y. July 28, 1998) and 181
F.R.D. 243 (S.D.N.Y. 1998) ................................................................................25

*Mendoza v. United States*,
623 F.2d 1338 (9th Cir. 1980) ..............................................................................6

*Missouri v. Jenkins by Agyei*,
491 U.S. 274 (1989)...........................................................................................31

*Moore v. City of San Jose*,
615 F.2d 1265 (9th Cir. 1980) ..............................................................................7

*Morales v. City of San Rafael*,
96 F.3d 359 (9th Cir. 1996) .................................................................................35

*Muehler v. Land O'Lakes, Inc.*,
617 F. Supp. 1370 (D. Minn. 1985)......................................................................27

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)), *rev'd on other grounds*,
490 U.S. 93 (1989) ...............................................................................................6

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972)..................................................................................9

*Officers for Justice v. Civil Service Comm'n*,
688 F.2d 615 (9th Cir. 1982) ............................................................................7, 8

*Parker v. Anderson*,
667 F.2d 1204, 33 Fed. R. Serv. 2d 963 (5th Cir. 1982) ......................................14

*Paul, Johnson, Alston & Hunt v. Graulty*,
886 F.2d 268 (9th Cir. 1989) .........................................................................28, 33

*PLCM Group, Inc. v. Drexler*,
22 Cal. 4th 1084 (2000) ......................................................................................32

*Reed v. General Motors Corp.*,
703 F.2d 170 (5th Cir. 1983) ..............................................................................13

*Riverside v. Rivera*,
477 U.S. 561 (1986)............................................................................................36

*Roberts v. Texaco Inc.*,
94 Civ. 2015 (CLB) (S.D.N.Y.) ...............................................................21, 25, 26

*Safeco Corp. v. Van Bronkhorst*,
529 F.2d 943 (9th Cir. 1976) ................................................................................7

*Scherrer v. Group Voyagers, Inc.*,
No. C 99-04834 (N.D. Cal. March 8, 2005) ........................................................32

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Serrano v. Priest*,
20 Cal. 3d at 25 (1977)................................................................................32

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990) .......................................................................27

*Sorenson v. Mink*,
239 F.3d 1140 (9th Cir. 2001) .......................................................................27

*State of W. Va. v. Chas. Pfizer & Co.*,
314 F. Supp. 710 (S.D.N.Y. 1970)..................................................................23

*Staton v. Boeing*,
327 F.3d 938 (9th Cir. 2003) ....................................................................24, 26

*Stoetzner v. United States Steel Corp.*,
897 F.2d 115 (3rd Cir. 1990) .........................................................................13

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1994) .............................................................................6

*Van Vranken v. Atlantic Richfield Co.*,
901 F. Supp. 294 (N.D. Cal. 1995) .......................................................25, 26, 32

*Vizcaino v. Microsoft*,
290 F.3d 1043 (9th Cir. 2002) .................................................................28, 33, 35

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982)..............................................................................14

*Wershba v Apple Computer, Inc.*,
91 Cal. App. 4th 224 (2001) ...........................................................................32

*Wise v. Popoff*,
835 F. Supp. 977 (E.D. Mich. 1993)................................................................28

*Women's Comm. For Equal Employment Opportunity v. National Broadcasting Co.*,
76 F.R.D. 173 (S.D.N.Y.1977) ...................................................................25, 26

*Zerkle v. Cleveland-Cliffs Iron Co.*,
52 F.R.D. 151 (S.D. N.Y. 1971) .......................................................................9

## STATUTES

42 U.S.C. § 1981 ..............................................................................................10

42 U.S.C. §2000e ........................................................................................10, 23

California's Fair Employment and Housing Act, Govt. Code
§12940.........................................................................................................10

## RULES

Fed. R. Civ. P.
Rule 23(e)...................................................................................................26
Rule 23(e)(1)(B)...........................................................................................6
Rule 30(b)(6)................................................................................................3

## TABLE OF AUTHORITIES
### (continued)

**Page**

### TREATISES

3 NEWBERG 4TH,
§ 8:32 ..................................................................................................................19

4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002)
§ 11:41 ..................................................................................................................7

4 NEWBERG 4TH,
§ 11:45 ................................................................................................................11
§ 11:49 ................................................................................................................12
§ 11:58 ..........................................................................................................15, 16
§ 12:13 ................................................................................................................23
§ 12:15 ................................................................................................................21

5 Moore's Federal Practice, § 23.83[2] (Matthew Bender 3d ed. 1999) ..................18, 19

8 NEWBERG 4TH,
§ 11.41 ..................................................................................................................9
§ 24:126 ..................................................................................................8, 9, 14, 20
§ 24:127 ..............................................................................................................14
§ 24:129 ..............................................................................................................24

Manual for Complex Litigation, Fourth (2004)
§ 14.121 ........................................................................................................29, 33
§ 14.122 ..............................................................................................................28
§ 21.312 ................................................................................................................6
§ 21.313 ..............................................................................................................19
§ 21.634 ................................................................................................................7
§ 32.465 ..............................................................................................................19

Richard Posner, ECONOMIC ANALYSIS OF LAW (3d ed. 1986)
§ 21.9 ..................................................................................................................34

1

**NOTICE OF MOTION AND PLAINTIFFS' MOTION FOR
ORDER GRANTING FINAL APPROVAL**

2

3    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

4          **NOTICE IS HEREBY GIVEN** that on April 14, 2005, at 4:00 p.m., or as soon

5    thereafter as the matter may be heard in the Courtroom of the Honorable Susan Illston, located at

6    450 Golden Gate Avenue, San Francisco, California, Plaintiffs Eduardo Gonzalez, Anthony

7    Ocampo, Encarnacion Gutierrez, Johan Montoya, Juancarlos Gómez-Montejano, Jennifer Lu,

8    Austin Chu, Ivy Nguyen, Angeline Wu, Eric Fight, Carla Grubb, David Culpepper, Patrice

9    Douglass, Robair Sherrod, Brandy Hawk, Andre Steele, and Elizabeth West will and hereby do

10   move this Court for final approval of the settlement that was preliminarily approved by this Court

11   on November 16, 2004.

12          This motion is based upon this Notice of Motion and Motion and the

13   Memorandum of Points and Authorities in Support thereof; the Declaration of Bill Lann Lee In

14   Support of Order of Final Approval ("Bill Lann Lee Decl."); the Declaration of Gregory M.

15   Gochanour ("Gochanour Decl."), the Declaration of Hunter R. Hughes III ("Hughes Decl."), the

16   other declarations of Plaintiffs' counsel submitted herewith; the other records, pleadings, and

17   papers filed in this action; and upon such other documentary and oral evidence or argument as

18   may be presented to the Court at the hearing of this motion.

19                **MEMORANDUM OF POINTS AND AUTHORITIES**

20   **I.    INTRODUCTION**

21          On November 16, 2004, this Court (1) certified a settlement class; (2) appointed

22   Plaintiffs' counsel as Class Counsel; (3) appointed Plaintiffs as adequate Class Representatives;

23   (4) preliminarily approved the proposed class action settlement at issue; (5) directed distribution

24   to the Class of notice of settlement and opportunity to "opt out" of or object to the settlement; and

25   (6) set a schedule for the final settlement approval process.  Stipulation of Proposed Settlement

26   and Order of Preliminary Approval of Proposed Consent Decree, November 16, 2004

27   ("Preliminary  Approval Order').

28

1    As directed by this Court, notice of the settlement and instructions on how to

2  submit Claim forms for monetary relief and on how to opt out were given by publication in

3  periodicals and internet banner advertisements, and by first class mail to roughly 320,000

4  potential class members.  *See* Claims Administrator's Interim Report to the Court and Point

5  Allocation Recommendation, filed Friday, April 8, 2005 ("Interim Report") at p. 2; Declaration of

6  Wayne Pines, filed Friday, April 8, 2005 ("Pines Decl.") at ¶ 10 (describing "total circulation of

7  all print advertising in the Notice campaign [as] 21,468,694").

8    The proposed Consent Decree[1] resolves all of Plaintiffs' claims against

9  Abercrombie arising out of the facts at issue in this litigation, including injunctive relief,

10  monetary relief, and attorneys' fees and costs.  The Consent Decree satisfies all the criteria for

11  final settlement approval under Ninth Circuit law and falls well within the range of possible

12  approval.

13    To date, the Claims Administrator has received approximately 20,000 claim forms,

14  eight objections to the settlement (two of which were untimely), and 57 opt-outs (one of which

15  was untimely, and five of which were rescinded).  Interim Report at pp. 1-2.  Thus, 0.04% of the

16  claimants objected, and 0.28% of the people submitting Claim forms or opt-out statements opted

17  out (both figures include timely and untimely submissions as well as timely rescissions).  The

18  objections are narrow in scope.  The objectors principally raised issues concerning the fact that

19  the Decree did not encompass disability discrimination, unsupported claims that the monetary

20  relief obtained was insufficient, and concerns about certain general release and other provisions.

21  As explained below, these objections are meritless.

22    Plaintiffs therefore respectfully request that the Court grant final approval to the

23  Consent Decree, putting into effect the parties' settlement of Plaintiffs' claims against Defendants

24  Abercrombie & Fitch Stores, Inc., A&F California, LLC, A&F Ohio, Inc., and Abercrombie &

25  Fitch Management Co. (hereinafter "Abercrombie"), for significant injunctive and monetary

26

27

_____

28  [1] The Consent Decree is attached hereto as Exhibit 1.

1    relief for the benefit of the class of minority and female employees and applicants for

2    employment certified in the Preliminary Approval Order.

3    **II.    PROCEDURAL  BACKGROUND**

4            This litigation consists of three related cases that the court ordered consolidated on

5    November 11, 2004.

6            Plaintiffs filed their first *Gonzalez* complaint on June 16, 2003, alleging that

7    Abercrombie's nationwide employment policies and practices discriminated against minorities

8    with respect to recruitment, hiring, job assignment, managerial promotion, termination, and other

9    terms and conditions of employment in violation of 42 U.S. § 1981 and the California Fair

10   Employment and Housing Act ("FEHA").  The claims of named Plaintiffs paralleled the class

11   allegations.  The complaint was filed four years after the initial administrative charge of

12   discrimination was filed with the U.S. Equal Employment Opportunity Commission ("EEOC")

13   and two years after the EEOC determined that Abercrombie had engaged in classwide

14   discrimination against Latino and African American applicants and employees.

15           This complaint was subsequently amended on August 13, 2003, January 9, 2004,

16   June 10, 2004 and November 8, 2004 to add Title VII claims, managerial discrimination claims,

17   and more named Plaintiffs and Defendants.  Abercrombie answered each complaint, denying all

18   liability.

19           The parties conducted extensive discovery relevant to class certification.  In

20   particular, Plaintiffs' counsel obtained and analyzed 17,000 pages of documents and

21   approximately 74 discs containing computerized data and information.  After the initial round of

22   class discovery of documents, Plaintiffs' Fed. R. Civ. P. Rule 30(b)(6) manager depositions, and

23   Abercrombie's depositions of several named Plaintiffs, the parties commenced mediation while

24   continuing to prepare for class certification.  Plaintiffs' Mediation Brief, submitted April 5, 2004,

25   summarized the discovery Plaintiffs conducted  as well as the expert analyses prepared from the

26   discovery.  (Plaintiffs' Mediation Brief was submitted under seal as an exhibit to the

27   November 12, 2004 Declaration of Bill Lann Lee in Support of Motion for Order Granting

28   Preliminary Approval of the Proposed Consent Decree ("Bill Lann Lee Preliminary Approval

Decl.").)  In addition to formal discovery, Plaintiffs' counsel contacted more than 500 potential class members of witnesses, and prepared over 165 declarations from potential class members and witnesses.  *See* Bill Lann Lee Preliminary Approval, ¶ 12; Bill Lann Lee Decl., ¶ 35.  The declarations and analyses of expert witnesses that Plaintiffs' counsel retained were prepared both for the mediation and for a class certification motion should the mediation fail.

After eight two-day sessions of arm's-length mediation, under the supervision of Mediator Hunter R. Hughes III, Esq., of Atlanta, Georgia, the parties reached agreement to the proposed Consent Decree.

A related class action complaint, the *West* action, was filed at the conclusion of the mediation on November 8, 2004, alleging gender discrimination by Abercrombie in employment policies and practices nationwide.  Although their complaint was filed at the conclusion of the mediation, Plaintiffs' *West* counsel engaged in significant pre-suit activity, including contacting over 70 witnesses, collecting declarations from Class Members and retaining an expert witness to prepare statistical analyses.  *West* counsel also participated fully in the mediation.  *See* November 12, 2004 Declaration of Jack W. Lee In Support of Preliminary Approval of the Proposed Consent Decree.

The EEOC filed its pattern or practice action, *EEOC v. Abercrombie*, alleging both race and gender discrimination by Abercrombie in employment policies and practices nationwide, on November 8, 2004.  Prior to filing, the EEOC conducted an active investigation encompassing administrative charges across the country, interviewing numerous witnesses, performing independent statistical analyses, and  questioning Abercrombie managers and officials.  The EEOC also fully participated in every mediation session.

Under the terms of the proposed Consent Decree, Abercrombie will pay approximately $40 million directly to the Class.[2]  In addition, Abercrombie has agreed to substantial injunctive reforms, including:

---

[2] After subtracting an estimated $154,767 in opt-out credits, an estimated $125,000 in administrative costs beyond imputed interest, and $360,000 in awards for Class Representatives and Charging Parties, in accordance with the Consent Decree, approximately $39,360,233 (or 98.4% of the fund) remains for distribution to the Class Members.  *See* Interim Report at 6.

1.  Benchmarks and goals for hiring and promotion of women, Latinos, African Americans, and Asian Americans, the progress toward which Abercrombie will be required to report at regular intervals;

2.  A prohibition on using participation in fraternities or sororities as a criterion for employment and a prohibition on targeting specific colleges for recruitment purposes;

3.  A new Office and Vice President of Diversity, responsible for reporting to the CEO or COO on Abercrombie's progress toward fair employment practices;

4.  Equal Employment Opportunity (EEO) and Diversity Training for all employees with hiring authority;

5.  Advertising of jobs, revision of position descriptions and employee performance evaluations for managers;

6.  A new internal complaint procedure;

7.  The hiring of 25 recruiters to recruit and hire female and minority employees, and a requirement for Abercrombie to advertise employment opportunities in media that target minorities of both genders;

8.  Abercrombie marketing materials will reflect diversity by including members of minority racial and ethnic groups;

9.  Regular reporting and an annual Court hearing to review progress; and

10. A Monitor and a Special Master to oversee compliance.

The term of the decree is six years unless the Court relieves Abercrombie of the provisions of the Decree after four and a half years.

### III.   ADEQUATE NOTICE WAS GIVEN TO THE CLASS OF THE PROPOSED CONSENT DECREE AND THE OPPORTUNITY TO OPT OUT.

#### A.   Legal Standard

In the Ninth Circuit, "[t]he due process clause requires that notice be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action

1   and afford them an opportunity to present their objections.'" *In re Cement and Concrete Antitrust*

2   *Litigation*, 817 F.2d 1435, 1440 (9th Cir. 1987) (quoting *Mullane v. Central Hanover Bank &*

3   *Trust Co.*, 339 U.S. 306 (1950)), *rev'd on other grounds*, 490 U.S. 93 (1989).

4
> This standard does not mean that the notice must recite the
> language of every provision of a proposed settlement agreement.
5   > Notice is satisfactory if it "generally describes the terms of the
> settlement in sufficient detail to alert those with adverse viewpoints
6   > to investigate and to come forward and be heard."

7   *Id.* (*Mendoza v. United States*, 623 F.2d 1338, 1352 (9th Cir. 1980)); *Torrisi v. Tucson Elec.*

8   *Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1994).  Likewise, according to the Manual for Complex

9   Litigation, Fourth (2004) ("MCL 4th"), the Court must "'direct notice in a reasonable manner to

10   all class members who would be bound by a proposed settlement, voluntary dismissal, or

11   compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)."

12   *Id.* at § 21.312, p. 293 (quoting Fed. R. Civ. P. 23(e)(1)(B)).

13          Rule 23 requires that the notice provide certain minimal information:

14
> The notice should announce the terms of a proposed settlement and
> state that, if approved, it will bind all class members.  If the class
15   > has been certified only for settlement purposes, that fact should be
> disclosed.  Even though a settlement is proposed, the notice should
16   > outline the original claims, relief sought, and defenses so class
> members can make an informed decision about whether to opt out.
17

18   *Id.* at p. 294.

19          **B.      Adequate Notice Was Given**

20          Pursuant to the Court's Preliminary Approval Order, Claims Administrator

21   Settlement Services, Inc. ("SSI") sent by first class mail approximately 320,000 notices of class

22   settlement, claim forms and explanation claims procedure on or before January 18, 2005 to all

23   known potential Class Members.  *See* Declaration of Mark Patton (filed on April 8, 2005), ¶ 9; *id.*

24   at ¶ 4 (describing database of 171,309 employees and former employees received from defense

25   counsel); Declaration of Ron Barton (filed on April 11, 2005), ¶¶ 2-4 (describing same, compiled

26   by Abercrombie Senior Systems Engineer and sent to defense counsel).  This population included

27   thousands of Class Members as well as thousands of individuals fitting the demographic profile

28   of the Class who were not Class Members.

1    In addition, the Court's Preliminary Approval Order required that Abercrombie

2    publish by January 18, 2005 a legal notice of class settlement, the form of which the Court

3    previously approved, in internet banner ads and the following periodicals:  *People*, *Teen People*,

4    *Cosmopolitan*, *Glamour*, *Parents*, *Vibe*, *Ebony*, *People en Español*, and *Maxim en Español*.

5    Defendant Abercrombie timely published legal notice of class settlement.  *See* Wayne Pines

6    Decl., ¶¶ 9-10.  Furthermore, both the filing and the settlement of the case generated significant

7    nationwide media coverage.

8    Adequate notice was given.  As a result of the notice provided, approximately

9    20,000 Class Members have filed claim forms, 57 opted out, and eight submitted objections.

10   **IV.    THE PROPOSED CONSENT DECREE SATISFIES THE REQUIREMENTS FOR**
     **FINAL APPROVAL BECAUSE IT IS FAIR, REASONABLE, AND ADEQUATE.**

11   "The compromise of complex litigation is encouraged by the courts and favored by

12   public policy."  4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS (4th ed.

13   2002) ("NEWBERG 4TH"), § 11:41, p. 87 (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 88

14   n.14 (1981) (Title VII employment) ("In enacting Title VII, Congress expressed a strong

15   preference for encouraging voluntary settlement of employment discrimination claims.")); *Ellis v.*

16   *Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("[C]ooperation and voluntary

17   compliance are the preferred means for achieving the statutory goals of Title VII."); *Churchill*

18   *Village, L.L.C. v. General Elec.*, 361 F.3d 566, 576 (9th Cir. 2004) (quoting *Class Plaintiffs v.*

19   *City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil Service Comm'n*,

20   688 F.2d 615, 625 (9th Cir. 1982); *Safeco Corp. v. Van Bronkhorst*, 529 F.2d 943, 950 (9th Cir.

21   1976).

22   The Ninth Circuit has held that a class action settlement should be approved if the

23   settlement is fair, reasonable, and adequate.  *See Class Plaintiffs*, 955 F.2d at 1276; MCL 4th,

24   § 21.634, p. 322 ("At the fairness hearing, the proponents of the settlement must show that the

25   proposed settlement is "'fair, reasonable, and adequate.'" ); 4 NEWBERG 4TH, § 11:41, p. 87;

26   *Moore v. City of San Jose*, 615 F.2d 1265, 1271 (9th Cir. 1980) ("The sole question before the

27   district court in reviewing a settlement agreement is whether the agreement is fundamentally fair

28

1    or just.").

2            Trial courts are entrusted with broad discretion in determining whether a proposed

3    settlement is fair, reasonable, and adequate, and will only be reversed for a clear abuse of

4    discretion.  *Class Plaintiffs*, 955 F.2d at 1276; *Officers for Justice*, 688 F.2d at 626; *Marshall v.*

5    *Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); 8 NEWBERG 4TH, § 24:126, p. 493-94

6    ("When appealed, a court-approved settlement rarely will be overturned.  The abuse of discretion

7    standard leaves much room for judicial discretion."); *Churchill*, 361 F.3d at 575.  Furthermore,

8    courts should give "proper deference to the private consensual decision of the parties," since "the

9    court's intrusion upon what is otherwise a private consensual agreement negotiated between the

10   parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the

11   agreement is not the product of fraud or overreaching by, or collusion between, the negotiating

12   parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."

13   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988).

14           The Ninth Circuit has provided a nonexhaustive list of factors to guide courts'

15   discretion:

16           the strength of plaintiffs' case; the risk, expense, complexity, and
             likely duration of further litigation; the risk of maintaining class
17           action status throughout the trial; the amount offered in settlement;
             the extent of discovery completed, and the stage of the proceedings;
18           the experience and views of counsel; the presence of a
             governmental partic ipant; and the reaction of the class members to
19           the proposed settlement.

20   *Officers for Justice,* 688 F.2d at 625 (internal citations omitted).

21           Newberg provides similar guidance.

22           In making a determination of whether an employment
             discrimination class action settlement is fair and reasonable and to
23           safeguard properly the interests of absent class members, the
             district court should evaluate:  (1) the probable outcome of the
24           litigation; (2) the recommendation and experience of counsel;

25

26           (3) the amount and nature of discovery; (4) the future expense and
             duration of litigation; and (5) the number of objectors, and the
27           substance of the objections.

28   8 NEWBERG 4TH, § 24:126, pp. 492-93.  "Basically, the court should weigh the rewards the class

could secure from the settlement against the probable costs and results of continued litigation as well as consider the public policy aspects of Title VII." *Id.* at 493. Newberg also advises that "arm's-length bargaining" is relevant to the fairness and reasonableness of the settlement. *Id.*, § 11.41, p. 90.

Here, these factors support a finding that the Consent Decree is fair, adequate, and reasonable. First, the strength of Plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation, and the risk of maintaining class action status throughout the trial, compared to the amount offered in settlement, all support approval. Second, the discovery completed and the stage of the proceedings support the settlement because the parties have adduced sufficient evidence to provide a reliable basis for assessing the relative strength of their positions. Third, Plaintiffs' counsel's and the EEOC's recommendation support final approval of the Consent Decree because counsel and the EEOC are experienced in this type of complex employment discrimination class action litigation. Fourth, the enthusiastic reaction of Class Members and the tiny number of objections support final approval. Fifth, because the settlement is the result of extensive, arm's-length negotiations spanning six months, the Consent Decree should be granted final approval.

## A. The Consent Decree Provides Exceptional Injunctive And Monetary Relief for the Class.

The determination of a "reasonable" settlement is not susceptible of a mathematical equation yielding a particular sum. Rather, "in any case, there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). *See also Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D. N.Y. 1971); *Glicken v. Bratford*, 35 F.R.D. 144, 152 (S.D.N.Y. 1964). Here, the proposed Consent Decree is reasonable in part because it offers substantial concrete benefits to Class Members that they would otherwise be unlikely to achieve. In particular, the injunctive relief is robust, possibly exceeding what might be attainable through complete litigation of the claims. The injunctive relief obtained in the proposed Decrees substantially complies with the ambitious outline of relief Plaintiffs initially proposed at the beginning of mediation. *See* Plaintiffs' Mediation Brief, Exhibit A. Furthermore,

1  the monetary relief of $40 million is approximately 59% of the $69 million Plaintiffs sought in

2  mediation ($73 million less $4 million of 1998 pre-class period losses).  *See* Plaintiffs' Mediation

3  Brief, Table D.

4          Specifically, the injunctive relief, as noted above, provides for monitoring for six

5  years;[3] hiring benchmarks and goals; a ban on recruiting from fraternities, sororities, or specific

6  colleges for recruitment purposes; a new Office and Vice President of Diversity; EEO and

7  diversity training for all employees with hiring authority; advertising of vacancies and revision of

8  job descriptions and manager performance evaluations; a new internal complaint procedure; the

9  hiring of 25 recruiters to recruit and hire female and minority employees, and targeted advertising

10 to minorities; a requirement that marketing materials will reflect diversity; regular reporting and

11 an annual Court hearing and appointment of a Monitor and a Special Master.

12          **B.      This Litigation Involved Substantial Potential Risks.**

13          The complexity, expense, and likely duration of the litigation are also relevant.

14 *Marshall*, 550 F.2d at 1173, 1178; *In re NASDAQ Market-Makers Anti-trust Litig.*, 187 F.R.D.

15 465 (S.D.N.Y. 1998); *In re Washington Public Power Supply Systems Securities Litigation*, 720

16 F. Supp. 1379, 1387 (D. Ariz. 1989).

17          The factual and legal issues in this action are complex.  The trial of Plaintiffs'

18 claims under Title VII of the Civil Rights Act, 42 U.S.C. §2000e, under 42 U.S.C. § 1981, and

19 under California's Fair Employment and Housing Act, Govt. Code §12940 *et seq.* — claims that

20 involve potentially tens of thousands of Class Members and which arose in hundreds of stores

21 nationwide over a period of more than five years — would require substantial preparation and

22 ultimately the presentation of a large number of witnesses.

23 ───────────────────

[3] In contrast, recent comparable consent decrees in major employment discrimination cases have
24 had shorter terms.  (Copies of several such decrees and related documents are attached to the Bill
Lann Lee Decl., ¶¶ 20-34, Exs. H-V (hereinafter referred to, respectively, as *Boeing* consent
25 decree; *Coca-Cola* consent decree; *Fleetwood* consent decree; *Group Voyagers* consent decree;
*Home Depot* consent decree; *Ingles* consent decree; *Mitsubishi* consent decree; *Publix* consent
26 decree; *Rent-a-Center* consent decree; *Shoney's* consent decree; *Texaco* consent decree; *United*
consent decree; *United* notice).)  *See, e.g.*, *Mitsubishi* consent decree at ¶ 14 (3-year term);
27 *Boeing* consent decree at 12 (minimum 3-year term); *Coca-Cola* consent decree at 46 (4-year
term); *Fleetwood* consent decree at 2 (4-year term); *Rent-a-Center* consent decree at 7-8 (4-year
28 term, with possible 1-year extension).

1          Of particular relevance to the reasonableness of the proposed Consent Decree is

2   the fact that Defendant has available legal and factual grounds for defending this action, including

3   whether common questions exist justifying class action treatment of Abercrombie's three

4   divisions extending to over 700 stores; whether special qualifications and interest limit the pool of

5   minority or women applicants; whether Class Members applied for Abercrombie's relatively low-

6   paying, part-time sales associate jobs; the extent of alleged in-store segregation; difficulty of

7   assessing damages in light of the ease of mitigating harm to applicants for jobs paying slightly

8   above minimum wage; and whether emotional distress damages are available on a classwide

9   basis.  Thus, Plaintiffs and the Class could recover no compensation for emotional distress

10  damages or for backpay and/or they could win only limited or no injunctive relief.  By the same

11  token, Abercrombie faces the potential for a substantial jury verdict.  Between these two disparate

12  extremes is a more reasonable outcome, which is this settlement.

13          Furthermore, final resolution of the case through complete litigation could easily

14  take another few years.  The parties would be unlikely to be ready for trial before until 2006.

15  Even if trial were to occur then, the delay of appeals could postpone final resolution until 2008 or

16  later.  By settling now, Plaintiffs and the Class are able to secure compensation and injunctive

17  relief immediately, and Abercrombie is able to achieve finality.

18          The proposed Consent Decree will yield a certain, substantial, and prompt

19  recovery for the class both in monetary relief and reform of Abercrombie's employment policies

20  and practices.  Such a result will benefit the parties and the court system.

21      C.      **The Discovery Completed and the Stage of Proceedings Support Final**
22              **Approval.**

23          Plaintiffs presented substantial evidence to support the fairness, reasonableness,

24  and adequacy of the settlement, though such evidence is not necessary for final approval.

25  4 NEWBERG 4TH, § 11:45, p. 127 (noting that in the context of a class action settlement, "[i]t is

26  clear that the court need not possess evidence to decide the merits of the issue, because the

27  compromise is proposed in order to avoid further litigation").

28          As noted above, the results of Plaintiffs' classwide discovery and expert analyses

1    are summarized in the Bill Lann Lee Preliminary Approval Decl. and Plaintiffs' Mediation Brief.

2    Class Counsel and Abercrombie reviewed the extensive evidence carefully during the litigation

3    and settlement negotiations to assess the strengths and weaknesses of their respective cases.  They

4    were therefore well prepared to reliably gauge the reasonableness of the Consent Decree.  Their

5    judgment of the appropriateness of the monetary compensation and the sufficiency, completeness,

6    and feasibility of the injunctive relief was well-founded.

7          Thus, Plaintiffs' counsel negotiated the Consent Decree with ample knowledge of

8    the strengths and weaknesses of their case.

9          **D.**     **The Experience and Views of Class Counsel, the EEOC, and Mediator**
                **Support the Proposed Consent Decree.**
10

11         In appraising the fairness of a proposed settlement, the view of experienced

12   counsel favoring the settlement is "entitled to considerable weight."  *In re Saxon Sec. Litig.*, 644

13   F. Supp. 465 (S.D.N.Y. 1985); *Boyd v. Bechtel Corp.*, 485 F. Supp. 622 (N.D. Cal. 1979); *Linney*

14   *v. Cellular Alaska P'ship*, 1997 WL 450064 , at *5 (N.D. Cal. July 18, 1997); *Ellis,* 87 F.R.D. at

15   15, 18.

16         Class Counsel are highly experienced in class action litigation generally, and

17   specifically in employment discrimination class actions.  *See* Bill Lann Lee Preliminary Approval

18   Decl., ¶ 4; Declaration of Thomas A. Saenz ("Saenz Decl."), ¶¶ 4-7; Declaration of Martin

19   D'Urso ("D'Urso Decl."), ¶¶ 4-6; Declaration of Jack W. Lee.  It is their considered opinion that

20   the proposed Consent Decree achieves the best result possible for Class Members under the

21   circumstances.  Some of the Class Counsel have been prosecuting this case for roughly six years,

22   and are intimately familiar with the strengths and risks involved in the case.  Likewise, the EEOC

23   has been involved in the investigation of the claims raised in this case for almost six years as well

24   and recommends this Consent Decree.

25         The EEOC's enthusiastic participation in the settlement supports approval.

26   4 NEWBERG 4TH, § 11:49, p. 154 (noting that "the court may ask for the agency's opinion of the

27   fairness and adequacy of the settlement").  *See* Declaration of Gregory M. Gochanour

28   ("Gochanour Decl.") (supporting the Consent decree as "fair, reasonable, and adequate relief for

the Class," and opining that "the result is a just one").

Mediator Hunter Hughes, himself an experienced employment discrimination litigator and mediator, has submitted a declaration attesting to the fairness, adequacy, and reasonableness of the proposed Consent Decree. *See* Hughes Decl.

**E.      The Reaction of Class Members Supports the Proposed Settlement**

All 16 Class Representatives support final approval.  Class Members were given reasonable notice of the settlement terms and had the opportunity to object and/or opt out, in compliance with Rule 23(e)(4)(A) and the Court's Preliminary Approval Order.

The overwhelmingly positive response of potential class members supports the conclusion that the proposed settlement is fair, adequate, and reasonable.  Approximately 20,000 individuals in a largely transient, college-age population submitted Claim forms.  Including untimely submissions and excluding rescissions, 63 individuals, or 0.31% of the total, submitted opt-out statements or objections.  Thus, roughly 99.69% of the response supported the Decree by seeking relief under its terms.

It would be "extremely unusual" if no objections were submitted.  *See In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707, 712-13 (M.D. Pa. 1978), *aff'd in part*, 612 F.2d 576 (3rd Cir. 1979).  Hence, for example, in *Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118-19 (3rd Cir. 1990), the Third Circuit held that the fact that "only" 29 members of a 281-member class (10%) had objected "strongly favor[ed] settlement."  *See also Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (that only 16% of the class objected was persuasive of the adequacy of the settlement); *County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1428, 1437 (E.D.N.Y. 1989) ("[O]pposition to a class settlement--even by a majority of the class — is not a bar to court approval if the settlement is fair," citing *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987)).

Objections by several class members or even by a substantial percentage of class members do not prevent the Court from granting final approval.  *See Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983) (affirming district court's approval of proposed class settlement, despite objections by 23 of 27 named plaintiffs and nearly 40% of the class); *Huguley*

1   *v. General Motors Corp.*, 128 F.R.D. 81 (E.D. Mich. 1989), *aff'd*, 925 F.2d 1464 (6th Cir. 1991),

2   *and aff'd*, 999 F.2d 142 (6th Cir. 1993) (approving settlement over objections of approximately

3   15% of the class); *Parker v. Anderson*, 667 F.2d 1204, 33 Fed. R. Serv. 2d 963 (5th Cir. 1982)

4   (affirming approval of settlement over class member and plaintiff objections); 8 NEWBERG 4TH, §

5   24:127, p. 501 ("Before approving a consent decree, the court may make adjustments for

6   objections raised, unless the settlement is found to be fair and reasonable in spite of the raised

7   objections.").

8              F.        **The Settlement Is a Product of Extensive, Arm's-Length Negotiations.**

9              Where a settlement is reached through arm's-length negotiations, in the absence of

10  fraud or collusion, the Court should be hesitant to substitute its own judgment for that of counsel.

11  "A presumption exists in favor of a settlement when there has been arm's-length bargaining and

12  no objections by the parties, and when both counsel are able to evaluate reasonably their chances

13  for success if the case were to proceed to trial." 8 NEWBERG 4TH, § 24:126, p. 493 (citing

14  *Guardians Ass'n of New York City Police Dept. v. Civil Service Commission of City of New York*,

15  527 F. Supp. 751 (S.D.N.Y. 1981)); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979)

16  (Orrick, J.) ((approving settlement of employment discrimination case negotiated by experienced

17  counsel after significant discovery, despite finding that it provided very modest relief to the

18  class); *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

19             The Consent Decree is the result of vigorous, extended arm's-length negotiations

20  spanning half a year of structured mediation. The negotiations between Plaintiffs' counsel, the

21  EEOC, and counsel for Abercrombie were conducted under the supervision of experienced

22  mediator Hunter Hughes. *See* Hughes Decl., ¶¶ 8-10; Gochanour Decl., ¶ 6. The parties

23  submitted mediation briefs, declarations, expert statistical reports, damages estimates and legal

24  authorities to Mr. Hughes prior to the first mediation session on April 13-14, 2004, and thereafter

25  as well. The negotiations were often heated and protracted. The settlement discussions involved

26  eight two-day mediation sessions and numerous additional telephone discussions and drafting

27  sessions. Bill Lann Lee Preliminary Approval Decl., ¶ 31. Extensive, good-faith settlement

28  discussions between the parties continued outside of mediation sessions. The parties exchanged

1   numerous settlement drafts until the day the Consent Decree was signed on November 8, 2004.

2   *See* Bill Lann Lee Preliminary Approval Decl., ¶ 29.  Moreover, the Court was involved in

3   regulating the mediation schedule, extending several times the Court's deadlines.

4          The EEOC's participation in the negotiations weighs in favor of finding a class

5   settlement fundamentally fair, adequate, and reasonable.  *Hanlon*, 150 F.3d at 1026.  Here, the

6   government entity specifically charged with enforcing Title VII for private employees like

7   Abercrombie, is a signatory to the proposed Decree.

8          The intensive efforts of Plaintiffs' counsel, the EEOC, and Defendant's counsel to

9   resolve this case have resulted in a fair and comprehensive settlement that provides significant

10  injunctive and monetary relief for the class members.

11  **V.**      **THE OBJECTIONS ARE WITHOUT MERIT.**

12         Only eight objections were filed by Class Members, including two that were

13  received late.  We discuss each of the objections in turn, but note initially that most of the

14  objections are conclusory.  "General objections without factual or legal substantiation carry little

15  weight."  4 NEWBERG 4TH, § 11:58.

16  **A.**      **Objections of Three Minority Class Members with Disabilities.**

17         Three minority Class Members with disabilities objected to the proposed Decree

18  because the Decree does not address disability discrimination.  *See* Objections of Esteban Diaz,

19  Tony Gómez, and Maria I. Hernandez (included in Interim Report).  Those objections stated that

20  they would make claim forms for monetary relief as minority Class Members, but that they would

21  continue to pursue their EEOC charges raising disability discrimination against Abercrombie.

22         The instant cases concern discrimination on the basis of race, national origin or

23  gender.  Neither the three related complaints, the underlying administrative charges of named

24  Plaintiffs, nor the proposed Decree address claims of discrimination on the basis of disability.

25  Nor does the Decree bar these or other individuals from pursuing disability claims against

26  Abercrombie in subsequent proceedings.  The release provision for Class Members is limited to

27  claims of "alleged race, color, national origin or gender discrimination."  Consent Decree,

28  XVIII.A.

These objections do not warrant any action by the Court because, as these objectors themselves admit, they can continue asserting their disability claims notwithstanding the proposed Decree.

**B.     Late Objections of Amani J. King and Efe Agindotan.**

Amani J. King filed a late objection (received by the Claims Administrator on March 10, 2005) to the $40 million monetary relief as not sufficient without any supporting data. Efe Agindotan filed a late objection (received by the Claims Administrator on March 22, 2005) "claiming the amount of $250,000.00 USD."

"Inadequacy of the fund may be attacked on the basis that the circumstances indicate that the plaintiff's likelihood of recovery is greater than suggested by the proponents, or that the potential recovery of damages has been undervalued and therefore underestimated." 4 NEWBERG 4TH, § 11:58; *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380 (S.D.N.Y. 1972), *aff'd in part, rev'd in part on other grounds*, 495 F.2d 448 (antitrust) (approving settlement that represented 3.2 to 3.8% of possible damages).

In this case, King offers no factual support for his claim that the settlement is insufficient.  In fact, as noted above, the $40 million in monetary relief Plaintiffs ultimately obtained is approximately three-fifths of Plaintiffs' initial estimate of loss, in spite of Defendants' substantial defenses.  Similarly, Agindotan offers no factual support for his personal claim of entitlement to a quarter of a million dollars, nor did he opt out to bring his own claim.

**C.     Objection of Elizabeth Guleke.**

Objector Elizabeth Guleke, represented by her father James O. Guleke II, filed a motion to dismiss for lack of personal jurisdiction (because she is a Texas resident) and a request for exclusion, as well as objecting to the proposed Decree.  Plaintiffs treat the motion to dismiss and request for exclusion as an opt-out notice.

Guleke objects to the "binding" effect upon her of the injunctive relief, questions whether Class Members obtain any "real" benefit from the Decree, objects to disclosing private information during the implementation of the Decree, and argues that the appointment of Mediator Hunter Hughes as Special Master is inappropriate.  First, the binding effect of the

1  Decree's reforms to Abercrombie's employment system result from Rule 23(b)(2), not the

2  Decree.  In any event, the binding effect is largely theoretical for a former employee such as

3  Guleke.  Second, Plaintiffs submit that the Decree's benefits are not only real but also substantial.

4  Moreover, Guleke has no standing to object because she has not submitted a claim form and has

5  excluded herself from the monetary relief.  Third, there is no evidence at all of abuse of Class

6  Members' privacy interests by the Claims Administrator SSI, and, again, Guleke has no standing

7  to raise issues concerning the claims procedure.

8        Fourth, Guleke's opposition to the parties' proposal that the Court appoint

9  Mr. Hughes as Special Master for implementation of the Consent Decree is meritless.  She argues

10  that a mediator should not disclose mediation communications to a Special Master "appointed to

11  resolve all disputes arising under the Decree."  Guleke's position stems from a misreading of the

12  Decree and a misconception of the legal principles governing consent decree implementation.

13  She is wrong that the Special Master will resolve all disputes; Section X.B. makes clear that the

14  Court itself is the ultimate arbiter of disputes under the Decree.  Furthermore, the parties' joint

15  proposal of Mr. Hughes as Special Master waives any objections in view of the advantages of his

16  knowledge and experience.  Again, neither party nor the EEOC objects to the fact that Mr.

17  Hughes's fee will be paid by Abercrombie.  Nor is there any basis for analogizing Mr. Hughes'

18  prior service as the parties' neutral mediator to serving as a lawyer for a party.  In short, there is

19  neither a conflict of interest nor any appearance of impropriety.

20        **D.**    **The Objection of Rachel Potter.**

21        Rachel Potter (a.k.a. "Rachel Lee Hoop")[4] and Leigh Foster, represented by some

22  of the same counsel, submitted substantially overlapping objections on March 7, 2005, each of

23  which is less than four pages, addressing a series of perceived shortcomings of the Consent

24  Decree in one or two paragraphs.[5]  The objections were conclusory and cited no legal authority.

25  _____

26  [4] *See* Bill Lann Lee Decl., ¶ 17, Ex. F (attaching Claim form of Rachel Lee Hoop (which lists "Rachel Lee Potter" as a former name)).

27  [5] By agreement of the parties, Foster's counsel has withdrawn her objection subject to the Court's approval in exchange for the written assurance of Plaintiffs' Counsel to provide notice and an opportunity to comment upon any proposed modification of the Decree and to have the comments

28  brought to the attention of the Special Master and the Court, as well as Plaintiffs' Counsels'

425190.1                                    - 17 -

The lone objection with merit is the discovery of a self-described "typographical" error, in which the letter "D" should be changed to "C."  (The parties have agreed to make this change, subject to the Court's approval.)[6]

### 1.     The Proposed Consent Decree Is Sufficiently Clear.

Potter objects that the Decree "is simply inadequate," arguing that the 60-page Consent Decree and the Notice "do not state how much money the class member is to potentially receive."  Potter Objection, at 2.  Potter also asserts that the Allocation Plan is "vague and unclear," Potter Objection, at 3, but specifies no particular phrase that is vague or unclear and suggests no improvements to the Consent Decree.  Potter's counsel could have easily called Class Counsel, Abercrombie's counsel, the EEOC, or the Claims Administrator to better understand the Consent Decree.  Her counsel did not.[7]  *See* Interrogatory Responses of Rachel Potter, pp. 10-11 (answering only "None" or that "I spoke with my attorney" in response to interrogatories regarding the effort she made to understand allocation to her or to the class members generally under the Decree).  Thousands of other Class Members chose the straightforward route of calling for information.  *See* Interim Report at 2-3 (summarizing over 5,000 instances of people contacting Claims Administrator for information).

Notice need only provide "general" information about a settlement.  *See, e.g., Mendoza v. United States,* 623 F.2d 1338, 1352 (9th Cir. 1980) ("very general description of the proposed settlement" satisfies standards); *In re Michael Milken & Assocs. Sec. Litig.,* 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (Class notice "need only describe the terms of the settlement generally.").)  "It is not necessary to include all of the details of the settlement, but only to 'fairly apprise' class members of the terms of the settlement."  5 Moore's Federal Practice, § 23.83[2]

---

payment of $15,000 in attorneys' fees.  *See* Motion For Order Approving Withdrawal of Objection Submitted By Leigh Foster, filed on April 11, 2005.

[6] Potter also complains, without factual support, that the negotiated attorneys' fees are "excessive" and should "better correspond to the actual value" conferred, without specifying what a more appropriate fee would be.  Potter Objection, at 5.  This objection is addressed above.

[7] Potter also complains that Exhibit C was not posted on the Claims Administrator's website.  It was available from Counsel, the Clerk's Office and the Claims Administrator, but her counsel chose not to request it.  *See* Interrogatory Responses of Rachel Potter, p. 10 (Bill Lann Lee Decl., ¶ 18, Ex. G).

1  (Matthew Bender 3d ed. 1999) (quoting *Gottlieb v. Wiles*, 11 F.3d 1004, 1013 (10th Cir. 1993)

2  (settlement notice was not deficient simply because it failed to specify exact formula to be used in

3  calculating amounts to be awarded to individual class members)).  "[F]requently, . . . settlements

4  provide only the basic principles for determining [class member] awards, contemplating further

5  proceedings to ascertain the factual matters on which the awards depend."  MCL 4th, § 32.465, p.

6  597; 3 NEWBERG 4TH, § 8:32, at p. 265 ("It is unnecessary for the settlement distribution formula

7  to specify precisely the amount that each individual class member may expect to recover.").

8  "Often, . . . the details of allocation and distribution are not established until after the settlement is

9  approved."  MCL 4th, § 21.313, pp. 295-96.  Here, the Notice approved by the Court explained

10  the settlement process and monetary relief factors in significant detail.[8]

11        Usually, it is impossible for an individual class member to determine their

12  individual recovery (or even the average recovery) *ex ante*, because the number of claimants is

13  unknowable *ex ante.  See, e.g.*, *United* notice, p. 2 (explaining allocation as dependent on future

14  individualized fact determinations); *Mitsubishi* consent decree, ¶ 24 (explaining discretionary

15  allocation based on EEOC's case-by-case determination of each claim's value, based on five

16  factors); *Rent-a-Center* consent decree, p. 15 (providing individual monetary recovery contingent

17  on number of claimants and attorneys' fees and costs to be taken out of fund); *Boeing* consent

18  decree, p. 18, 21-23 (same).

19        The proposed Decree is not vague.  In addition to providing the total class

20  recovery, the proposed Decree provided the specific factors that would be used to evaluate

21  claims.  These factors are:  "length of service with Abercrombie; discrimination claims based on

22  race, national origin or gender in promotion, assignment, hire or termination; any personal injury,

23  such as emotional distress, suffered as a result of the discrimination; and any time or effort

24  devoted to the litigation."  Consent Decree at 56.  (Potter's counsel does not appear to have read

25  the Decree with a great amount of care, erroneously claiming that Plaintiffs' fees and costs total

26  ─────────────────

27  [8] Potter's objection also lacks sufficient support because she failed to "specify what amount
    would fairly, adequately, and reasonably settle [her] monetary claims," or to "state on what
    grounds [s]he deserves a larger share of the settlement funds."  *Ellis v. Naval Air Rework Facility*,

28  87 F.R.D. 15, 20 (N.D. Cal. 1980).

1   $40 million.  Potter Objection, at p. 4 n.1.)

2      **2.**  **The Court Retains Jurisdiction Over the Parties And Has Sole Authority To Modify the Terms of the Consent Decree.**

3

4     Potter misreads the Consent Decree to permit the parties to unilaterally modify the 60-page proposal and then objects to its own misreading.

5

6     First, Potter misconstrues Section VI.B., asserting that it allows the parties to

7   collusively abort the Consent decree's term without Court approval, after payment of all

8   attorneys' fees, Potter Objection, at 3, reading the first sentence in isolation.  However, "[u]nless

9   and until the court issues an order granting the motion to be relieved, all provisions of the Decree

10   shall remain in full force and effect."  Section VI.B., at p. 9.

11     Second, Potter similarly argues that Section IX.B.2. allows the parties to modify

12   the Consent decree without Court approval.  Potter Objection, at 3-4.  This ignores the remainder

13   of the paragraph, which makes clear that Court approval is required to effectuate a modification.

14     More importantly, a consent decree is an *order* of the court.  Only the court may

15   amend its own order.  Decrees and commentators references to the parties' ability to modify a

16   decree impliedly assume that such modifications require court approval.  *See, e.g.*, 8 NEWBERG

17   4TH, § 24:126, p. 494 ("Consent decrees that are approved as part of a class settlement may be

18   modified based on the experience of the parties implementing the decree.") (citing *Alaniz v.*

19   *California Processors, Inc.*, 73 F.R.D. 269 (N.D. Cal. 1976) (Title VII employment class action)

20   (approving certain modifications in consent decree agreed upon by the parties).

21     In fact, this Court approved a Consent Decree that contained almost identical

22   language in *Butler v. Home Depot*, Case Nos. C-94-4335 SI, C-95-2182 SI (N.D. Cal.) ("Class

23   Counsel and Home Depot may jointly agree to modify the Decree. . . .").  *See* Bill Lann Lee

24   Decl., ¶¶ 24-25, Exs. L-M (attaching consent decree and subsequent order in which the Court

25   modified two aspects of that Consent Decree in response to the parties' stipulated proposed

26   order).  Similar modification language has been used in other employment discrimination consent

27   decrees.  *See, e.g.*, *Boeing* consent decree at 63 (allowing the parties to "negotiate in good faith

28   over modifications that will ensure that the objectives of this Decree may be achieved"); *Publix*

consent decree at 30 (providing that class counsel, the EEOC, and the defendant "may jointly agree to modify the Decree"); *Ingles* consent decree at 14 (same, without EEOC).

### 3. The Release Is Narrow, Protecting Class Members' Rights To the Maximum Extent Feasible.

Potter next asserts that the release is "far too broad," Potter Objection, at 4, without specifying how the release is overbroad, by, for example, pointing to specific types of claims (whether hers or hypothetical) that might be released. In actuality, the release is narrow. Here, the release is limited to claims arising out of conduct during the liability period alleging discrimination by race, color, national origin, and/or gender in employment. Section VIII.A., at pp. 10-11. It explicitly excludes harassment claims. It does not release disability discrimination, age discrimination, minimum wage, or overtime claims, for example. (In contrast, the named Plaintiffs' release is broader.)

Class action settlements commonly release "any and all related civil claims the plaintiffs had against the settling defendant[] based on the same facts." *In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981). The release "may refer to all claims, both potential and actual, that may have been raised in the pending action with respect to the matter in controversy." 4 NEWBERG 4TH, § 12:15, pp. 310-11; *id.* at 312 & 312 n.6 (noting that it is typical for the judgment to embrace "the claims that were asserted or that may arise out of the transactions or events pleaded in the complaint").

Comparable major employment discrimination settlements have often included much broader releases than those here. *See, e.g.*, *Roberts v. Texaco Inc.*, 94 Civ. 2015 at 5 (CLB) (S.D.N.Y.) (releasing age, disability, gender, and religion discrimination claims in racial discrimination class action); *Coca-Cola* consent decree at 31 n.10 (releasing "all employment claims" including workers' compensation, age, disability, gender, and religion discrimination, libel, slander, assault and invasion of privacy).

### 4. Plaintiffs Agree that the Single-Letter Typographical Error Should Be Corrected.

Potter points out a typographical error in Section VIII.C. Potter Objection, at 4.

1   The last sentence begins, "This Section VIII.D."  Because the sentence is within Section VIII.C.,

2   the letter "D" should be changed to "C."[9]  As described in the Motion For Order Approving

3   Withdrawal of Objection Submitted By Leigh Foster, filed on April 11, 2005, this change has

4   already been addressed through the discussions between Class Counsel and Objector Foster's

5   counsel.

### 5. The Monitoring Mechanisms Are Adequate.

7          Potter argues that the monitoring mechanisms are inadequate for failing to award

8   attorneys' fees to successful challenges, asserting that the fixed payment to Class Counsel for

9   such future challenges is an insufficient incentive for Class Counsel to uphold their duty.  Potter

10   Objection, at 4-5.  This criticism is meritless.

11          As an initial matter, the Consent Decree provides multiple overlapping

12   enforcement mechanisms, which together ensure that Class Members' interests are more than

13   adequately protected:  (1) a Court-appointed Monitor, (2) a Court-appointed Special Master,

14   (3) judicial oversight, including annual status reports and hearings, (4) regular compliance

15   meetings, (5) extensive reporting and recordkeeping, and (6) oversight by Class Counsel and

16   EEOC.

17          Class Counsel will satisfy their ongoing obligations to the Class by properly

18   seeking out and presenting instances of noncompliance to the Special Master.  The liquidated

19   $600,000 allocated for future attorneys' fees is staggered in six declining annual payments from

20   2005 to 2010.  Section XVIII.B., p. 59.  The *Home Depot* Consent Decree contained a similar

21   provision.  *Id.* at 82 (staggering payments over several years after final approval date).  The

22   Court, which will hold annual hearings, will of course be able to gauge whether Class Counsel are

23   fulfilling their duties.

24          Potter also criticizes omitting the EEOC from seeking fees.  Potter Objection, at

25   p. 4.  However, the EEOC is precluded by statute from recovering fees under Title VII.  42 U.S.C.

26

---

27   [9] Although Objectors Foster and Potter could have brought it to the parties' attention by a simple
    phone call or other informal contact, Objectors instead chose to bring a formal objection to the
28   Consent Decree.

1  § 2000e-5(k) (permitting parties, but not the EEOC, to recover costs and attorney's fees).  This

2  fact will not prevent the EEOC from fulfilling its duties under the Consent Decree.

3  ### 6.    The 125% Opt-Out Credit Is Reasonable.

4  Potter further asserts that the 125% credit that Abercrombie receives for each opt-

5  out is excessive because the "percentage returned . . . to Abercrombie should never exceed the

6  amount paid to [the] average Class Member."  Potter Objection, at 3.  Potter cites no authority or

7  logic.  To the contrary, a 125% credit is reasonable because opt-outs are likely to litigate their

8  claims individually, imposing defense costs on Abercrombie and exposing Abercrombie to

9  greater-than-average liability risk.

10  "A lump sum settlement offer by defendants may contain a provision that entitles

11  the defendants to reduce the settlement fund on exclusion of a substantial portion of class claims."

12  4 NEWBERG 4TH, § 12:13, p. 307; *id.* at p. 308 (citing *State of W. Va. v. Chas. Pfizer & Co.*, 314

13  F. Supp. 710 (S.D.N.Y. 1970) (approving reduction of settlement from $100 million to $83

14  million based on opt-out credits)).  Similar employment discrimination class actions have similar

15  provisions.  For example, the *Publix* consent decree provided for an opt-out credit to the

16  defendant of $20,000-150,000 per class member who opted out, up to a total of $4,000,000 in opt-

17  out credits.  *Id.* at 106-08.  Similarly, in *Ingles*, the defendant received $37,500 or $5,000 for each

18  opt-out, up to a total of $1,000,000.  *Id.* at 67.

19  In the instant case, the Claims Administrator has calculated that average Class

20  Member awards should range from $1,449 to $2,757.  Interim Report at 6-7.  The average opt-out

21  credits therefore range from $1,811 to $3,446.  These amounts do not provide Abercrombie

22  generous amounts to defend individual cases.  The objection to the size of the opt-out credit is

23  without merit.

24  ## VI.    THE PROPOSED CLASS REPRESENTATIVE AND CHARGING PARTY AWARDS ARE FAIR, REASONABLE, AND ADEQUATE.

25  In accordance with routine class action practice, the parties propose that the named

26  plaintiffs receive awards to provide fair compensation for their contribution to the litigation.

27  These awards are in place of their recovery as Class members, and compensate them for their

28

investment of time and effort, their exposure to the risks of retaliation and harassment, the invaluable service they provided during the pre- and post-filing investigation of potential discrimination, and their broader claims releases.

"Settlement agreements in employment discrimination class actions may contain provisions awarding monetary recoveries and other special benefits to named plaintiffs for their unique claims." 8 NEWBERG, § 24:129, p. 504-05; *cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). The Ninth Circuit recently addressed the issue of representative plaintiff awards in *Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003), affirming that named plaintiffs can receive reasonable incentive awards. In order to determine whether an award was reasonable, the Ninth Circuit held that a court must individually evaluate the awards, considering relevant factors, including each plaintiff's actions for the interests of the class, the degree of benefit to the class by those actions, the amount of time and energy a plaintiff has expended for the litigation, and reasonable fears of workplace retaliation. *Staton*, 327 F.3d at 977.

In accordance with *Staton*, Plaintiffs' counsel made individualized determinations of each named Plaintiff and Charging Party award based on several factors, including an assessment of their claims, pendency of administrative charges, participation in media outreach to the Class, deposition and other involvement in investigative proceedings, or preparing written discovery. These determinations are summarized in Bill Lann Lee Decl., ¶ 8, Ex. B.

In *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685 (N.D. Ga. 2001), the Court approved incentive awards of $300,000 to each named plaintiff in recognition of the services they provided to the class by responding to discovery, participating in the mediation process and taking the risk of stepping forward on behalf of the class. *Id.* at 694. In *Boeing*, the consent decree stated that the 12 named plaintiffs would apply for awards of $100,000 each, for a total of $1.2 million, or 1.6% of the $75 million fund. *Id.* at 26. (This was partly in compensation for the broader release of claims that they made. *Id.* at 27.) In *Publix*, each of the 12 named plaintiffs who did not opt

425190.1

1    out received $67,710, taken from the total monetary fund of $63.5 million (for a total of 1.3%).

2    *Id.* at 96-97.  The *United* consent decree provided payments of $3,350,663 to the 13 named

3    plaintiffs, or 11.1% of the total, for an average of roughly $258,000 per named plaintiff.  *United*

4    notice p. 2.  The *Rent-a-Center*, consent decree provided payments of $100,000 each to 19 named

5    plaintiffs and 3 charging parties (for a total of $2.2 million), and $55,000 each to several other

6    named plaintiffs.  *Id.* at 12-13.  Likewise, this Court recently ordered named plaintiff awards of

7    $30,000 and $28,125 (above and beyond their compensation as class members) to two named

8    plaintiffs in an overtime pay class action.  *Scherrer*, at 12.[10]

9           "[I]t is not uncommon for class members with prior charges of discrimination to

10   receive special relief in settlement."  *League of Martin v. City of Milwaukee*, 588 F. Supp. 1004,

11   1024 (E.D. Wis. 1984) (Title VII) (holding that individual relief for a named plaintiff, who "filed

12   the EEOC charge upon which this lawsuit is based and has been instrumental in prosecuting this

13   lawsuit since the date it was filed," was appropriate); *Kyriazi v. Western Elec. Co.*, 527 F. Supp.

14   18, 20 (D.N.J. 1981) (Title VII) (ordering back pay of $103,507 and reinstatement for single

15   named plaintiff in addition to $7 million settlement for which 2000 potential class members

16   submitted claim forms); *Women's Comm. For Equal Employment Opportunity v. National*

17   *Broadcasting Co.*, 76 F.R.D. 173, 180 (S.D.N.Y.1977) (Title VII) (approving awards ranging

18

19   [10] S*ee also In Re S. Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997) (approving
     $303,000 payment to each class representative plaintiff in employment case settling before class
20   certification); *Martens v. Smith Barney*, No. 96 Civ. 3779, 1998 WL 1661385 *4 (S.D.N.Y. July
     28, 1998) and 181 F.R.D. 243, 262 (S.D.N.Y. 1998) (approving payments of up to $150,000 for
21   named plaintiffs, for a total of $1.9 million in incentive payments for employment case settling
     prior to class certification); *Roberts v. Texaco*, 979 F. Supp. 185 (S.D.N.Y. 1997) (approving
22   incentive payments up to $85,000 for named plaintiffs in employment case settling prior to class
     certification); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995)
23   (approving $50,000 participation award); *Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27 (E.D. Pa.
     1985) (award of $20,000 each to two class representatives); *Bryan v. Pittsburgh Plate Glass Co.*,
24   59 F.R.D. 616, 617 (W.D. Pa. 1973), *aff'd*, 494 F.2d 799 (3d Cir.) (payments of $17,500 each to
     individual class members who aided in advancing Title VII case); *Enterprise Energy Corp. v.*
25   *Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991) (approving $50,000
     awards to named plaintiffs, from settlement with current cash value of $32 million in consumer
26   case); *In re Dun & Bradstreet Credit Services Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio
     1990) (approving $35,000 to $55,000 awards to corporate named plaintiffs, from settlement of
27   $18 million in consumer case); *Cimarron Pipeline Const., Inc. v. National Council on*
     *Compensation Ins.*, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) (approving $10,000
28   awards to corporate named plaintiffs, from settlement of $35 million in securities case).

1  from $1,336 to $35,174 for named plaintiffs, equaling roughly 71% of their total damages, in

2  addition to settlement of $1.5 million plus injunctive relief).

3         In sum, the factors courts use in determining the amount of incentive payments

4  include (1) a comparison between the incentive awards and the range of monetary recovery

5  available to the class; *Ingram*, 200 F.R.D. at 694; *Roberts*, 979 F. Supp. at 204; (2) time and effort

6  put into the litigation; *Van Vranken*, 901 F. Supp. at 299; *Cook v. Niedert*, 142 F.3d 1004, 1016

7  (7th Cir. 1998); (3) whether the litigation will further the public policy underlying the statutory

8  scheme, *Roberts*, 979 F. Supp. at 201 n.25; (4) risks of retaliation, *Roberts*, 979 F. Supp. at 202,

9  *Cook*, 142 F.3d at 1016; and (5) compromise of unique individual claims, *Women's Comm. for*

10 *Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977).

11        The average amount awarded to the Class Representatives in this litigation is less

12 than $16,000, *inclusive of monetary relief for their claims*, which is well within the range of

13 awards courts have permitted named plaintiffs.  *See* Exhibit C to Consent Decree (listing

14 individual Named Plaintiff and Charging Party awards).  The valuable efforts of the class

15 representatives and charging parties, their willingness to litigate and pursue their representative

16 claims, and the strength of their claims have resulted in a settlement that will benefit all

17 Settlement Class Members.  Bill Lann Lee Preliminary Approval Decl., ¶ 32.  The payment of

18 approximately 0.9% of the $40 million total to 16 Class Representatives additional Charging

19 Parties is appropriate.  Class Representatives and Charging Parties, unlike Class Members, are

20 required to execute broader releases and to forego payments under the normal Claims process.

21 **VII.    THE PROPOSED FEE IS LIKEWISE FAIR, REASONABLE, AND ADEQUATE.**

22        "Attorneys' fees provisions included in proposed class action settlement

23 agreements are, like every other aspect of such agreements, subject to the determination whether

24 the settlement is "fundamentally fair, adequate, and reasonable." *Staton v. Boeing Co.*, 327 F.3d

25 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. Proc. 23(e)).  To be fair, adequate, and reasonable,

26 the fees should be "not unreasonably high." *Id.* at 964.

27        Adequate compensation for Class counsel is socially beneficial:

28

1
2
3

> The contingent fee and the class action are "the poor man's keys to the courthouse." Both vehicles allow the average citizen and taxpayer to have their injuries redressed and their rights protected. Both permit persons of limited resources to obtain competent legal counsel, an essential ingredient in our adversary system of justice.

4

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375 (D. Minn. 1985).

5
6

Where, as here, counsel's efforts create a fund and/or nonmonetary benefits

7

available to a class, "the district court has discretion to use either [the percentage or the lodestar]

8

method." *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir.

9

1994). *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (noting that the traditional method for

10

calculating a common fund fee is to award a percentage of the total fund); *Six (6) Mexican*

11

*Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (same). "Whether a

12

court applies the lodestar or the percentage method, 'we require only that fee awards in common

13

fund cases be reasonable under the circumstances.'" *In re Washington Public Power Supply*

14

*System Sec. Litig.*, 19 F.3d 1291, 1294 n.2 (9th Cir. 1994) (quoting *Florida v. Dunne*, 915 F.2d

542, 545 (9th Cir. 1990)).

15
16

First, the lodestar method involves multiplying the number of hours reasonably

17

expended by the reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424 (1983). The court

18

may reduce the hours claimed where the time was not reasonably expended, but must provide an

19

explanation for the reduction. *Sorenson v. Mink*, 239 F.3d 1140, 1146 (9th Cir. 2001). The

20

hourly rates used must be "in line with those prevailing in the community for services by lawyers

21

of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 886, 895.

22

"[A]pplying the attorneys' current rates" is appropriate as a means of compensating for the delay

23

in payment. *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1305 (9th

Cir. 1994).

24
25

The next step in the lodestar method is to determine whether to grant a multiplier,

26

based the *Kerr* factors (listed below) that are not accounted for in the lodestar determination.

27

*Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1212 (9th Cir. 1986); *In re Washington*

28

*Power Supply System Sec. Litig.*, 19 F.3d 1291, 1303 (9th Cir. 1994) (holding that district court

1    abused its discretion in denying a lodestar multiplier).[11]

2           Second, the percentage-of-fund method involves awarding a reasonable percentage

3    of the fund to the attorneys.  The Ninth Circuit has approved of the approach of setting the

4    benchmark percentage-based fee awards at "25 percent . . .[, which] can then be adjusted upward

5    or downward to account for any unusual circumstances involved in this case."  *Paul, Johnson,*

6    *Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  In addition, fees in comparable

7    cases (as a percent of total recovery) are particularly relevant.  *Vizcaino v. Microsoft*, 290 F.3d

8    1043, 1050 n.4 (9th Cir. 2002) (approving fee of 28% of $97 million recovery) (surveying 34

9    recent "megafund" cases valued at $50-200 million in recovery, and finding that "most [fee]

10   awards" are between 10% and 30% of the total recovery, and "a bare majority" are "clustered in

11   the 20-30% range").[12]  "[O]ne purpose of the percentage method is to encourage early settlements

12   by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to

13   undertake risky, complex, and novel litigation."  MCL 4th, § 14.122, p. 193 (citing *Deposit Guar.*

14   *Nat'l Bank v. Roper*, 445 U.S. 326, 338-39 (1980) (recognizing the importance of a financial

15   incentive to entice qualified attorneys to devote their time to complex, time-consuming cases in

16   which they risk nonpayment)).

17          In the instant case, Plaintiffs used a lodestar method to determine the fee after the

18   substantial injunctive and monetary relief had been negotiated.  Bill Lann Lee Decl., ¶ 16;

19   Hughes Decl., ¶ 11; Gochanour Decl., ¶ 7.  A percentage-based cross-check provides a means of

20   confirming the reasonableness of the fee.  *Hanlon*, 150 F.3d at 1029 (approving of the district

---

21   [11] Where plaintiffs attain relief under both federal and California state law, it is appropriate to
22   enhance the lodestar fee with a multiplier based on state law, even though the multiplier is not
     available under the federal substantive law.  *Mangold v. California Public Utilities Comm'n*, 67
23   F.3d 1470, 1478 (9th Cir. 1995) (affirming multiplier of two, where plaintiffs brought both
     ADEA and FEHA claims); *Scherer*, at 3 (same).

24   [12] Authority in other Circuits is consistent.  *In re Safety Components Int'l, Inc.*, 166 F. Supp.2d
     72, 101-04 (D.N.J. 2001) (surveying percentage of fund awards across Third Circuit and finding
25   awards well above 25 percent to be common)*; In re Warner Communications Sec. Litig.*, 618 F.
     Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("[t]raditionally, courts in this
26   Circuit and elsewhere have awarded fees in the 20%-50% range in class actions"); *Manners v.*
     *American Gen. Life Ins. Co.*, 1999 WL 33581944, at *29 (M.D. Tenn., Aug. 11, 1999) (citing
27   cases and stating that "throughout the Sixth Circuit, attorneys' fees in class actions have ranged
     from 20%-50%"); *Wise v. Popoff*, 835 F. Supp. 977, 980 (E.D. Mich. 1993) (holding that courts
28   routinely award fees ranging from 20-50 percent of the common fund).

court's apparent review of the negotiated fees under a lodestar methodology, then conducting a brief percentage review as a cross-check); *cf.* MCL 4th, § 14.121, p. 178 (noting that "seven courts of appeals permit awarding fees by either the percentage-fee or lodestar method or both (generally using the lodestar as a cross-check)").

Under either method, the court should gauge the reasonableness of the fee by considering the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975):

> (1) the time and labor required,
> (2) the novelty and difficulty of the questions involved,
> (3) the skill requisite to perform the legal service properly,
> (4) the preclusion of other employment by the attorney due to acceptance of the case,
> (5) the customary fee,
> (6) whether the fee is fixed or contingent,
> (7) time limitations imposed by the client or the circumstances,
> (8) the amount involved and the results obtained,
> (9) the experience, reputation, and ability of the attorneys,
> (10) the 'undesirability' of the case,
> (11) the nature and length of the professional relationship with the client, and
> (12) awards in similar cases.

*Id.* at 70 (lodestar method); *Loring v. City of Scottsdale, Ariz.*, 721 F.2d 274, 275 (9th Cir. 1983) (percentage method) (citations omitted).  Factors 1, 2, 3, 4, 5, and 9 are generally accounted for in the lodestar, and are not necessary to the determination of the multiplier here.  They are discussed below because of their relevance to the percentage determination.

### A.      The Time and Labor Required Were Substantial.

Class counsel expended substantial time and labor in securing the significant relief for the Class.  In total, the private firms and public interest organizations invested approximately 13,187 hours of attorney, law clerk, and support staff time.  *See* declarations of Class Counsel. MALDEF in particular has prosecuted the case for six years, since 1999, when the first charge of discrimination was filed with the EEOC.  *See* Saenz Decl., ¶ 12.  Once the case was filed, Class Counsel quickly and intensively conducted extensive class discovery in both cases, and engaged in substantial research into the factual and legal issues, as evidenced by Plaintiffs' Mediation Brief.  During the six-month mediation, Class Counsel continued to prepare for class certification and trial.  Notably, Class counsel prepared and collected over 170 signed Class Member and

witness declarations, and conducted hundreds of other interviews.  See Plaintiffs also expended significant resources in extensive expert statistical, industrial, psychological, and sociological analyses of Defendant's employment data and employment practices.  *See, e.g.*, Bill Lann Lee Preliminary Approval Decl., ¶¶ 10, 16.

### B.   <u>The Questions Involved Were Novel and Difficult.</u>

The questions involved raised novel and difficult issues.  Plaintiffs alleged "image discrimination," a form of subjective stereotyping.  Abercrombie was in a position to defend against substantial backpay exposure with evidence of the opportunity for easy mitigation of damages due to the low-age and part-time nature of the jobs, high industry turnover, and general labor pool mobility.  Furthermore, Plaintiffs' emotional distress claims were susceptible to attack at the class certification stage on commonality grounds, and at the merits stage on grounds of provability and degree of harm.

### C.   <u>The Case Required Significant Skill to Perform the Legal Service Properly.</u>

The prosecution of this case required significant legal skill, as indicated in the previous factor, and the staying power and managerial competence to pursue the litigation in coordinated fashion with a large team of private and public interest co-counsel, and against a determined adversary.  The case also required significant negotiation skills and knowledge of remedial options to conduct a successful protracted negotiation in the extended mediation.

### D.   <u>Class Counsel Were Precluded From Other Employment Due to Acceptance of the Case.</u>

The attorneys who took the laboring oar in the litigation were precluded from other employment by their substantial investment of time and resources in this litigation once the action was filed.

### E.   <u>The Customary Fee and Awards in Similar Cases, Whether Measured Under the Lodestar Method or the Percentage Method, Support the Fee Application.</u>

The customary fee in complex employment discrimination class action cases – as confirmed in similar cases[13] – is measured either by the lodestar method or as a percentage of the fund generated.  Under either method, the fee is reasonable.

---

[13] The fifth and twelfth *Kerr* factors are addressed together here.

1          **1.       The fee is reasonable under the lodestar-multiplier method.**

2                  The fee request is reasonable in light of the amount of time and expense invested

3    by Class Counsel during the course of investigation and litigation.  Class Counsel conducted

4    extensive discovery, including interviewing hundreds of witnesses and potential class members to

5    secure over 170 signed declarations.  Class Counsel invested significant resources of time and

6    money in legal, statistical, industrial, psychological, and sociological analyses of the case, and in

7    extensive negotiations.  These efforts are all reflected in counsel's contemporaneously-kept time

8    records.  *See* Bill Lann Lee Decl., ¶¶ 9-16, Exs. C-E (attaching fee and cost data for Lieff,

9    Cabraser, Heimann & Bernstein, LLP); Saenz Decl., ¶¶ 11-19, Exs. B, C, & D (attaching fee and

10   cost data for Mexican American Legal Defense and Educational Fund);  Declaration of Kimberly

11   West-Faulcon, ¶¶ 11, 16, Exs. C & D (attaching fee and cost data for NAACP Legal Defense and

12   Educational Fund); Declaration of Minah Park, ¶¶ 14-15, Exs. A & B (attaching fee and cost data

13   for Asian Pacific American Legal Center); D'Urso Decl., ¶¶ 10, 15, Ex. A (attaching fee and cost

14   data for Kohn, Swift & Graf, P.C.); Declaration of Barry Goldstein, ¶ 10, Ex. C (attaching fee

15   data for Barry Goldstein); Declaration of Jack Lee, ¶¶ 21, 26, Exs. A & C (attaching fee and cost

16   data for Minami, Lew & Tamaki LLP); Declaration of Sidney L. Gold, ¶ 10, Ex. A (attaching fee

17   data for Sidney L. Gold & Associates, P.C.); Declaration of Bryan Clobes, ¶¶ 11, 16, Exs. B & E

18   (attaching fee data for Miller Faucher); Declaration of Cleo Fields, ¶¶ 12, 17, Ex. A & B

19   (attaching fee and cost data for Rainbow/PUSH Coalition); Declaration of James Keller, ¶¶ 11,

20   16, Ex. A (attaching fee and cost data for Gottesman & Associates).[14]  For the Court's

21   convenience Exhibit 2 to this document contains a summary compilation of the firms' and

22   nonprofit organizations' hours, lodestars, and costs.

23                  The raw lodestar for Class Counsel amounts to $4,072,304.  The Consent Decree

24   provides for fees and costs together of $7,250,000.  Total costs equal roughly $540,000, leaving

25

26

---

27   [14] Calculation of a lodestar based on current hourly rates is appropriate as a means of
     compensating for delay in payment. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283-84 (1989);
28   *Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991).

1   approximately $6,710,000 as fees.[15]  This corresponds to a 1.65 multiplier on the raw lodestar

2   amount.

3            When awarding fees based on California law, such as the FEHA claims pleaded by

4   Plaintiffs here, the trial court has substantial discretion to adjust the lodestar.  *PLCM Group, Inc.*

5   *v. Drexler*, 22 Cal. 4th 1084, 1095-96 (2000); *Lealao v. Beneficial Cal., Inc.*, 82 Cal. App. 4th 19,

6   40-45 (2002).  The court may augment the lodestar upon consideration of various factors,

7   including, but not limited to, the novelty and difficulty of the questions involved and the skill

8   displayed in presenting them, and the contingent nature of the fee award, both from the point

9   view of eventual victory on the merits and the point of view of establishing eligibility for an

10  award.  *Serrano v. Priest*, 20 Cal. 3d at 25, 49 (1977).  In California, courts regularly use a

11  multiplier of 2.0 or greater in statutory fee cases to approximate market fees.  *See, e.g.*, *Mangold*

12  *v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478-79 (9th Cir. 1995) (2.0); *City of Oakland v.*

13  *Oakland Raiders*, 203 Cal. App. 3d 78, 82-85 (1988) (2.34); *Coalition for Los Angeles County*

14  *Planning in the Pub. Interest v. Bd. of Supervisors of Los Angeles County*, 76 Cal. App. 3d 241,

15  251 (1977) (slightly above 2.0).  In fact, "[m]ultipliers in the 3-4 range are common in lodestar

16  awards for lengthy and complex class action litigation."  *Van Vranken v. Atlantic Richfield Co.*,

17  901 F. Supp. 294, 298 (N.D. Cal. 1995); *Wershba v Apple Computer, Inc.*, 91 Cal. App. 4th 224,

18  255 (2001) ("Multipliers can range from 2 to 4 or even higher."); *In re Unisys Corp. Retiree*

19  *Medical Benefits ERISA Litig.*, 886 F. Supp. 445, 482 (E.D. Pa. 1995) (noting that "the range of

20  multipliers in large and complicated class actions has ranged from 2.26 to 4.5") (citing *Behrens v.*

21  *Wometco Enterprises, Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988) (listing 9 cases in that range and

22  awarding a 3.0 multiplier)).

23           By comparison, this Court in *Scherrer v. Group Voyagers, Inc.*, No. C 99-04834,

24  (N.D. Cal. March 8, 2005), a class action asserting employees' overtime pay rights, awarded

25

26  _____
    [15] At the time of the Preliminary Approval hearing, Class Counsel estimated that approximately
    $400,000 of this amount would be allocated to costs.  Since that time, Class Counsel have
27  received bills for further costs, and the total cost figure is roughly $540,000 at this point.
    Regardless, because the fees and costs amount is fixed, the increased costs do not change the
28  amount paid by Abercrombie or the amounts recovered by the Class Members.

425190.1                                         - 32 -

1   $3,286,916 in fees after a settlement for $14-15 million. *Id.* at 2, 10 (Bill Lann Lee Decl., ¶ ___,

2   Ex. K).  There, the Court granted a multiplier of 1.4 based on an analysis of the *Kerr* factors.

3   *Group Voyagers* is distinguishable in four ways.  First, *Abercrombie* Class counsel was efficient,

4   bringing this complex case to resolution prior to moving for class certification less than two years

5   after filing, whereas the parties in *Group Voyagers* spent more than four years and "wasteful[ly]"

6   went to the brink of trial twice. *Id.* at 10.  Second, *Abercrombie* Class counsel secured substantial

7   injunctive relief to prevent recurrence of alleged discriminatory policies and practices and six-

8   year monitoring, whereas the relief in *Group Voyagers* was solely monetary. *Id.* at 1-2.  Third,

9   the effective percentage of total recovery sought here (14%) is <u>less</u> than that sought (30-31%) <u>or</u>

10   actually awarded (18-19%) in *Group Voyagers*.  Fourth, comparable complex employment

11   discrimination consent decrees, as discussed below, have involved higher percentage awards.

12   ## 2.   The fee is also reasonable under the percentage method.

13   As outlined above, the Ninth Circuit benchmark percentage award is 25%. *Paul,*

14   *Johnson, Alston & Hunt v. Graulty*, 886 F.2d at 272; *Vizcaino v. Microsoft*, 290 F.3d at 1050 n.4

15   (finding that "a bare majority" of recent awards in "mega fund" cases are "clustered in the 20-

16   30% range").  The Manual for Complex Litigation observes that "[a]ttorney fees awarded under

17   the percentage method are often between 25% and 30% of the fund."  MCL 4th § 14.121, p. 188

18   ("Awarding attorneys 25% of a common fund represents a typical benchmark."); *id.* at p. 188

19   n.488 (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) for the proposition

20   that the benchmark is "25% with adjustments up to 33% for complexity, risk, and nonmonetary

21   results").

22   Recent comparable employment discrimination settlements have provided higher

23   fees than that sought by Plaintiffs' Counsel as a percent of the total fund paid by defendant,

24   generally ranging from 18 to 25%, even where the absolute amounts were higher. *See, e.g.,*

25   *Boeing* at 56 (stating class counsel's intent to seek 25% of the fund as fees, up to $15 million,

26   plus costs up to $3 million); *Publix* at 109-10 (providing 22% or $18 million in fees and costs for

27   work performed before and after approval date on top of $63.5 million in monetary relief); *Rent-*

28   *a-Center* at 58 (providing up to 22%, or fee up to $10.5 million, plus costs of up to $775,000, to

1   be paid out of the settlement fund of $47 million); *Shoney's* at 60; 86-89 (awarding 20%, or $25.5

2   million in attorneys' fees and costs on top of a monetary fund of $105 million); *Coca-Cola* at 36-

3   37 (awarding 18%, or $20 million on top of $90 million in monetary relief).

4           Here, the amount payable by Abercrombie for the Class's benefit is roughly

5   $49.45 million.[16]  The proposed, effective percentage fee of 14% of total monetary recovery is

6   reasonable in light of the customary fee in comparable contingent employment discrimination and

7   other cases.[17]

8        **F.**      **The Contingent Nature of the Fee Supports the Proposed Award.**

9           The contingent nature of the case also supports the fee request.  As described

10  above, Class Counsel were not guaranteed success once they filed suit.  Bill Lann Lee

11  Preliminary Approval Decl., ¶¶ 33-34 (describing risk at trial and appellate stages, and substantial

12  potential difficulty and delay in achieving significant injunctive relief).  Furthermore, Plaintiffs

13  faced a determined opponent with substantial defenses.

14          Reward for contingency risk in cases such as this one is appropriate in the Ninth

15  Circuit.  "It is an established practice in the private legal market to reward attorneys for taking the

16  risk of non-payment by paying them a premium over their normal hourly rates for winning

17  contingency cases.  Contingent fees that may far exceed the market value of the services if

18  rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of

19  assuring competent representation for plaintiffs who could not afford to pay on an hourly basis

20  regardless whether they win or lose."  *In re Washington Public Power Supply System Sec. Litig.*,

21  19 F.3d 1291, 1299 (9th Cir. 1994) (citing Richard Posner, ECONOMIC ANALYSIS OF LAW § 21.9,

22  at 534-35 (3d ed. 1986) and other authority); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th

23  Cir. 1992) ("[T]he failure to make any provision for risk of loss may result in systematic

24  undercompensation of Class Counsel in a class action case, where as we have said the only fee

---

25  [16] The monetary relief of $40,000,000, plus fees and costs of $7,250,000, plus $600,000 for future

26  monitoring, plus $600,000 in notice costs paid by Abercrombie, plus imputed interest for one
    year at 2.5% of roughly $1,000,000, equals approximately $49,450,000.

27  [17] The denominator of the percentage calculation includes the fees and costs because "those fees
    are still best viewed as an aspect of the class' recovery."  *In re General Motors Corp. Pick-up*

28  *Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3rd Cir. 1995).

that counsel can obtain is, in the nature of the case, a contingent one."); *In re Shell Oil Refinery*, 155 F.R.D. 552, 571 (E.D. La. 1993) (observing that the contingency fee system "permits a greater recovery for successful cases, thereby rewarding investment in successes and offsetting the losses from unsuccessful cases.").  Such is the law in California as well.  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131-32 (2001).

### G. The Time Limitations Imposed by the Client and the Circumstances Support the Fee Award.

The compressed and overlapping discovery, mediation, and class certification phases of the litigation resulted from the Court's pretrial schedule.  The parties reached settlement prior to class certification, saving the parties and the Court time and resources.

### H. The Amount Involved Was Substantial and the Results Obtained Were Exceptional, Including $40 million for the Class as Well as Robust Injunctive Relief.

The amount involved and results obtained strongly support the fee award.  Class Counsel secured substantial injunctive relief, as described above, as well as the approximately $40 million in cash compensation for the Class, separate from fees or costs.  The value of the forward-looking injunctive relief is not quantifiable, and will inure to the benefit of Class Members and other minority and female applicants and employees of Abercrombie for years to come.

Courts customarily take nonmonetary relief into account when valuing the benefit conferred upon the class.  *Vizcaino*, 290 F.3d at 1049 (noting that a higher fee was warranted in part because "counsel's performance generated benefits beyond the cash settlement fund," such as the defendant's agreement to hire class members and "change its personnel classification practices"); *id.* (an upward adjustment to the lodestar is appropriate "to reflect the benefits to the public flowing from [the] litigation") (quoting *Bebchick v. Wash. Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.C. Cir. 1986)); *Morales v. City of San Rafael*, 96 F.3d 359, 364 (9th Cir. 1996) (instructing district court, "in determining a reasonable fee award on remand," to "consider not only the monetary results but also the significant nonmonetary results [plaintiff] achieved for himself and other members of society") ("[A] civil rights plaintiff seeks to vindicate important

1   civil and constitutional rights that cannot be valued solely in monetary terms.") (quoting *Riverside*

2   *v. Rivera*, 477 U.S. 561, 574 (1986) (plurality opinion)); *Loring v. City of Scottsdale, Ariz.*, 721

3   F.2d 274, 275 (9th Cir. 1983) (reversing district court's fee determination for failure to take into

4   account nonmonetary benefits to class).

5       I.      **Class Counsel Have a High Degree of Experience, Reputation, and Ability.**

6               Class counsel's experience, reputation, and ability also justify the fee award.  The

7   attorneys contributing the bulk of the work to the case, Bill Lann Lee for Lieff, Cabraser,

8   Heimann & Bernstein, Thomas A. Saenz of MALDEF, and Martin D'Urso of Kohn, Swift &

9   Graf, have extensive experience litigating complex employment discrimination class actions, and

10  other class actions in general. *See* their Declarations.

11      J.      **The Case Was Somewhat Undesirable.**

12              The undesirability of the case is a minor factor supporting the award.

13  Abercrombie is a well-established, huge corporation that had withstood the charges of

14  discrimination on file with the EEOC until these lawsuits were filed.

15      K.      **Class Counsel's Professional Relationship with the Class Representatives Was**
                **Longstanding.**

16

17              As described above, the nature and length of the professional relationships

18  between Class Counsel and the Class Representatives support the fee award.  Class Counsel

19  worked diligently not only to pursue compensation for the Class Representatives but also to seek

20  substantial programmatic changes in Abercrombie's approach to hiring, promotions, and

    diversity, in accordance with their clients' wishes.

21

22                                      **CONCLUSION**

23              For all the foregoing reasons, the parties respectfully request that this Court grant

24  final approval to the Consent Decree with the following exceptions:  [to be provided].

25

26

27

28

1    Respectfully submitted,

2    Bill Lann Lee (SBN 108452)                    Julie Su
     Kelly M. Dermody (SBN 171716)                 Minah Park
3    Eve H. Cervantez (SBN 164709)                 ASIAN PACIFIC AMERICAN LEGAL
     Elizabeth A. Alexander (pro hac vice)             CENTER
4    Jahan C. Sagafi (SBN 224887)                  1145 Wilshire Blvd., 2nd Floor
     Nirej S. Sekhon (SBN 213358)                  Los Angeles, CA  90017
5    LIEFF, CABRASER, HEIMANN &
     BERNSTEIN, LLP
6    275 Battery Street, 30th Floor
     San Francisco, CA  94111-3339
7    Telephone:  (415) 956-1000
     Facsimile:  (415) 956-1008
8
     Thomas A. Saenz (SBN 159430)                  Kimberly West-Faulcon
9    Shaheena Ahmad Simons (SBN 225520)            NAACP LEGAL DEFENSE AND
     MEXICAN AMERICAN LEGAL DEFENSE                    EDUCATIONAL FUND, INC.
10   AND EDUCATIONAL FUND                          1055 Wilshire Blvd., Suite 1480
     634 South Spring Street                       Los Angeles, CA  90017
11   Los Angeles, CA  90014
     Telephone:  (213) 629-2512
12   Facsimile:  (213) 629-0266

13   Joseph C. Kohn                                Bryan L. Clobes
     Martin J. D'Urso                              Melody Forrester
14   Hilary Cohen                                  Jeffrey D. Lerner
     KOHN, SWIFT & GRAF, P.C.                      MILLER FAUCHER AND CAFFERTY
15   One South Broad Street, Suite 2100            One Logan Square, Suite 1700
     Philadelphia, PA 19107                        Philadelphia, PA  19103
16   Telephone:  (215) 238-1700
     Facsimile:  (215) 238-1968
17
     Jack W. Lee, Esq. (SBN 071626)                Cleo Fields
18   Lisa Duarte, Esq. (SBN 169750)                THE FIELDS LAW FIRM, L.L.C.
     John Ota, Esq. (SBN 195532)                   2147 Government Street
19   MINAMI, LEW & TAMAKI LLP                      Baton Rouge, LA
     360 Post Street, 8th Floor
20   San Francisco, CA 94108
     Telephone:  (415) 788-9000
21   Facsimile:  Fax (415) 398-3887

22   James F. Keller                               Sidney L. Gold
     Zachary Gottesman                             Traci M. Greenberg
23   GOTTESMAN & ASSOCIATES                        SIDNEY L. GOLD & ASSOCIATES, P.C.
     2121 URS Center                               1835 Market Street
24   36 East 7th Street                            Philadelphia, PA  19103
     Cincinnati, OH  45202
25
                                                   Barry L. Goldstein
26                                                 GOLDSTEIN, DEMCHAK, BALLER,
                                                       BORGEN & DARDARIAN
27                                                 300 Lakeside Avenue
                                                   Oakland, CA 94612
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  April 11, 2005

By:  ___*/s/ Bill Lann Lee*___
Bill Lann Lee

*Attorneys for Plaintiffs*

NOTICE OF MOTION AND PLTFS' MOTION FOR ORDER GRANTING FINAL APPROVAL OF THE PROPOSED CONSENT DECREE