1   Kelly M. Dermody (SBN 171716)
    Jahan C. Sagafi (SBN 224887)
2   LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
3   275 Battery Street, 30th Floor
    San Francisco, CA  94111-3339
4   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
5   Email: kdermody@lchb.com
    Email: jsagafi@lchb.com
6

7

8

9

10

11  *Lead Counsel and the EEOC, on behalf of the Plaintiff Class Members*

12              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
13

14  EDUARDO GONZALEZ, ANTHONY            Case Nos.   03-2817 SI,
    OCAMPO, ENCARNACION GUTIERREZ,                   04-4730 SI, and
15  JOHAN MONTOYA, JUANCARLOS GÓMEZ-                 04-4731 SI
    MONTEJANO, JENNIFER LU, AUSTIN CHU,
16  IVY NGUYEN, ANGELINE WU, ERIC FIGHT,
    CARLA GRUBB, DAVID CULPEPPER,         **DECLARATION OF JAHAN C.**
17  PATRICE DOUGLASS, and ROBAIR          **SAGAFI IN SUPPORT OF LEAD**
    SHERROD, BRANDY HAWK and ANDRE        **COUNSEL AND EEOC'S APPEAL OF**
18  STEELE, on behalf of themselves and all others  **SPECIAL MASTER'S DECISION**
    similarly situated,                   **REGARDING ABERCROMBIE'S**
19                                        **MOTION TO DISMISS DISPUTE**
                   Plaintiffs,            **RESOLUTION AND ENFORCEMENT**
20                                        **PROCEEDINGS**
             v.
21                                        **Before Judge Illston**
    ABERCROMBIE & FITCH STORES, INC., A&F
22  CALIFORNIA, LLC, A&F OHIO, INC., and
    ABERCROMBIE & FITCH MANAGEMENT
23  CO.,

24                 Defendants.

25
    ELIZABETH WEST and JENNIFER LU,
26
                   Plaintiffs,
27
             v.
28

    763698.1
    ─────────────────────────────────────────────────────────────
    DECLARATION OF JAHAN C. SAGAFI ISO LEAD COUNSEL AND EEOC'S APPEAL OF SPECIAL MASTER'S DECISION

| | |
|---|---|
| 1 | ABERCROMBIE & FITCH STORES, INC., A&F CALIFORNIA, LLC, A&F OHIO, INC., and ABERCROMBIE & FITCH MANAGEMENT CO., |
| 2 | |
| 3 | Defendants. |
| 4 | |

| | |
|---|---|
| 5 | EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, |
| 6 | |
| 7 | v. |
| 8 | ABERCROMBIE & FITCH STORES, INC., A&F CALIFORNIA, LLC, A&F OHIO, INC., and ABERCROMBIE & FITCH MANAGEMENT CO. |
| 9 | |
| 10 | Defendants. |

11

12    I, Jahan C. Sagafi, declare as follows:

13    1.    I am a partner in the law firm of Lieff, Cabraser, Heimann

14 & Bernstein, LLP, Lead Counsel for the Plaintiff Class Members in this action.  I have personal

15 knowledge of the matters stated herein and if called to testify I could and would testify

16 competently thereto.

17    2.    Attached hereto as Exhibit A is a true and correct excerpt of the transcript

18 of the August 22, 2006 status conference before the Court in this matter.

19    3.    Attached hereto as Exhibit B is a true and correct copy of the Executive

20 Summary of the Court-Appointed Monitor's Second Annual Compliance Report

21    4.    Attached hereto as Exhibit C is a true and correct copy of the Special

22 Master's Decision Regarding Abercrombie's Motion To Dismiss.

23    I declare under penalty of perjury that the foregoing is true and correct to the best

24 of my knowledge and recollection.  Executed this 20th day of May, 2008, in New York, New

25 York.

26

27    _____
     Jahan C. Sagafi

28

- 1 -

# EXHIBIT A

Gonzalez Status Conference transcript 082206

Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

EDUARDO GONZALEZ, ET AL.,          )
                                   )
            Plaintiffs,            )
                                   )
    v.                             )     Nos. C 03-2817 SI,
                                   )   C 04-4730 SI and C 04-4731 SI
ABERCROMBIE & FITCH STORES,        )
INC.,                              )
                                   )
            Defendant.             )
-------------------------------    )
and related actions.               )
                                   )

                              San Francisco, California
                              Tuesday, August 22, 2006

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          Lieff, Cabraser, Heimann &
                         Bernstein
                         275 Battery Street, 30th Fl.
                         San Francisco, California  94111
                   BY:   BILL LANN LEE
                         JAHAN C. SAGAFI

For Plaintiffs:          Minami, Lew & Tamaki LLP
                         Union Square
                         360 Post Street - 8th Floor
                         San Francisco, California  94108-4903
                   BY:   JACK W. LEE

For Plaintiff:           Equal Employment Opportunity Commission
(EEOC)                   San Francisco District Office
                         901 Market Street, Suite 500
                         San Francisco, California  94103
                   BY:   GREG GOCHANOUR

            (Appearances continued on following page.)

1

Reported By:        Leo T. Mankiewicz, CSR 5297 RMR, CRR
                    Official Reporter

                      Gonzalez Status Conference transcript 082206
APPEARANCES:  (continued)

For Plaintiffs:          Mexican American Legal Defense
                            and Education Fund
                         634 South Spring Street, 11th Fl.
                         Los Angeles, California  90014
                    BY:  KRISTINA CAMPBELL

For Defendant:           Farella, Braun & Martel LLP
                         235 Montgomery Street, 30th floor
                         San Francisco, California  94104
                    BY:  DOUGLAS R. YOUNG

                         Vorys, Sater, Seymour & Pease LLP
                         52 East Gay Street
                         Columbus, Ohio  43216-1008
                    BY:  THOMAS B. RIDGLEY
                         MARK A. KNUEVE
                         JONATHAN M. NORMAN

ALSO PRESENT:  MR. FRED ALVAREZ, Court-appointed monitor

                    MR. TODD CORLEY,
                     Vice President of Diversity,
                     Abercrombie & Fitch

1

                                                          3

1    Tuesday, August 22, 2006

2                                            3:05 p.m.

3              THE COURT:  All right.  Calling cases 03-2817,

4    04-4730, and 04-4731.  Could you please state your appearances

5    for me.

6              MR. LANN LEE:  Bill Lann Lee and Jahan C. Sagafi for

                              Page 2

Gonzalez Status Conference transcript 082206

21    We'll just get that done, your Honor.

22              THE COURT:  And however you want to structure that,

23    I'll be glad to sign off on it, in terms of the time.

24              MR. LANN LEE:  All right.  We will submit an order,

25    then.
1

28

1               THE COURT:  Mr. Lee?

2               MR. JACK LEE:  Good afternoon, your Honor.  Jack Lee

3     for the class of women.  My remarks will be brief.

4               While Abercrombie has made significant and obvious

5     progress with respect to the hiring of women, and we applaud

6     them for that, the progress in hiring women has been quite

7     lopsided, and we have continuing areas of concern.

8               In general, the -- unfortunately, the progress of

9     white women has not been matched by African-American, Hispanic

10    women and Asian-American women.  I realize that you don't have

11    a report before you, but I wanted to give you a sense of the

12    numbers that we're talking about here.  Abercrombie has a

13    300 percent turnover rate, which means that each position in a

14    retail store turns over three times.  So it's significant.

15              THE COURT:  Per year?

16              MR. JACK LEE:  Per year.

17              THE COURT:  Do we know why that is?

18              MR. JACK LEE:  That's just the nature of many retail

19    jobs.  It's also a very unique feature of the pool of employees

20    that Abercrombie pulls from.  I will let them address that

21    issue, but it's something that all the parties considered in

22    negotiating these benchmarks as well as realizing what the

23    applicant flow rate is.

24              Let me emphasize again that we always believed, on

Page 24

Gonzalez Status Conference transcript 082206

12    to both types of documents, and it could be that Mr. Alvarez's

13    report is free-standing, but if it's not, then I may at some

14    point make inquiry to see if we can arrange to get some portion

15    of the rest of that.

16                  Okay, anything else?  No?  Great, thank you.

17                  MR. KNUEVE:   Thank you, your Honor.

18                                                          4:21 p.m.

19

20

21

22

23

24

25
6

CERTIFICATE OF REPORTER

             I, LEO T. MANKIEWICZ, Official Reporter for the United
States Court, Northern District of California, hereby certify
that the foregoing proceedings in Case No. C 03-2817 SI,
Plaintiff              v. Defendant              , were reported
by me, a certified shorthand reporter, and were thereafter
transcribed under my direction into typewriting; that the
foregoing is a true record of said proceedings as bound by me
at the time of filing.

             The validity of the reporter's certification of
said transcript may be void upon disassembly and/or removal
from the court file.

Page 40

Gonzalez Status Conference transcript 082206

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Friday, September 8, 2006

6

# EXHIBIT B

1  Fred W. Alvarez, State Bar No. 068115
   WILSON SONSINI GOODRICH & ROSATI
2  650 Page Mill Road
   Palo Alto, CA 94304-1050
3  Telephone: (650) 493-9300
   Facsimile: (650) 493-6811
4
   Court-Appointed Monitor
5
                    UNITED STATES DISTRICT COURT
6
                  NORTHERN DISTRICT OF CALIFORNIA
7

8  EDUARDO GONZALEZ, ANTHONY            )  CASE NOS.: 03-2817 SI, 04-4730 and
   OCAMPO, ENCARNACIÓN GUTIERREZ,       )  04-4731
   JOHAN MONTOYA, JUANCARLOS GÓMEZ-     )
9  MONTEJANO, JENNIFER LU, AUSTIN CHU,  )  **EXECUTIVE SUMMARY OF**
   IVY NGUYEN, ANGELINE WU, ERIC FIGHT, )  **COURT-APPOINTED MONITOR'S**
10 CARLA GRUBB, DAVID CULPEPPER,        )  **SECOND ANNUAL COMPLIANCE**
   PATRICE DOUGLASS, and ROBAIR         )  **REPORT**
11 SHERROD, BRANDY HAWK and ANDRE       )
   STEELE, on behalf of themselves and all others, )
12                                      )
              Plaintiffs,               )
13                                      )
          v.                            )
14                                      )
   ABERCROMBIE & FITCH STORES, INC.,    )
15 A&F CALIFORNIA, LLC, A&F OHIO, INC., )
   and ABERCROMBIE & FITCH             )
16 MANAGEMENT CO.,                      )
                                        )
17            Defendants.               )
   ELIZABETH WEST and JENNIFER LU,      )
18                                      )
              Plaintiffs,               )
19                                      )
          v.                            )
20                                      )
   ABERCROMBIE & FITCH STORES, INC.,    )
21 A&F CALIFORNIA, LLC, A&F OHIO, INC., )
   and ABERCROMBIE & FITCH             )
22 MANAGEMENT CO.,                      )
                                        )
23            Defendants.               )
   EQUAL EMPLOYMENT OPPORTUNITY         )
24 COMMISSION,                          )
                                        )
25        v.                            )
                                        )
26 ABERCROMBIE & FITCH STORES, INC.,    )
   A&F CALIFORNIA, LLC, A&F OHIO, INC., )
27 and ABERCROMBIE & FITCH             )
   MANAGEMENT CO.,                      )
28                                      )
              Defendants.               )

   EXECUTIVE SUMMARY OF COURT-
   APPOINTED MONITOR'S SECOND
   ANNUAL COMPLIANCE REPORT

1  **I.     REQUIREMENTS OF CONSENT DECREE**

2       The Consent Decree provides for the preparation of an Executive Summary of the Court-

3  Appointed Monitor's Annual Compliance Report.  The Executive Summary should set forth "the

4  substance of the Monitor's findings" with respect to Abercrombie's[1] compliance with the

5  requirements of the Consent Decree for the applicable period.  The Consent Decree goes on to

6  describe the Executive Summary as follows:  "The parties contemplate that the Executive

7  Summary will reflect the Monitor's general findings in areas such as, but not limited to, training,

8  recruitment, . . . and attainment of Benchmarks, all as more specifically covered by the Report,

9  and the parties also contemplate that the Executive Summary will not include specific findings as

10 to, inter alia, the numbers of applications, hires, promotions, or specific occurrences or events.

11 By way of example, the Executive Summary's discussion of the Company's training could

12 generally set out the Monitor's findings relative to whether the Company had or had not met its

13 overall training objectives under the Decree over the subject reporting period, and, if not, a

14 general statement of matters with respect to which there had been non-compliance and any steps

15 the Company is to take to resolve such matters."  What follows is the Monitor's Executive

16 Summary of the Second Annual Compliance Report, with topics listed in the order presented in

17 the Consent Decree.  This Executive Summary does not discuss any of Abercrombie's

18 obligations limited to the first year following the Approval Date of the Decree.

19 **II.    SUBSTANCE OF MONITOR'S FINDINGS REGARDING MARKETING**

20      The Consent Decree requires that Abercrombie's marketing materials "reflect diversity,

21 as reflected by the major racial/ethnic minority populations of the United States."  The Monitor

22 found that Abercrombie's marketing materials during the Second Compliance Period,[2] taken as a

23

24     [1] This Executive Summary incorporates herein by reference the definition of "Abercrombie"
contained in the Consent Decree:  "'Abercrombie' or the 'Company' means Abercrombie &
25 Fitch Stores, Inc.; A&F California, LLC; A&F Ohio, Inc.; and Abercrombie & Fitch
Management Co., as well as each of their parents, subsidiaries, affiliates, officers, directors,
26 agents, management, successors and assigns and those in active concert or participation with
them, or any of them.  The terms of [the Consent] Decree cover all stores operated by
27 Abercrombie whether under the name Abercrombie & Fitch, Hollister, abercrombie, or any other
concept operated by Abercrombie."

28     [2] The Second Compliance Period extends from May 2006 to April 2007.

1  whole, did not reflect diversity. When the Monitor compared the apparent race/ethnicity of

2  individuals appearing in Abercrombie's marketing materials to the U.S. Census figures regarding

3  the major racial/ethnic minority populations of the United States, Abercrombie's marketing

4  materials were considerably less diverse. In particular, images of individuals whose apparent

5  race/ethnicity was Asian American or Latino were almost entirely absent from Abercrombie's

6  marketing materials.

7      To achieve compliance with this obligation, Abercrombie should strive to include African

8  American, Asian American, and Latino images in the full range of marketing materials so that

9  those materials, taken as a whole, reflect diversity.

10 **III.  SUBSTANCE OF MONITOR'S FINDINGS REGARDING NOTICE AND POSTING**

11

12     The Monitor found that Abercrombie generally achieved compliance with the Consent

13 Decree's requirements regarding the posting of Exhibit B Notices. In addition, Abercrombie

14 published the Exhibit B Notice every four (4) months in the HR 411 Bulletin, as required by the

15 Consent Decree.

16 **IV.  SUBSTANCE OF MONITOR'S FINDINGS REGARDING EEO AND DIVERSITY TRAINING**

17

18     The majority of Abercrombie's Managers-in-Training, Assistant Managers, Store

19 Managers, and General Managers, as well as District Managers and Regional Managers, have

20 received EEO and Diversity Training. However, Abercrombie has not yet demonstrated whether

21 its District Managers, Regional Managers, and in-store managers were trained within the time

22 periods required by the Consent Decree. The great majority of Abercrombie's Home Office

23 Employees received EEO and Diversity Training within the time periods prescribed by the

24 Consent Decree. Abercrombie did not have any training obligations with respect to Human

25 Resources Associates in the Second Compliance Period. On a going-forward basis, Abercrombie

26 should ensure that it implements adequate systems to identify which employees are due for

27 training under the Consent Decree, and that those employees are timely trained.

28

1

2   **V.    SUBSTANCE OF MONITOR'S FINDINGS REGARDING INTERNAL
        COMPLAINT PROCEDURE**
3

4       The Monitor found that, in general, Abercrombie complied with the Consent Decree's

5   requirements that it (1) commence and resolve investigations in a timely manner; (2) interview

6   relevant witnesses; (3) communicate the results of investigations to complainants; and (4) keep

7   written records of the investigatory steps taken. The Monitor also found that Abercrombie

8   continued to adequately publicize the Internal Complaint Procedure through the Exhibit B

9   Notices and the Associate Handbooks.

10  **VI.   SUBSTANCE OF MONITOR'S FINDINGS REGARDING RECRUITMENT AND
        HIRING**
11

12      In the First Annual Compliance Report, the Monitor reported that Abercrombie did not

13  comply with the Consent Decree's requirements that "all involved staff" receive training in the

14  Company's Recruitment and Hiring Protocol and that they do so within prescribed time periods.

15  Abercrombie also did not achieve compliance with these requirements during the Second

16  Compliance Period. Abercrombie must promptly train all involved staff, including all District

17  Managers, General Managers, Store Managers, Assistant Managers, and Managers-in-Training,

18  to be in compliance with the terms of the Consent Decree.

19      In the First Annual Compliance Report, the Monitor reported that Abercrombie's

20  Recruitment and Hiring Protocol did not contain an affirmative requirement that Abercrombie

21  seek qualified African American, Asian American, and Latino applicants of both genders, as

22  required by the Consent Decree. Abercrombie has since revised the Protocol to comply with this

23  portion of the Decree.

24  **VII.  SUBSTANCE OF MONITOR'S FINDINGS REGARDING MANAGERIAL
        PROMOTIONS**
25

26      Abercrombie promoted the targeted numbers of African American, Asian American,

27  Latino, and female managers to most managerial positions. However, Abercrombie did not

28  promote sufficient numbers of African American Assistant Managers to the Store

EXECUTIVE SUMMARY OF COURT-          -3-
APPOINTED MONITOR'S SECOND
ANNUAL COMPLIANCE REPORT

1  Manager/General Manager positions during the fourth six-month period.  To comply with the

2  requirements of the Consent Decree, Abercrombie must renew its efforts to promote African

3  American managers "in a proportion that is no less than the specific group's proportion of the

4  available feeder pool."

5  **VIII.   SUBSTANCE OF MONITOR'S FINDINGS REGARDING RECRUITERS**

6          The Monitor found that Abercrombie employed the agreed-upon number of Recruiters

7  and that Abercrombie based an adequate number of those Recruiters in major metropolitan areas,

8  as required by the Consent Decree.  Abercrombie was also charged with using Best Efforts[3] to

9  ensure that its Recruiters reflect diversity in race/national origin and gender.  More than half of

10 the Company's Recruiters are female, and a significant percentage are African American.

11 Abercrombie has also increased its percentage of Asian American Recruiters.  However, the

12 percentage of Latino and Asian American Recruiters remains too low to warrant a finding that

13 the Recruiters generally reflect diversity with respect to race.  The Monitor encourages

14 Abercrombie to continue its efforts to increase the overall diversity of its Recruiters.

15         The Consent Decree requires that Abercrombie consider both external and internal

16 candidates for the Recruiter position.  Although the Recruiter job description no longer provides

17 that a candidate must currently be employed by Abercrombie in a management-level position,

18 the Company has not yet hired an external candidate.  For the upcoming compliance period,

19 Abercrombie should expand its external recruiting efforts when seeking additional Recruiters

20 and/or filling vacant Recruiter positions.  Alternatively, Abercrombie should seek modification

21 of this requirement from Lead Counsel and the EEOC if the Company believes that the

22 objectives of the Recruiter provision are being attained.

23         In compliance with the Consent Decree, Abercrombie revised the job description for the

24 Recruiter position to include an affirmative directive that the Recruiters recruit African

25 Americans, Asian Americans, and Latinos of both genders.

26

27  [3] This Executive Summary incorporates herein by reference the definition of "Best Efforts" contained in the Consent Decree: "'Best Efforts' means implementing and adequately funding a

28  plan reasonably designed to comply with all the specific objectives to which the best efforts are directed."

1  **IX.    SUBSTANCE OF MONITOR'S FINDINGS REGARDING ADVERTISEMENTS**

2        The Monitor found that Abercrombie generally complied with the Consent Decree's

3  requirement that the Company place advertisements for in-store employment opportunities in

4  periodicals that targeted African Americans, Asian Americans, and/or Latinos of both genders.

5  In the third six-month period, the majority of the advertisements did not advertise for in-store

6  employment, as required by the Consent Decree.  However, in the fourth six-month period, all of

7  the advertisements expressly advertised for in-store opportunities.

8  **X.    SUBSTANCE OF MONITOR'S FINDINGS REGARDING RECRUITING**
   **EVENTS**

9

10       The Monitor found that Abercrombie satisfied the requirement that the Company attend

11  Minority[4] job fairs and recruiting events that are attended by African American, Asian American,

12  and Latino individuals of both genders.

13  **XI.    SUBSTANCE OF MONITOR'S FINDINGS REGARDING DIVERSITY**
    **CONSULTANT**

14

15       The Monitor found that Abercrombie utilized a Diversity Consultant to conduct diversity

16  and inclusion training and to aid in identifying sources of qualified Minority candidates, as

17  required by the Consent Decree.

18  **XII.    SUBSTANCE OF MONITOR'S FINDINGS REGARDING DOCUMENTATION**

19       The Monitor found that Abercrombie complied with the Consent Decree's requirement

20  that the Company provide documentation regarding the placement of advertisements for in-store

21  opportunities and the Recruiters' attendance at job fairs and recruiting events targeted towards

22  African Americans, Asian Americans, and Latinos.

23

24

25

26  _____

27       [4] This Executive Summary incorporates herein by reference the definition of "Minority"
    contained in the Consent Decree: "'Minority' means all African Americans, Asian Americans,

28  and Latinos."

## XIII. SUBSTANCE OF MONITOR'S FINDINGS REGARDING HIRING BENCHMARKS

The Monitor found that Abercrombie complied with the requirements of the Consent Decree in terms of implementing and establishing Hiring Benchmark rates for the third and fourth six-month compliance periods.

However, Abercrombie did not meet most Company-wide Hiring Benchmarks set for the Second Compliance Period. Table 1, below, summarizes Abercrombie's performance with respect to the Benchmarks for the Model position in the third and fourth six-month periods.

**Table 1**
**Model - Achievement of Third and Fourth Period Benchmarks**

|  | Third Period | Fourth Period |
|---|---|---|
| African American | Missed | Missed |
| Asian American | Missed | Missed |
| Latino | Missed | Missed |
| African American Female | Missed | Missed |
| Female | Met | Met |

Table 2, below, summarizes Abercrombie's performance with respect to the Benchmarks for the Manager-in-Training position in the third and fourth six-month periods.

**Table 2**
**MIT - Achievement of Third and Fourth Period Benchmarks**

|  | Third Period | Fourth Period |
|---|---|---|
| African American | Met | Missed |
| Asian American | Missed | Met |
| Latino | Missed | Missed |
| Female | Met | Met |

## XIV. SUBSTANCE OF MONITOR'S FINDINGS REGARDING REPORTING AND COMPLIANCE MEETINGS

The Monitor found that Abercrombie complied with the reporting and compliance meeting requirements set forth in the Consent Decree. The Company timely provided all reports required under the terms of the Consent Decree and engaged in compliance meetings pursuant to the terms of the Consent Decree.

XV.    **SUBSTANCE OF MONITOR'S FINDINGS REGARDING CONTENTS OF SEMI-ANNUAL PROGRESS REPORTS**

Abercrombie submitted Semi-Annual Progress Reports in a timely fashion, which it supplemented with additional materials.  The Monitor found that the Semi-Annual Progress Reports generally included the materials and information required pursuant to the Consent Decree.

Dated:  August 31, 2007                          Fred W. Alvarez

By:  _____
     Fred W. Alvarez
     WILSON SONSINI GOODRICH & ROSATI
     Professional Corporation

     Court-Appointed Monitor

# EXHIBIT C

In the Matter of the
Dispute Resolution Proceeding
Between

ABERCROMBIE & FITCH STORES, INC.

        And

LEAD COUNSEL AND THE EEOC

## SPECIAL MASTER'S DECISION REGARDING
## ABERCROMBIE'S MOTION TO DISMISS

This matter has been brought by Lead Counsel and the EEOC[1] (herein "Plaintiffs") before the Special Master pursuant to the Dispute Resolution and Enforcement Section (Section X.B.) of the Consent Decree in this case. Under Section X.B.2. of the Decree, the Special Master is authorized "to resolve all disputes arising under the Decree, subject to limitations and standards set forth in the Decree."

The substantive dispute raised by Plaintiffs, and that was not resolved after exhausting the other requisite alternative dispute provisions of the Decree, concerns Abercrombie's compliance with the Decree Section X.C.1. the "Marketing Diversity Provision." That Section provides:

> Abercrombie believes that the artistic aspect of its marketing materials is a critical factor driving the success of Abercrombie and its brand. As a company committed to achieving diversity in its store associates, as reflected in the other terms of this Decree, Abercrombie will reflect diversity, as reflected by the major racial/ethnic minority populations of the United States, in its marketing materials (taken as a whole).

---

[1] Lead Counsel are Kelly Dermody and Jahan Sagafi of Lieff Cabraser, Heimann & Bernstein, LLP; Bill Lann Lee of Lewis, Feinberg, Lee, Renaker & Jackson, P.C. and Jack Lee of Minami & Tamaki LLP. The EEOC is represented by John Hendrickson and Gregory Gochanour in the EEOC's Chicago Regional office.

Plaintiffs, citing the findings of the Decree Monitor, contend that Abercrombie has failed to comply with its diversity obligations under the Marketing Diversity Provision. Based on that assertion, on December 10, 2007, Plaintiffs initiated this proceeding by giving formal notice of their intent to move for an order enforcing Section X.C.1. In such December 10 filing, Plaintiffs seek a determination that Abercrombie has violated Section X.C.1. of the Decree and a remedial order setting specific marketing diversity goals and timetables.

Abercrombie responded with a Motion to Dismiss arguing, among other things, that the relief sought by Plaintiffs is impermissible under the express terms of the Decree.

For reasons discussed below, Abercrombie's Motion is granted and the proceedings initiated by Plaintiffs letter of December 10, 2007 are dismissed.

## BACKGROUND[2]

As the parties well know, the Abercrombie Decree was the product of many months of intense negotiation. With my direct involvement as mediator, the parties reached compromises on literally scores of issues ranging from relatively minor ones such as establishing how the beneficiary of Cy Pres funds would be determined, to very difficult ones that included agreeing to hiring benchmarks, the amounts of monetary payments to class members and Plaintiffs' counsel, and provisions related to how Abercrombie should market its products.

The marketing issue was a very difficult one from the outset. Abercrombie attributes much of its success to its distinctive and innovative marketing approach and insisted on preserving unimpaired its right to market its products without interference from third parties. While Plaintiffs recognized the importance to Abercrombie of its marketing programs, they

---

[2] The information set forth in this Background section has previously been made public and is not covered by the mediation privilege. Moreover, I have limited this statement to generic non-confidential observations.

contended that a purported lack of diversity in Abercrombie's marketing materials was a factor

that significantly adversely impacted the number of minorities interested in seeking employment

at Abercrombie. This marketing issue was discussed at virtually all of the in-person negotiating

sessions, but it was not until the end of the negotiations that a compromise resolution was

reached. That compromise was carefully drafted and is reflected by the terms of the Decree.

## DISCUSSION

The language of Section X.C.1 and its Subsections a. and b. control the outcome of this

matter.[3] As noted, Section X.C.1. sets forth affirmative diversity marketing obligations for

Abercrombie. As discussed briefly below, however, Subsections X.C.1, a. and b.,[4] go on to spell

out the only two remedies available in the event Abercrombie fails to comply with its Section

X.C.1. obligations.

---

[3] Consent decrees and orders have many of the characteristics of ordinary contracts and they should be construed generally as contracts without reference to the legislation originally sought to be enforced. United States v. Armour, 402 U.S. 673, 682 (1971).

[4] Subsections X.C.1 a. and b. provide:

Lead Counsel and/or the EEOC may assert that Abercrombie has not met its commitment under this paragraph for the following purposes only:

    a.    In the event that, at the end of the twenty- four (24) month period following the Approval Date, the Applicant Rate for any Minority group is lower than such group's interim Benchmark for the fourth six-month period, Lead Counsel and/or the EEOC may assert that this was caused by a chilling of applicant flow caused in part by not meeting the commitment in paragraph 1 of this Section. Any such assertion and Abercrombie's response thereto, may be considered by the Special Master. If the Special Master accepts the assertion of Lead Counsel and/or the EEOC, then the sole remedy shall be that the applicable interim Benchmark shall remain in effect unless and until the applicable Applicant Rate exceeds the applicable interim Benchmark.

    b.    In the event that Abercrombie seeks to obtain early termination of this Decree, under Section VI.B. hereof, and in the event that Lead Counsel and/or the EEOC seeks to challenge such early termination, Lead Counsel and/or the EEOC may assert that Abercrombie has not met its commitment in paragraph 1 of this Section. Any such assertion, and Abercrombie's response thereto, may be considered by the Special Master and/or the Court, along with Abercrombie's meeting or failing to meet other provisions of the Decree, in deciding whether to grant Abercrombie's request for early termination of the Decree.

(Emphasis added)

Subsection X.C.1. a.

In this subsection the parties agreed that if Abercrombie has not met certain availability benchmarks (i.e. goals) by the end of the first 24 months of the Decree, then upon Plaintiffs' successfully carrying their burden of showing that such failure by Abercrombie caused "a chilling of applicant flow" then "the applicable interim Benchmark shall remain in effect" for an additional period.  Thus, the parties agreed that the extending of the period during which interim Benchmarks would remain in place would serve as one remedy for Abercrombie's failure to meet its marketing diversity obligations.

Subsection X.C.1. b.

This subsection provides Plaintiffs a second remedy relative to a breach by Abercrombie of the Marketing Diversity Provision -- the potential barring of Abercrombie from obtaining an "early termination" of the Decree.  Under Section VI of the Decree, its term runs for 6 years. That 72 month period, however, can be reduced to 54 months (4.5 years) if various conditions are satisfied by Abercrombie.   One such condition is Abercrombie's compliance with the Marketing Diversity Provision.  Thus, if Plaintiffs can show that Abercrombie has violated that provision, they may use that failure as grounds to oppose Abercrombie's early termination of the Decree.

Thus, in addressing this contentious marketing issue, the parties struck a compromise; Abercrombie agreed that its marketing materials taken as a whole would reflect diversity as measured by the major racial/ethnic minority populations of the United States and the Plaintiffs agreed that if this obligation was not met then they had two potential remedies - one relating to Abercrombie's benchmark obligations and a second that could limit Abercrombie's ability to terminate the Decree early.

In this proceeding, however, Plaintiffs are not pursuing either of these remedies; rather as noted, they seek an order setting goals and timetables for Abercrombie's marketing diversity programs. But as detailed above, under the terms of the Decree, such relief is not available to Plaintiffs. As a result, even assuming a breach of Section X.C.1., I have no power to order the relief sought by Plaintiffs in this proceeding.[5]

In contending that the Decree should not be so construed, Plaintiffs make two primary arguments. First they assert that in these proceedings the remedies attendant to a breach of Section X.C.1. are not limited or qualified by Subsections a. and b. Rather, according to Plaintiffs, the remedy proscriptions of Subsections X.C.1 a. and b. are nothing more than limitations on the circumstances under which Plaintiffs can "independently" assert a breach. Thus, they argue that since they are not "independently" pursuing this claim, but rather are moving to enforce the findings the Monitor, Subsections X.C.1. a. and b. have no bearing on this proceeding and do not limit the remedies available to enforce of the Monitor's findings.

Elsewhere in their briefing, but in a like vein, Plaintiffs contend that this is really a dispute between the Monitor and Abercrombie and that the Plaintiffs are merely pursuing the dispute on the Monitor's behalf. Accordingly, they argue that since the limitations on remedies the Plaintiffs may seek do not apply to the Monitor, Subsections a. and b. have no application to this dispute.

Both arguments, however, are inconsistent with the express language of the Decree. As to the former, this proceeding was initiated by Plaintiffs' request for an order requiring diversity marketing goals and timetables -- something not permitted by the Decree. While they may seek

---

[5] As a general proposition decrees are negotiated and their final terms reflect the compromises of litigants in which they both give up something they might have won in litigation and waive their rights to litigate. Resultant decrees must be construed as written. <u>United States v ITT Continental Baking Co.</u>, 420 U.S. 223, 236-38 (1975).

to rely on the Monitor's findings in properly moving to enforce the Decree's terms, that does not change the fact that the Decree clearly bars this proceeding - - a proceeding in which the marketing relief sought by Plaintiffs is not permitted by the Decree: "Lead Counsel and/or the EEOC may assert that Abercrombie has not met its commitment under this paragraph [Section X.C.1.] for the following purposes [a. and b.] only". (Emphasis added.) It makes no difference whether Plaintiffs seek the barred relief "independently" based on the Monitor's findings or as a representative of or counsel for the Monitor.

As for the argument that this is really a dispute between the Monitor and Abercrombie, counsel for Abercrombie correctly points out that the Monitor has not asserted that there exists a dispute, much less initiated the dispute resolution procedures of the Decree.  In fact, Plaintiffs bring this proceeding without the knowledge of the Monitor, so far as the record reflects.  But that is not really the point.  Even if the Monitor requested that Plaintiffs bring this proceeding, the Decree bars the relief Plaintiffs currently seek.[6]

Plaintiffs next argue both in their Opposition to the Motion and in their Sur-reply that to construe the Decree to limit Plaintiffs remedies to those set forth in Subsection X.C.1. a. and b., renders Abercrombie's marketing obligations meaningless.  "Because the Monitor does not have standing . . . to bring disputes to the Special Master or court, it must rely on a party to do so . . . [and to limit relief as per Subsections X.C.1. a. and b.] would strip the Court appointed Monitor of his power to review and assess Abercrombie's compliance of the marketing diversity requirement . . ." Opposition Brief at p. 6.[7]

_____

[6] Moreover, as Plaintiffs acknowledge, under Sections X.B.4. and 8. the Monitor does not have standing to initiate the dispute resolution mechanisms much less enforce the terms of the Decree.
[7] See also Plaintiffs Sur-reply at p. 1 where Plaintiffs argue that Abercrombie's construction of the Decree renders Section X.C.1 unenforceable, as according to Plaintiffs, there is no one with the authority or power to force Abercrombie to live up to its marketing obligations.

Once again, Plaintiffs' argument cannot survive the plain language of the Decree. First, Subsections a. and b. have no impact on the power of the Monitor to review and assess Abercrombie's compliance with any provision of the Decree. These subsections speak to remedies not assessment of compliance. Second, regardless of the Monitor's role or how his power may be circumscribed by Subsections a. and b., if a breach of Section X.C.1. is found, there are only two available remedies. Notably though, neither is insubstantial in its import. As previously outlined, Subsection a. permits the imposition of interim Benchmarks for minority hiring until the Applicant Rate (as defined by the Decree) exceeds the applicable interim Benchmarks. This is not a meaningless remedy as its enforcement has the potential of, among other things, causing Abercrombie to increase its availability pool for minorities, which in turn could be expected to result in an increase in the number of minority hires. This of course, would be achieving precisely what Plaintiffs argue the marketing provisions are intended to achieve, but through a more direct route.

The second authorized remedy is also of considerable import. There are substantial costs and burdens for Abercrombie attendant to its being subject to this Decree. In recognition of that, the parties crafted language that provides that should Abercrombie violate Section X.C.1., that violation may be argued by Plaintiffs to prolong the term of the Decree by more than 30%. By Abercrombie's having to continue to operate under the Decree for an additional 18 months, its Benchmarks obligations (among others) remain in place and that again may directly accomplish the asserted purposes of the Decree.

That Plaintiffs at this juncture do not agree that these two negotiated remedies are sufficient is not an adequate grounds for adopting a reading of the Decree that is inconsistent

674002v1

with the plain meaning of its language.[8]  The Decree does not empower the Special Master to create new remedies; particularly when to do so would viciate the bargain the parties struck. (See Subsection X.B.4.)

Accordingly, Abercrombie's Motion to Dismiss is GRANTED and the enforcement proceedings initiated by Plaintiffs December 10, 2007 filings are hereby dismissed.

This _24th_ of April 2008.

SPECIAL MASTER

Hunter R. Hughes

---

[8] Indeed, "the instrument must be construed as written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation" Armour, 402 U.S. at 682.