**Exhibit 1**

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

ATTORNEYS AT LAW

JAHAN C. SAGAFI
PARTNER

EMBARCADERO CENTER WEST
275 BATTERY STREET, 30TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3339
TELEPHONE: (415) 956-1000
FACSIMILE: (415) 956-1008
mail@lchb.com
www.lchb.com

NEW YORK
NASHVILLE

August 28, 2009

## VIA ELECTRONIC MAIL & U.S. MAIL

Jonathan M. Norman
Thomas B. Ridgley
Mark A. Knueve
VORYS, SATER, SEYMOUR & PEASE, LLP
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008

> Re:   *Gonzalez v. Abercrombie & Fitch* – Letter pursuant to Section X.B.4.a.
> of the Consent Decree

Dear Colleagues:

We are sending this letter to Abercrombie on behalf of the EEOC and Lead Counsel seeking to initiate steps to resolve a dispute pursuant to Section X.B.4.a. of the Consent Decree. Following are each of the four components required by the Decree:

> (a)   **reference to all specific provisions of the Decree that are involved:**

The issues outlined below are covered by Sections X.A.1; X.A.5; XII.A.2; and XIV.A and C of the Consent Decree.

> (b)   **a statement of the issues:**

Lead Counsel and the EEOC raise the following issues: (i) failure to achieve a substantial number of benchmarks; (ii) failure to use best efforts to achieve benchmarks; (iii) use of a people selection process that has a disparate impact on the hiring of minorities into the Brand Representative (now "Model") position; and (iv) consideration of changes in activities and implementing procedures that cause possible disparate treatment in hiring into the Brand Representative (now "Model") position, suppression of minority applicant flow for that position, and disproportionate segregation of minorities into the back of the store positions, Impact and Overnight.

832254.1

Jonathan Norman
August 28, 2009
Page 2

     **(c)**    **a statement of the remedial action sought by the initiating party:**

     The EEOC and Lead Counsel seek a finding by the Court that Abercrombie has violated the above-referenced sections of the Consent Decree and an Order requiring Abercrombie to: make changes in activities and implementing procedures relating to the people selection process that cause possible disparate treatment or disparate impact in hiring, including altering its hiring criteria to eliminate or mitigate adverse impact of hiring processes on minority applicants for the Brand Representative (now "Model") position; altering its employment application kiosks to allow applicants to apply for more than one position; refraining from speaking to applicants at the employment kiosks; and such other relief as may be appropriate.

     **(d)**    **a brief statement of the specific facts, circumstances and any other arguments supporting the position of the initiating party:**

     (1) At the last status hearing, when the Court was apprised of Sixth Period reporting, the Court advised Abercrombie that if it continued to fail to achieve the benchmarks, it would need to identify the reasons for the continued failure and implement changes that reasonably could be expected to bring Abercrombie into compliance with the Decree. Abercrombie then missed several benchmarks but failed to identify reasons and a reasonable plan of action.

     (2) Abercrombie has consistently failed to achieve benchmarks for many minority categories. Throughout the life of the Decree, on a recurring basis, Abercrombie has failed to achieve benchmarks for minority hiring and promotions, particularly for African Americans, Latinos, and African American females. For example, in the Seventh Period, Abercrombie failed to achieve the benchmark for hiring into the Brand Representative (now "Model") position with respect to African Americans, Latinos, and African American females. It also failed to achieve the benchmark for MITs with respect to African Americans and Latinos, the Assistant Manager benchmark with respect to African Americans and Asian Americans, and the Store Manager benchmark with respect to African Americans and Asian Americans. Abercrombie's performance with respect to achieving benchmarks under the Decree in the Eighth Period was even worse (and arguably Abercrombie's worst performance since the entry of the Decree). It failed to achieve the benchmark for hiring into the Brand Representative (now "Model") position with respect to African Americans, Latinos, females, and African American females. It also failed to achieve the benchmark for the MIT position with respect to African Americans, Asian Americans and Latinos. Abercrombie also failed to achieve the benchmark for the Assistant Manager position with respect to African Americans, Latinos and Asian Americans, and failed to achieve the benchmark for the Store Manager position with respect to African Americans and Latinos.

     (3) Abercrombie has failed to identify reasons for its failure to meet benchmarks and has failed to implement changes that reasonably could be expected to bring Abercrombie into compliance with the Decree. We refer you to Abercrombie's Report regarding the Seventh Period results which provided Abercrombie's analysis of why it failed to meet benchmarks and other requirements and the actions it intended to take to bring itself into compliance with the

Jonathan Norman
August 28, 2009
Page 3


Decree.  We also refer you to the written response provided by the EEOC and Lead Counsel in which we indicated that we did not agree with the explanations and analysis provided by Abercrombie and did not believe that the actions proposed by Abercrombie reasonably could be expected to bring Abercrombie into compliance.

Thank you for your cooperation.

Sincerely,


*/s/ Bill Lann Lee*
Bill Lann Lee
Lewis, Feinberg, Lee, Renaker & Jackson, P.C.


*/s/ Jack Lee*
Jack Lee
Minami Tamaki LLP


*/s/ Jahan C. Sagafi*
Jahan C. Sagafi
Lieff, Cabraser, Heimann & Bernstein, LLP


*Attorneys for Plaintiffs*


*/s/ Gregory Gochanour*
Gregory Gochanour


*Attorney for EEOC*


cc:      Fred Alvarez


832254.1

**Exhibit 2**

Bill Lann Lee (SBN 108452)
Julie Wilensky (SBN 271765)
LEWIS, FEINBERG, LEE, RENAKER &
JACKSON, P.C.
476 9th Street
Oakland, CA  94607
Telephone: (510) 839-6824
Facsimile: (510) 839-7839
Email: blee@lewisfeinberg.com
Email: jwilensky@lewisfeinberg.com

John C. Hendrickson (IL SBN 1187589)
Gregory M. Gochanour (IL SBN 6210804)
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
500 West Madison Street, Suite 2800
Chicago, IL  60661
Telephone: (312) 869-8100
Facsimile: (312) 869-8124
Email: gregory.gochanour@eeoc.gov

Kelly M. Dermody (SBN 171716)
Jahan C. Sagafi (SBN 224887)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: kdermody@lchb.com
Email: jsagafi@lchb.com

Jack W. Lee (SBN 071626)
Sean Tamura-Sato (SBN 254092)
MINAMI TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, CA  94108
Telephone: (415) 788-9000
Facsimile: (415) 398-3887
Email: jlee@minamitamaki.com
Email: seant@minamitamaki.com

*Lead Counsel and the EEOC, on behalf of the Plaintiff Class Members*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDUARDO GONZALEZ et al., | ) | Case Nos. 03-2817 SI, 04-4730 SI, and |
| Plaintiffs, | ) | 04-4731 |
| | ) | |
| v. | ) | **PLAINTIFFS' MEMORANDUM** |
| | ) | **IN SUPPORT OF PLAINTIFFS'** |
| ABERCROMBIE & FITCH | ) | **ENFORCEMENT PROCEEDING** |
| STORES, INC., et al., | ) | **AND IN OPPOSITION TO** |
| Defendants. | ) | **ABERCROMBIE'S MOTION** |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | **REQUESTING RESOLUTION OF THE** |
| | ) | **ENFORCEMENT PROCEEDING** |
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | **Before Special Master** |
| | ) | **Hunter R. Hughes** |
| v. | ) | |
| | ) | |
| ABERCROMBIE & FITCH | ) | |
| STORES, INC., et al., | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

In addition, the Monitor appropriately found that throughout the life of the Decree, Abercrombie has failed to meet certain benchmarks set by the Decree for the hiring for African Americans, Latinos, and African American females, and that Abercrombie's efforts with respect to certain benchmarks are not "best efforts" as defined by the Decree.

## II.   STATEMENT OF THE CASE

### A.  Statement of Issues

(1) Whether the selection criteria for the model position, taken collectively, cause adverse impact in the hiring of Africans, Latinos, and African American females into the model position;

(2) If there is such adverse impact, whether Abercrombie has used best efforts to determine whether alternative job-related selection criteria or an alternative use of existing selection criteria has less adverse impact and would be equally predictive of performance; and

(3) Whether Abercrombie has used best efforts to achieve the benchmarks set by the Consent Decree for the hiring of Latinos, African Americans, and African American females into the model position.

### B.  Statement of Relief Requested

Plaintiffs seek a ruling from the Special Master stating that Abercrombie is not in compliance with Section XII.A.2 and XIV of the Consent Decree.  Plaintiffs request that the Special Master order Abercrombie to comply with the Decree by modifying the PSP to use less discriminatory alternatives, or by implementing the existing PSP in a less discriminatory manner. If the Special Master finds in Plaintiffs' favor, Plaintiffs will seek an order from the Court to effectuate the relief and extend the Decree. Abercrombie is not entitled to a declaration that,

contrary to the Monitor's determinations, it met the best efforts standard in seeking to meet the benchmarks.

### III. <u>STATEMENT OF FACTS</u>

#### A. Background

Abercrombie's People Selection Process for models ("PSP") consists of structured group interviews conducted by store managers and "people assistant" store managers in all stores. (*See* Expert Report of Dr. Kathleen K. Lundquist ("Lundquist Report") ¶ 39 & Attachment C, "Understanding the Structured Interview," at 4.) The interviews cover three competencies, "Appearance & Sense of Style," "Outgoing & Promotes Diversity," and "Sophistication & Aspiration." (Declaration of Todd Corley ("Corley Dec.") Ex. 4 (Model Interview Guide).) The managers are provided interview guides with questions and scripts, although they are supposed to ask no questions for the first competency. (Lundquist Report Attachment C, "Conducting an Interview," at 13; Corley Dec. Ex. 4.) The managers rate each applicant on each competency on a three-point scale. (Corley Dec. Ex. 4.) These ratings require managers to make subjective assessments.[1] (Lee Dec. Ex. 1, APT Responses to Questions, at A&F 4001.) Applicants who score 1 out of 3 on the "Appearance & Sense of Style" competency are automatically rejected. (Lee Dec. Ex. 2, PSP Interview Guide) ("If someone scores a 1 on appearance & sense of style, they SHOULD NOT be hired."); Corley Dec. Ex. 4 at 11.)

Abercrombie provides its store managers centralized, common training of the PSP. (*See* Lundquist Report Attachment C (training on the PSP); Lee Dec. Ex. 3, HR 411 info) (stating that only managers who have completed the online PSP training may conduct interviews); Corley Dec. ¶¶ 11-20) (describing training and oversight of store managers).) Store managers are

---

[1] Exhibits to Plaintiffs' Motion are submitted as attachments to the Declaration of Bill Lann Lee ("Lee Dec.").

**Exhibit 3**

**BEFORE SPECIAL MASTER HUNTER R. HUGHES**

| | |
|---|---|
| In the Matter of the | : |
| Dispute Resolution Proceeding | : |
| Between | : |
| | : |
| ABERCROMBIE & FITCH STORES, INC. | : |
| | : |
| Plaintiffs, | : |
| | : |
| And | : |
| | : |
| LEAD COUNSEL | : |
| and | : |
| THE EQUAL EMPLOYMENT | : |
| OPPORTUNITY COMMISSION ("EEOC"): | |
| | : |
| Defendants. | : |
| _____ | : |

## <u>ORDER</u>

Lead Counsel for Plaintiffs in the original action and the Equal Employment

Opportunity Commission (herein "Plaintiffs") initiated this enforcement action on

August 28, 2009 pursuant to Section X.B. of the Consent Decree ("the Decree").[1]

They contend that Abercrombie & Fitch Stores, Inc. ("Abercrombie") has failed to

comply with its obligations under Sections XII.A.2. and XIV of the Decree

because it did not (1) investigate the possibility of changing its hiring criteria or its

---

[1] This Decree was entered into in November 2004 following lengthy negotiations
involving Abercrombie, Class Counsel and the EEOC.  It was approved by Judge
Susan Illston on April 14, 2005.

implementation by conducting empirical analyses to determine whether certain of

the individual components of Abercrombie's hiring process PSP[2] had adverse

impact on one or more of the Protected Groups[3] covered by the Decree, or (2)

ascertain if the assessments required by its hiring process were made reliably.

(Plaintiffs' Memo in Support of Enforcement Action, p. 1.)  This challenge raises

three core issues:

(1)     Whether the selection criteria for Abercrombie's Model position,[4]

taken collectively, cause adverse impact in the hiring of African-Americans,

Latinos, and African-American females into that position;

(2)     If there is such adverse impact, whether Abercrombie has used Best

Efforts to determine whether alternative job-related selection criteria or an

alternative use of job-related selection criteria would have less adverse impact and

would be equally predictive of performance; and

(3)     Whether Abercrombie has used Best Efforts to achieve the

Benchmarks established in Section XIV of the Consent Decree for the hiring of

---

[2] The entire hiring process here at issue is called the People Selection Process ("PSP").

[3] The "Protected Groups" in the Decree are African-Americans, Asian-Americans, Latinos, women and African-American women.

[4] The Model position is Abercrombie's title for the position of in-store sales person.  Abercrombie asserts that the job is not a typical retail position, but, rather, it is a position where the main function is to model the brand to the customer.

Latinos, African-Americans, and African-American females into the Model position.

Before turning to the specific issues raised by Plaintiffs, it is helpful to address very briefly the context in which this proceeding arises. The Decree culminated from litigation brought against Abercrombie asserting a number of class claims; one of which being that Abercrombie's hiring policies and practices for the position of Model discriminated against certain minorities. The case settled in 2004 and, as a part of the settlement, Abercrombie committed to developing a new hiring process for its Model position. The agreed upon process is set forth in Section XII.A. of the Decree. It provides in relevant part the following:

### XII.   JOB ANALYSIS, MINIMUM ELIGIBILITY REQUIREMENTS, JOB CRITERIA

#### A.   Job Analysis and Job Criteria.

1.   The parties stipulate and agree upon Abercrombie's retention of Kathleen Lundquist, a professional industrial organizational psychologist, to develop a written job analysis and job-related criteria for each in-store store position.

2.   No later than four (4) months after the Approval Date, in consultation with the industrial organizational psychologist, Abercrombie shall develop selection criteria for in-store positions, including Minimum Eligibility Requirements that are job related and consistent with business necessity to the extent required by Title VII. Selection criteria shall be subject to challenge under Section X of this Decree only if a particular position's selection criteria, taken collectively, cause adverse

- 3 -

impact in selection rate for African-Americans, Asian-Americans, Latinos, or women.  If the selection criteria cause such adverse impact and are challenged under Section X of this Decree, the selection criteria shall be affirmed if Abercrombie shows that it has used Best Efforts to determine whether alternative job-related selection criteria or whether an alternative use of job-related selection criteria has less adverse impact and would be equally predictive of job performance.

***

4.     Abercrombie will provide Lead Counsel and the EEOC with the job analyses, including Minimum Eligibility Requirements, and job-related criteria in order to provide an opportunity for comment.  The content of the job analyses and job-related criteria prepared pursuant to Section XII.A.1. will not be subject to review under Section X of this Decree.

In addition, Abercrombie agreed to certain interim and thereafter applicant-flow based hiring goals or Benchmarks.  Those benchmark principles and obligations are set forth in Section XIV of the Decree.

## XIV.  BENCHMARKS

### A.     General Principles

1.     Abercrombie shall use Best Efforts to meet the selection benchmarks set forth in this section. These Benchmarks do not establish maximum or minimum rates for the selection of African Americans, Latinos, Asian Americans or women; rather these Benchmarks establish selection rates that Abercrombie will use Best Efforts to achieve.

2.     In attempting to meet these Benchmarks, Abercrombie shall not be required to select unqualified persons

- 4 -

or to displace any incumbent associate from his or her position. These Benchmarks are not quotas; rather, they are Benchmarks designed to afford guidance as to whether Abercrombie is making selection decisions in such a way as to afford equal employment opportunity.

3.      Abercrombie's failure to achieve a Benchmark for a particular position or period will not be considered a violation of this Decree unless Abercrombie has failed to use Best Efforts to meet the Benchmark. Should Abercrombie demonstrate that the proportion of good faith offers made to applicants of a particular group as compared to all applicants was at least as high as the Benchmark percentages, such evidence will conclusively establish that the Benchmark was met.

*****

## C.    Applicant Rate Goals

After the period when Interim Hiring Goals, described in Part B above, will be used, Abercrombie shall use Applicant Rate in the preceding six- month period as a goal for Benchmark Positions during the remaining term of the Decree. Abercrombie will identify the applicable Applicant Rate to the Monitor, Lead Counsel, and the EEOC within thirty (30) days of the beginning of each six- month period. If Abercrombie has been found to have failed to use Best Efforts to implement Benchmarks, the parties shall meet and confer under the direction of the Special Master to determine when and under what conditions Abercrombie may proceed to use of [sic] Applicant Rate goals.

## The Creation of Selection Criteria and the PSP

As per the Decree, Abercrombie retained Dr. Kathleen Lundquist and her

organization, APTMetrics, Inc. ("APT") as a consulting expert relative to the

- 5 -

development of a new selection process. Also as called for by the Decree, Dr. Lundquist first undertook and completed a job analysis study of all in-store positions including the Model position, across brands, regions, and districts. (See Corley Dec. ¶7; Lundquist Dec. ¶¶8 & 15.)

Based on the job analysis, key competencies were identified that were deemed important and required at the time of hire for the Model position. From the original 22 competencies identified for this position, the number was eventually reduced to three; "Outgoing & Promotes Diversity;" "Sophistication & Aspiration;" and "Appearance & Sense of Style." The job analysis showed that all three competencies were important, but of the three the "Appearance & Sense of Style" competency was the most critical to the Model job. (Lundquist Dec. ¶33) Dr. Lundquist included the Appearance & Sense of Style competency as a separate hurdle in the hiring tools she created, (id. ¶34), since she had found that a main function of the Model job is to model the brand to the customer and actually serve as a type of advertising for the brand. Specifically, Dr. Lundquist structured the selection process, PSP, such that only applicants who scored 2 out of 3 on the Appearance & Sense of Style competency were eligible for selection. (Lee Dec. Ex. 2, PSP Interview Guide) ("If someone scores a 1 on Appearance & Sense of Style, they **SHOULD NOT** be hired."); Corley Dec. Ex. 4 at 11.)

The cut-off scores for the Sophistication & Aspiration and Outgoing & Promotes Diversity competencies are considered as a total.  Each candidate is rated 1, 2, or 3 for these two competencies, and when added to the Appearance & Sense of Style score, a 6 or 7 score total constitutes a "meets expectations/ recommended," and 8 or 9 is "outstanding/high recommended."  Thus, to be eligible for hire, candidates must meet or exceed a total score of at least 6 with their Appearance & Sense of Style score being no less than 2.  (Application of Hiring & Interview Training Guide at 62.)

Given that there were several thousand Models employed in the stores and that the turnover in the position was high (during the term of the Decree, there were more than 150,000 applications per year for the Model position), (see Lanier Dec., Table 2), Dr. Lundquist considered use of a group interview and alternatives thereto.  (Lundquist Dec. ¶¶39, 41-42.)  After concluding that group interviews were appropriate, APT developed a group structured interview process whereby Store Managers could interview up to eight  Model applicants in a group setting. (Id.)  The structured interviews were validated using a content validation approach. (Lundquist Dec. ¶46.)

- 7 -

With the development of the selection criteria[5] and a structured interview process, a new centralized common training program was also developed by APT in which all hiring managers are provided interview guides and trained with questions and scripts for use in interviews.  (Lundquist Report Attachment C, "Conducting an Interview," at 13; Corley Dec. Ex. 4.)  Thus every store uses the same interviews and the same questions and same rating procedures in hiring for the Model position.  While the structured interviews are aimed at providing consistent and reliable outcomes and selections, Managers nevertheless still have to make some subjective assessments in respect of their hiring selection decisions. (Declaration of Bill Lann Lee ("Lee Dec.") Ex. 1, at 4001-2; Corley Dec. Ex. 4).

The actual hiring decisions are made by the Managers in each store. However, District Managers and Regional Managers oversee and monitor the selection process in the stores for which they are responsible.  (Lee Dec. Ex. 4, Script for All-Stores Call and CEO's Speech at Home Office; Lundquist Report Attachment C, "Understanding the Structured Interview," at 4 ("The DM is still ultimately accountable for all the hiring conducted in the store"); Ex. 1, APT

---

[5] There are no other components of, or criteria for, the selection process, such as a background check, or a minimum education or experience requirement. (*See* Lundquist Report, Attachment B, Recruitment and Hiring Protocol, at 2-3 (stating that the Brand Representative (now Model) position has "no education requirement, no experience requirement" and listing "pass group interview" as the sole selection criteria).)

Responses to Questions, at A&F 4001.)  The Diversity Office and the Human

Resources Department also oversee the process and issue directives concerning

Model hiring in the stores.  (*See* Corley Dec. ¶¶ 11-20.)

The organizational psychologist expert hired by Plaintiffs for the purposes of

this enforcement proceeding, Dr. Sheldon Zedeck, has acknowledged that all of the

work of Dr. Lundquist and APT was within professional standards.  (Zedeck Dep.

at 119-20.)  Dr. Zedeck also acknowledged that all of the competencies assessed in

the structured interview were job-related and rated critical to the Model position by

the job analysis.  (Id.)  Furthermore at the April 1 hearing the plaintiffs agreed that

the PSP was properly validated by Dr. Lundquist.

### Implementation of PSP and Benchmarks

As referenced above, Section XIV of the Decree establishes hiring

Benchmarks (i.e. rates at which hires, or good faith offers, are set in the Decree)

that Abercrombie is required to use Best Efforts to meet.  For the first two years of

the Decree the Benchmarks or goals were set at interim rates and thereafter the

Benchmarks are set at the actual applicant flow rate for the previous 6 month

period for each of the Covered Groups.

The court appointed Monitor is required by the Decree to, among other things, assess whether Abercrombie used Best Efforts to attain the Benchmarks and issue annual compliance reports.  (See Section XVI of the Decree.)  Over the course of the Decree, the Monitor's compliance reports repeatedly found that Abercrombie, while dramatically increasing the number and percentage of minorities being hired into the Model position, did not reach the Benchmarks established by the Decree for hiring of African-Americans, African-American females and Latinos and that the shortfalls were at statistically significant levels when aggregated across stores on an annual basis.  (See Lee Ex. 7, Monitor's Fifth Report 82 n.88; Lee Dec. Ex. 9, Monitor's Fourth Report 85 n.80, Monitor's Third Report 75 n.69, Monitor's Second Report 94 n.89, Monitor's First Report 115.)

Dr. Lundquist separately monitored adverse impact quarterly on an aggregated basis (without separate consideration of specific store outcomes) after the implementation of the PSP.  On that aggregated basis, she found some patterns of adverse impact with respect to African-Americans and in some instances adverse impact as to Latinos.  (Lundquist Dec. ¶¶ 68, 71.)

Dr. Siskin also statistically assessed the Company's success in meeting the Benchmarks for African-Americans, Latinos, and African-American Females. (See Siskin Dec. ¶2.)  Dr. Siskin found that four factors affected Abercrombie's

- 10 -

ability to meet the Benchmarks: (1) applicant flow; (2) "Effective Applicant Flow;" (3) selection; and (4) the extent to which applicants self-identified as "Two or More Races" instead of, for example, African-American. (Id. ¶24.)

After analyzing the data relative to each of the Benchmarks for African Americans, Latinos and African-American women, Dr. Siskin found that Abercrombie missed the Benchmarks for Latinos for Periods 8 and 10; African-Americans for Periods 6, 8 and 10; and for African-American females Periods 6,7,8,9 and 10 but found that this number was the result of the selection rates at a limited number of stores.

At the April 1 hearing Abercrombie acknowledged that it had not achieved the selection Benchmarks provided for by Section XIV, but vigorously contended that it had met its Best Efforts obligations.

Following implementation of the PSP, APT and Abercrombie on an ongoing basis considered ways to improve the process and minimize adverse impact. (Lundquist Dec. ¶63; Corley Dec. ¶¶11-20.)  This work involved improvements to the job descriptions, interviews, Recruitment and Hiring Protocol, and to the PSP. Id.  For example, Dr. Lundquist recommended that Abercrombie develop a method for visually communicating the standards for Appearance & Sense of Style to enhance consistency in the application of those standards.  (Lundquist Dec. ¶35.)

Abercrombie, in consultation with APT, then developed the Image Book which provides pictures of associates who meet or exceed the Appearance & Sense of Style standard to help managers compare the look of the associates in their store with the look of the associates in the Image Book.  (Id.)  It was designed to be used as a resource for managers to help them calibrate what a "Meets" or "Exceeds Expectations" on Appearance & Sense of Style looks like.  (Id.)  The Image Book has been incorporated into PSP training by APT.  Id.  In the current versions of the Image Book, over 50% of the associates pictured are visibly People of Color.  (Corley Dec. ¶18.)

Some other examples of continuing work on the PSP include:

- Abercrombie audited the results of the selection procedures for completeness and content.  (Corley Dec. ¶¶11-20.)

- Abercrombie implemented a Hairstyle Sketchbook to clarify the Look Policy's provision on hairstyles, as the Monitor suggested.  (Lundquist Dep. at 20.)

- Abercrombie, in conjunction with APT, also conducted continual training and re-training regarding the PSP and the Model Group Interview Guide.  (Lundquist Dec. ¶¶63-67, 74, 77; Corley Dec. ¶¶11-20.)

- Abercrombie evaluated managers on compliance with the PSP. (Corley Dec. ¶¶18, 20.)

- Abercrombie, in conjunction with Dr. Lundquist, revised the Model Group Interview Guide from time to time to implement

suggestions of the Plaintiffs and/or the Monitor.  (Lundquist Dec. ¶75.)

- APT monitored adverse impact and when it detected adverse impact, it conducted investigations to attempt to determine the cause of the adverse impact, and determined that results varied by location.  (Lundquist Dec. ¶¶71-73, Lundquist Dep. at 10.)

- Consistent with the finding that selection rates differed by location, APT and Abercrombie evaluated individual managers as a potential source of adverse impact.  (Lundquist Dec. at ¶¶71-73; Lundquist Dep. at 18-19; Corley Dec. at ¶¶16, 18, 20.) When "problem" areas were located, responsible managers were counseled and/or trained.  (Id.)

- Abercrombie tied diversity in hiring and incumbency to store performance, worked to improve the effectiveness of the diversity recruiters, increased the size of the Office of Diversity, launched an Executive Diversity Council; created Diversity Week to bring company attention to diversity initiatives, and provided additional training and communication regarding diversity.  (Lundquist Dec. ¶64, 71-72; see also Corley Dec. ¶¶11-20.)

Abercrombie's applicant rates have steadily risen during the life of the Decree, from 8.7% (African-American) and 10.4% (Latino) during the First Semi-Annual Reporting Period to 17.26% and 17.29% during the Eleventh Period.

While, as evidenced by the foregoing, Abercrombie invested substantial time and resources into improving the PSP and addressing the shortfalls noted by APT and found by the Monitor, it did not conduct empirical analyses of the adverse effect of any of the three components of the Model interview guide, i.e.,

- 13 -

"Appearance & Sense of Style," "Outgoing & Promotes Diversity," and "Sophistication & Aspiration." (Lundquist Dep. 13:25-16:3.) Plaintiffs' industrial psychologist expert, Mr. Zedeck, recommended that "analyses should be undertaken to study if there are differential impacts of the competency ratings on adverse effect." (Lee Dec. Ex. 16, Expert Report of Sheldon Zedeck ("Zedeck Report" at 12.)

There also were no empirical studies involving another component of the PSP, the group interview. (Lundquist Dep. 29:22-30:19, 51:22-52:3.) The Model selection process relies on group interviews that could range from one to eight applicants at a time. (Corley Dec. Ex. 4.) In the structured interview format for more than one applicant, each applicant in turn is asked the same initial questions. (*Id.* at Section III ("Repeat the question to each candidate").) Group interviews in theory can give rise to issues of influence and cueing. (Lee Dec. Ex. 1 at A&F 3999.) APT did not then conduct empirical studies to ascertain, for example, if the single-applicant interviews had less adverse impact than multiple-applicant interviews in order to be in a position to consider possibly altering the group interview process. (Id. at 51:22-52:3.)

Abercrombie also did not make any specific empirical determination of whether the subjective assessments by raters using the interview guides were being

- 14 -

made reliably. Abercrombie conducted no empirical studies of inter-rater reliability to insure that different raters were in fact consistently making subjective assessments in using the interview guide. (Lundquist Dep. 16:4-17:15.)

Dr. Lundquist testified that she was more comfortable that Abercrombie's selection process was reliably administered based upon her continuing monitoring and work with the Company than she would have been had she conducted an empirical analysis. (Lundquist Dep. at 41-44.) Neither of the parties cited any research or other evidence to suggest that there is a relationship between adverse impact and inter-rater reliability. (Lundquist Dep. at 44; Zedeck Dep. at 103.)

Dr. Lundquist opined that even if an empirical component analysis were to identify that the Appearance & Sense of Style criterion for the Model position caused adverse impact, there is no other selection criterion which would both reduce adverse impact and be equally predictive of performance in the Model position. (Lundquist Dec. ¶¶11, 33, 34.) It is further Dr. Lundquist's opinion that there is no alternative selection criteria, nor alternative use of selection criteria, which would have less adverse impact and be equally predictive of performance. (See Lundquist Dec. ¶¶81-83.) Dr. Lundquist stated in her Declaration: "It is my professional opinion, on the basis of our work over the past six years, that there are no alternative selection criteria or alternative uses of the existing selection criteria

- 15 -

that would measure the critical requirements of the job and be equally predictive of performance in the Model position." (Id.)

During the life of the Decree, Abercrombie has more than quadrupled the incumbency rate of African-Americans, Asian-Americans, and Latinos in the Model position, and more than quintupled the incumbency rate of people who self-identify as non-white. As reflected in the below chart, more than half of those holding the Model position on October 31, 2010 were non-white:

| Race/Ethnicity | 2003 EE0-1 Report | October 31, 2010 Incumbency Rates |
|---|---|---|
| African-American | 2.48% | 13.91% |
| Asian-American | 3.18% | 10.04% |
| Latino | 3.34% | 18.47% |
| Two or More Races[6] | 0% | 8.92% |
| Total | 9% | 51.34% |
| White | 90.8% | 47.99% |

In raw numbers, the number of non-whites holding the Model position has multiplied nearly eight-fold, at the same time that the number of whites holding the Model position has declined by more than 25%:

| Race/Ethnicity | 2003 EE0-1 Report | October 31, 2010 Incumbency |
|---|---|---|
| African-American | 740 | 5,738 |
| Asian-American | 948 | 4,140 |
| Latino | 995 | 7,619 |

___

[6] Applicants began to be able to select the race/ethnicity category of "Two or More Races" during the life of the Decree. The category was not available at the time the Decree was negotiated.

- 16 -

| | | |
|---|---|---|
| **Two or More Races** | 0 | 3,680 |
| **Total** | 2,683 | 21,177 |
| **White** | 27,043 | 19,801 |

Abercrombie employs a higher percentage of African-Americans, Latinos, and Asian-Americans in its Model position than the percentage of African-Americans, Latinos, and Asian-Americans that live in the United States, as reflected by the 2005 United States Census:

| Race/Ethnicity | 2005 U.S. Census | 10/31/10 Incumbency Rates in Model Position |
|---|---|---|
| **White** | 67% | 47.99% |
| **African-American** | 12.80% | 13.91% |
| **Asian-American** | 4.30% | 10.04% |
| **Latino** | 14.40% | 18.47% |
| **Two or More** | 1.5% | 8.92% |
| **Total Minority** | 33.0% | 51.34% |

**Statistical Analyses By The Parties' Experts**

Both parties' statistical experts, Dr. Lanier for Plaintiffs and Dr. Siskin for Abercrombie, in reports prepared at the end of 2010 and in early 2011, found statistically significant adverse impact relative to the hiring of African-Americans, African-American females, and Latinos when store outcomes are aggregated company-wide. They did so initially by determining shortfalls at the store level and then aggregating the results across the company, thus taking into account the fact that competition for Model positions occurred at the store level as well as the

- 17 -

fact that selection process was the same in all stores.[7] (Lee Ex. 10, Expert Report of Louis R. Lanier, Ph.D. ("Lanier Report") ¶¶ 9, 11, 12; Expert Report of Bernard R. Siskin, Ph.D. ("Siskin Report") ¶¶ 12, 16.) Although Dr. Lanier used annual data and Dr. Siskin used six-month data, and they used different statistical formulas to determine in-store shortfalls,[8] both experts found statistically significant adverse effect for African-Americans and Latinos on an aggregate company-wide. (Lanier Report summary tbls. 2 & 3; Siskin Report tbl. 3.)[9]

Dr. Lanier found that instead of an expected 51,893 African-American applicants hired, 45,849 were hired in the entire period. (Lanier Report tbl. 2.)

_____

[7] Dr. Lanier's aggregation analysis (as does Dr. Siskin's alternative analysis) accounts for individual store application and hiring characteristics. Lanier Report ¶¶ 11-12. "Because the surpluses and shortfalls (and their variances) are calculated at the store level before being aggregated, individual store application and hiring characteristics are taken into account. In other words, applicants are assumed to be competing only against other applicants to the same store in the same period." "The company-wide expected hiring rate from my analysis accounts for individual store characteristics and is, therefore, consistent with the 'effective' applicant flow rate described by Dr. Siskin." Id.

[8] While the differing approaches give rise to some differences in outcomes, the experts' core differences relate to the propriety of aggregating the individual store outcomes.

[9] Dr. Siskin, however, opined that an appropriate adverse impact analysis must be store specific and "there is no statistical justification for aggregating across stores" because there is no common pattern across stores. (See Siskin Dec. ¶¶5, 12.) However, Dr. Siskin undertook an alternative analysis in which he computed disparate impact after aggregating the results over all stores, even though he believed it to be inappropriate. That aggregated analysis shows that there is adverse impact relative to the hiring of African-Americans and Latinos not inconsistent with the aggregated analysis of Dr. Lanier. (Id. ¶¶13, 16, 18.)

- 18 -

The shortfall was 6,052 hires.  (*Id.* ¶ 19 & summary tbl. 2.)  This shortfall was 31.94 standard deviations, and the probability of such a shortfall occurring randomly was virtually zero.  (*Id.* at summary tbl. 2 & ¶ 18.)  The standard deviations associated with the annual shortfalls ranged from 8.28 to 20.70.  (*Id.* at summary tbl. 2.)  The comparable shortfall for African-American female applicants was 4,952, or 31.88 standard deviations, which accounted for most of the African-American shortfall.  (*Id.* ¶¶ 29-30.)  The standard deviations associated with the annual shortfalls ranged from 8.51 to 20.60.  (*Id.* at summary tbl. 4c.)  The shortfall for Latino applicants was 3,089, or 16.39 standard deviations. (*Id.* at summary tbl. 3.)  The annual standard deviations ranged from 3.41 to 12.69.  (*Id.*)

According to Dr. Lanier, the African-American shortfall of 6,052 would have increased African-American hires by over 13.2% in the period and the Latino shortfall of 3,089 would have increased Latino hiring by approximately 5.8%.

Dr. Siskin testified that his report found shortfalls close enough that he would accept Dr. Lanier's shortfall numbers. (Lee Ex. 11, Deposition of Bernard R. Siskin ("Siskin Depo."), 29:14-31:10.)

Using a store level analysis, Dr. Siskin undertook an analysis for the 10th 6-month period and found that in 60 percent of 1,071 stores there was either no shortfall in African-American offers, or more African-Americans were offered

positions than would be expected. (Id. ¶14.) In that 10th period, the disparity in offers to African-Americans was statistically significant in 54, or 5.04%, of stores, and African-Americans were statistically significantly favored in about one percent of stores. (Id.) As for offers to Latinos during that period, in more than 60% of 1,080 stores, there was no shortfall in Latino offers, and in 28.6% of stores more Latinos were offered positions than would be expected. (Id. at ¶15.) The disparity in offers to Latinos was statistically significant in 19, or 1.76%, of stores. (Id.)

In response to Dr. Lanier's supplemental declaration stating that over the entire 4 year period 751 stores accounted for the shortfalls, Dr. Siskin prepared a supplemental declaration that analyzed six-month periods 3 through 9 and found that for every reporting period: (1) the majority of the stores show no disparity or show a surplus; (2) only a very small percent of stores show large disparities; and (3) a very small percent of stores was responsible for a large percent of the overall shortfall. (See Siskin Supplemental Dec.)

In addition, according to Dr. Siskin even the aggregated disparity was of "virtually no practical significance" because it passed the 4/15th [10] rule in every

---

[10] The 4/5th rule is a rule that considers whether the rate of selection of the minority group is at least 80% of that of the majority group. It is a rule of thumb which under the Uniform Guides can serve as a numerical basis for drawing an initial inference of adverse impact, thereby calling for additional more sophisticated tests

- 20 -

period and the average shortfall was one-half a person per store for African-Americans and one-quarter of a person per store for Latinos. (Siskin Dec. ¶¶20-23.)

### Section XII.A.2 - Conclusions of Law

Plaintiffs contend that the selection criteria used by Abercrombie cannot be "affirmed" because taken collectively, the selection criteria cause adverse impact in the selection rate for African-Americans and Latinos and that Abercrombie has not shown that it used Best Efforts to determine whether alternative job-related selection criteria, or an alternative use of the existing job-related selection criteria, has less adverse impact and would be equally predictive of job performance. Under the Decree, "adverse impact" is defined to be "in a manner consistent with Title VII law." *Id.* § III.B. "'Best Efforts' means implementing and adequately funding a plan reasonably designed to comply with all the specific objectives to which the best efforts are directed." Id. § III.H.

### Adverse Impact Analyses

Under the paradigm established by the parties in the Decree, Plaintiffs have the burden of showing adverse impact in the selection rates for one or more of the

---

for statistical significance. See Uniform Guidelines' interpretation and clarification (Q and A) by the Equal Employment Opportunity Commission.

Protected Groups.  As outlined above, both statistical experts agree that in the first instance there must be a store-by-store analysis to determine the existence of any shortfalls.  They also agree that if those outcomes are aggregated, they show adverse impact relative to the selection of African-Americans and Latinos.

Abercrombie, however, contends that statistical analysis of the outcomes of the individual store selection cannot be properly aggregated as selection decisions were made autonomously at disparate locations.  (Abercrombie's Mot. at 19.) Specifically, after finding that in the 10th six-month period there was adverse impact as to African-Americans in less than 6% of the stores, Dr. Siskin states that:

> If the structured process results are common (consistent) across all stores, then the aggregated results would be a reasonable measure of the impact of that process. However, if the results are not common across stores and disparities are driven by a handful of stores, the issue is one of individualized decision making and an aggregated result would yield no information and potentially only mask the impact of individual decision making at each store.

(Siskin Dec. ¶12.)

While in many circumstances aggregation is not proper, in this case I find that aggregation is appropriate in light of the specific facts of this case and the terms of the Decree.  The selection criteria and the PSP have been implemented company-wide, and Store Managers making the hiring decisions receive the same training and are required to ask the same questions and use the same procedures in

interviews.  *See supra* ¶¶ 5-9.  The Managers' decisions are subject to oversight by

District Managers and Regional Managers  and the overall process is monitored by,

among others, Abercrombie's Human Resources Department.  Thus, the hiring

process is centralized and consistently used company-wide.  As the Uniform

Guidelines provide, "evidence concerning the impact which the selection

procedure had *when used in the same manner in similar circumstances elsewhere*

may be considered in determining adverse impact."  29 C.F.R. §1607.4D

(emphasis added).

Moreover, and most importantly, Abercrombie's hiring procedures and

responsibilities and obligations are defined by the Decree at the Company level.

Its Benchmark obligations, for example, apply to Company-wide selections, and

the monitor's (and Dr. Lundquist's) analyses were all made company-wide.  Given

that the terms of the Decree call for Company-wide goals, the pertinent question

here is whether, as a company, Abercrombie's hiring practices have adversely

impacted one or more Protected Group members.  In this case, that answer is most

appropriately provided by a company-wide aggregated analysis which, as

discussed above, shows adverse impact relative to African-Americans, African-American women, and Latinos.[11]

Abercrombie also asserts that there can be no finding of adverse impact absent a showing of both statistical and practical significance (practical significance being whether the shortfalls are large enough to be meaningful in a practical sense. See generally, American Psychological Association Publication Manual (5th Edition) at 25-26. While Court decisions are mixed as to whether both statistical and practical significance are required to support an adverse impact finding, (compare Stagi v. National R.R. Passg. Corp., 391 Fed. Appx. 133 (3rd Cir. 2010) (practical significance is not required to show a *prima facie* case) with Angsley v. Boeing Co., 722 F. Supp. 2d 1218 (D. Kan. 2010) (practical significance is required to make a *prima facie* showing)), I find that the shortfalls here *are* practically significant over the life of the Decree. The shortfalls for African-Americans are over 6,000 hires, or 13% of African-American hires, and for Latinos over 3,000 hires, or almost 6% of Latino hires. (Lanier Report ¶ 43.)

---

[11] Further, even without aggregation, the 54 stores where Dr. Siskin found impact in the 10th six-month period account for almost 90% of the African-American shortfall in that period. (Siskin Dec. ¶23.) The language of the Decree simply requires Plaintiffs to show "adverse impact in selection rates." It cannot reasonably be construed to ignore the very substantial shortfalls occurring in those stores.

Given that company-wide aggregated statistics are called for by the Decree, and that when stores are aggregated company-wide, both experts find that the shortfalls in the selection of African-Americans, African-American women, and Latinos are statistically significant (and I find the shortfalls to be practically significant), I find that Plaintiffs have carried their burden of showing adverse impact.

**Causation Issue**

Adverse impact is only one prong of Plaintiffs' burden under XII.A.2. Plaintiffs must also prove that such impact was caused by the selection criteria developed by Abercrombie in consultation with Dr. Lundquist. To meet this burden, Plaintiffs argue that:

a.    There are no other components of, or criteria for, the selection process, such as a background check, or a minimum education or experience requirement that can be the source of the impact. (*See* Lundquist Report, Attachment B, Recruitment and Hiring Protocol, at 2-3 (stating that the Brand Representative (now Model) position has "no education requirement, no experience requirement").) In addition, every store uses the same criteria, interviews and questions. (*See, e.g.*, Lundquist Report, Attachment C, "Introduction," at 9.)

- 25 -

b.    The shortfalls are not narrowly focused in one area or set of stores. Dr. Lanier opined that 65% of the stores had shortfalls in the hiring of African-Americans and 58% of the stores had shortfalls in the hiring of Latinos, over the entire period. (Lanier Supplemental Dec. ¶¶ 3-5.)

c.    Abercrombie's hiring made significant efforts over the life of the Decree to reduce shortfalls in hiring rates across stores through means other than changing the selection criteria (see discussion at ¶¶ 11-13, *supra*) without any significant observable effects on shortfall patterns. (See Tbl 4 to Siskin Dec.)

d.    Because the application of selection criteria of necessity require hiring decisions to be in some measure subjective, it is expected that the hiring outcomes would vary from store to store -- i.e. the selection criteria are applied in some measure on a subjective basis, one would not expect that the use of the selection criteria would cause adverse impact uniformly across all stores.

In response, Abercrombie points out that Dr. Siskin has opined (1) there is no consistent pattern of statistically significant shortfalls across stores, and (2) any shortfalls in offers to African-Americans and Latinos were "not the result of the

common use of the structured interview process used for selection," Id. ¶17, and that such opinions are unrebutted.[12]

While it is a very close question, I am persuaded that the Plaintiffs have sufficiently met their causation burden.  Plaintiffs point out that there are no eligibility requirements for hiring other than an applicant being found by the hiring manager to have sufficiently met the cut scores for the three selection criteria.  That in and of itself substantially limits the potential causes for the shortfalls.  The lack of a consistent shortfall pattern among the stores is also undercut by the fact that a majority of the stores had statistically significant shortfalls for both African-Americans and Latinos at some point during the Decree.  But even more important is that despite Abercrombie and Dr. Lundquist extensively looking at and taking numerous steps to identify and reduce or eliminate possible causes of shortfalls

---

[12] "What you find is that there are a handful of stores which drive the overall disparity that one observes; that there is no consistent pattern across stores in terms of shortfalls or pattern of shortfalls whatsoever, which means that to the extent there are causes for the overall aggregated shortfall, it's due to special circumstances involving handfuls of stores.  It would not be due to a common or systemic practice, which is used across stores in selection of hiring at Abercrombie & Fitch of the model categories.

To that extent, what I've concluded is -- in my report, and I say it means that the data really does not support that there's a systemic problem with the structured interview process.  That type of outcome is not consistent with that hypothesis." (Siskin Dep. at 27.)

Notably, neither Dr. Siskin nor Abercrombie present any evidence of what the "special circumstances" he refers to may be, and Abercrombie has extended a great deal of effort trying to identify such circumstances.

(other than empirically analyzing alternative selection criteria), no pattern of reductions in shortfalls has been observed.  That, of course, further eliminates at least some of the other possible causes and further supports a finding that it is the selection criteria that cause the adverse impact.  Finally, Plaintiffs are correct that where, as here, the selection process calls for, in some measure, subjective selection assessments by the hiring managers, the outcomes from different stores may well vary.

### Abercrombie's Efforts to Comply With Its Best Efforts Obligation

Having found that the selection criteria for the Model position, taken collectively, cause adverse impact on African-Americans and Latinos, the burden shifts to Abercrombie to "show[] that it has used Best Efforts to determine whether alternative job-related selection criteria or whether an alternative use of job-related selection criteria has less adverse impact and would be equally predictive of job performance."  Consent Decree § XII.A.2.  Under the Decree, "'Best Efforts' means implementing and adequately funding a plan reasonably designed to comply with all the specific objectives to which the best efforts are directed."  *Id*. § III.H.

While recognizing the impressive changes in minority hiring rates, Plaintiffs nevertheless contend that to meet its Best Efforts obligations, Abercrombie had to

- 28 -

evaluate each component of the selection process (including the group interview)
for adverse impact. That obligation, they contend, flows from The Uniform
Guidelines which provide that if "the total selection process for a job has an
adverse impact, the individual components of the selection process should be
evaluated for adverse impact." 29 C.F.R. §1607.4C. Plaintiffs further cite to The
Society for Industrial and Organizational Psychologists' Principles for the
Validation and Use of Personnel Selection Procedures ("SIOP Principles") to the
same effect as support for their position that Best Efforts mandates selection
criteria component analyses.

In addition, Plaintiffs maintain that Abercrombie had an obligation to
ascertain if the subjective assessments required by raters in its interview guides
were being made reliably, (Lundquist Dep. 16:4-17:15), as required by the
Uniform Guidelines which provide that: "Whenever it is feasible, appropriate
statistical estimates should be made of the reliability of the selection procedure."
29 C.F.R. §1607.14C(5); see also SIOP Principles 25 ("Reliability of performance
on content-based selection procedures should be determined where feasible.").

Abercrombie responds that it has met any Best Efforts obligations as, per the
Decree's definition of Best Efforts, it "implemented" and "adequately funded" a
plan "reasonably designed" to determine whether alternative job-related selection

criteria or an alternative use of job-related selection criteria has less adverse impact and would be equally predictive of performance. Specifically, it argues that in coordination with Dr. Lundquist, it has fully implemented a plan through which it developed selection criteria and a validated PSP and that it aggressively monitored and modified the PSP in every way that could be reasonably required. Abercrombie points to the extraordinary amount of monies it has expended and work it, as well as Dr. Lundquist and APT, has undertaken in creating the selection criteria and PSP, as well as APT's and Abercrombie's ongoing efforts throughout the term of the Decree to determine the availability of alternative selection criteria (and uses of criteria) that would lessen impact, but be equally predictive of job performance.

Here the parties established in the Decree the means by which a new selection process was to be developed and implemented by Abercrombie. While the language of the Decree alters the burdens of proof relative to enforcement procedures, it tracks in substance the concepts set out in the Uniform Guidelines and generally used under Title VII's adverse impact model relative to the propriety of particular selection processes. See 42 U.S.C. § 2000e-2(E)(11). Plaintiffs contend that consistent with that approach in evaluating the Best Efforts of Abercrombie, the procedures outlined in Section 1607.4C of the Uniform

Guidelines establish the standard to be met at this juncture; i.e. having established adverse impact caused by the selection criteria, to meet the Best Efforts obligations the individual components of the selection criteria must be evaluated by Abercrombie for adverse impact.  I agree with Plaintiffs' position.

While acknowledging that it has not undertaken such a component analysis, Abercrombie does not argue that the Uniform Guideline standards set forth in §1607.4C do not apply in this context.  Instead, it contends that it was not required to conduct an empirical analysis to evaluate the individual components of the selection process for the Model position to meet its Best Efforts obligations because: (1) it was Abercrombie's view that under the language of §XII.A.2. of the Decree, a component analysis was not required; (2) throughout the life of the Decree, Dr. Lundquist monitored adverse impact and detected no adverse impact towards Asian-Americans or women, minimal to no adverse impact towards Latinos, and inconsistent and minimal patterns with respect to African-Americans; (3) the hire rates and incumbency rates of all minorities were increasing dramatically in the Model position; (4) a component analysis would be burdensome due to the number of interviews conducted; and (5) it was Dr. Lundquist's opinion, after considering the matter, that no alternative selection criteria and no alternative use of selection criteria could minimize adverse impact

- 31 -

and be equally predictive of performance.  While several of these points present legitimate considerations, none are sufficient to satisfy its Best Efforts obligation.

First, Abercrombie states that under its interpretation of §XII.A.2. of the Decree, a component analysis is not required.  At the hearing Abercrombie further explained its position, saying that the following language of §XII.A.2. demonstrated that no individualized component analysis was contemplated/agreed to by the parties: "Selection criteria shall be subject to challenge under Section X of the Decree only if a particular position's selection criteria, taken collectively, cause adverse impact.... ."  (emphasis added)  That language, however, does not address the instant issue.  It speaks to how adverse impact is to be determined--by consideration of the Model position's three selection criteria taken collectively.  It does not provide that the selection criteria cannot be analyzed separately as provided for by the Uniform Guidelines once, as is the case here, adverse impact has been established.

Second, Abercrombie points out that during the life of the Decree, Dr. Lundquist detected only limited adverse impact relative to the selection of Latinos and inconsistent patterns of adverse impact with respect to African-Americans. This argument suggests that the adverse impact evidence of which it was aware during the life of the Decree, was such that it did not trigger any obligation to do

- 32 -

an individual component analysis.  While the Plaintiffs bear some responsibility here for failing earlier to pursue actively its enforcement action which has now been pending for over 20 months, it is clear from the record that the Monitor repeatedly advised Abercrombie of his view that the selection process was causing adverse impact--particularly as to African-American women.  See e.g. Monitor's 4th and 5th year reports.)  That, coupled with the quarterly impact findings of Dr Lundquist, were sufficient to put Abercrombie on notice of its potential obligation to undertake a component analysis.

Third, Abercrombie points out quite correctly that hire and incumbency rates of all minorities were increasing dramatically in the Model position.  As noted, for example, Abercrombie's results here, including its outreach programs, have achieved very impressive increases in minority application rates.  The Decree could have stated that results like these fulfilled Abercrombie's obligations, but it does not.  Thus, these impressive results do not vitiate the need to comply with the terms of the Decree that, as discussed above, call for an individualized component analysis.

Next, Abercrombie states that a component analysis would be burdensome given the number of interviews.  Abercrombie does not provide any factual basis for that assertion other than the raw number of interviews.  That is a legitimate

- 33 -

concern given the number of applicants but, as the Uniform Guidelines and well qualified experts such as Dr. Lundquist are aware, sampling, among other techniques, can be used to minimize the burden.  See Section 1604 A of The Uniform Guidelines.

Finally, Abercrombie points to Dr. Lundquist's opinion that there are no other selection criteria which would both reduce impact and be equally predictive of performance in the Model position.  She may well be right.  Indeed, Dr. Lundquist is very highly regarded and in my experience the most highly sought after professional in her field of expertise.  But she has rendered that opinion without the benefit of a component analysis called for by the Uniform Guidelines. The Decree obligates Abercrombie to make that determination before Dr. Lundquist can issue such an opinion that could be persuasive under the terms of the Decree.

Abercrombie further argues that Plaintiffs have presented no evidence that there are any alternatives that have less impact yet are equally predictive of the selection criteria being used.  In response to Plaintiffs' contention that alternatives such as adding situational judgment tests and personality tests to the structured interview process, either in the form of paper-and-pencil tests or in the form of other "instruments" might be included in the PSP, (Zedeck Dep. at 108-11, 115-

16), Abercrombie argues that adding a step to the selection process would increase its cost without any evidence that such tests would decrease adverse impact. Indeed, Abercrombie notes that adding such tests could increase adverse impact, as there would be an additional hurdle to the selection process. Id. Additionally, such tests would not be equally predictive of performance because they could not assess the most predictive competency, Appearance & Sense of Style. (Zedeck Dep. at 52, 57, 64, 108, Exh. 3 at pp. 5-6; Lundquist Dep. at 33, 35-38; Lundquist Dec. ¶¶33-34.)

In response to Plaintiffs' suggestion that Abercrombie could use alternative cut-off scores, "such as the minimum score of 2 on 'Appearance & Sense of Style,'" Abercrombie again notes that there is no evidence that alternative scoring would reduce adverse impact. (Zedeck Dep. at 111-12.) Further, they observe that Dr. Lundquist considered alternative scoring of the Appearance & Sense of Style competency, and determined that it would not be equally predictive of performance. (Lundquist Dep. at 33; see also Zedeck Dep. at 52, 57, 64, 108, Exh. 3 at pp. 5-6; Lundquist Dep. at 35-38; Lundquist Dec. ¶¶33-34.) At her deposition, Dr. Lundquist also explained that changing the weight of the other competencies assessed in the interview would alter the ability of the selection criteria to assess performance. (Lundquist Dep. at 35.) Again, Dr. Lundquist may be correct. But

the Decree requires the predicate of using Best Efforts before rejecting alternative criteria/alternative uses of criteria.

The evidence in the record is compelling that Abercrombie used extraordinary efforts not only in developing a validated PSP process, but also to address the shortfalls it recognized existed relative to hiring at a number of its stores.  Again, the issue is whether despite those efforts and overall laudable outcomes (e.g. the increase of its minority representation in the Model position from approximately 10% to over 50% incumbency in less that 5 years) it used Best Efforts in determining whether there were alternative job-related selection criteria (or alternative uses of existing criteria) with less impact, yet equally predictive of job performance.

In sum, I find that Abercrombie's Best Efforts obligations under the Decree require it to evaluate the individual selection criteria for adverse impact and then to determine whether alternative job-related selection criteria or an alternative use of job-related selection criteria has less adverse impact and would be equally predictive of job performance.

Plaintiffs also challenge the fact that Abercrombie did not undertake inter-rater reliability analyses.  However, §XII.A.2 speaks to selection criteria and their uses.  Inter-rater reliability studies do not fall within the scope of this Decree

- 36 -

provision and, in any event, I find that the evidence does not support a finding that inter-rater reliability issues are a potential cause of adverse impact.

## Benchmarks (Section XIV) Conclusions of Law

While Plaintiffs do not agree with several aspects of Dr. Siskin's Benchmark compliance analysis, I need not address those differences as Abercrombie is not contending that it met the Benchmarks but, rather, that it satisfied its Section XIV Best Efforts obligations.

Plaintiffs' position in essence is that Abercrombie's obligations to use Best Efforts under XII.A.2 coincides with its Best Efforts obligations under XIV. Thus Plaintiffs contend that once it has established that the Benchmark obligations were not satisfied, then Abercrombie was required under the Uniform Guidelines to reexamine the PSP on a component analysis. In Plaintiffs' view, given Abercrombie's decision not to undertake the component analysis and instead to continue to rely on efforts that had not been wholly successful in achieving Benchmarks, its plan could not be found to be reasonably designed and implemented to achieve the Benchmarks. I disagree with Plaintiffs' position.

I find that Abercrombie did use Best Efforts to meet its Benchmark obligations under Section XIV. Abercrombie's Best Efforts obligations under Section XII.A.2. and Section XIV are not, as argued by Plaintiffs, fungible. The

former is aimed at a very narrow issue of concern centering around the hiring selection criteria adopted by Abercrombie as a part of its new hiring procedures. Section XII.A.2. tracks in many respects the obligations of parties under Title VII and the Uniform Guidelines under the adverse impact model.  While changing the respective burdens of the parties in some respects, the adverse impact, causation and alternative criteria concepts of Section XII.A.2. track those found in Title VII and used in adverse impact cases under Title VII.  Thus, interpreting Section XII.A.2. consistent with Title VII selection concepts and principles is logical and consist with the intent of the parties evidenced by the structure and language of the Decree.

But the Benchmark provision is different. The Benchmarks are not quotas. They are simply targets established to afford guidance as to whether Abercrombie is making selection decisions in a way as to afford equal employment opportunity. Section XIV is structured differently and serves a different purpose than the Section XII provision.  It does not adopt Title VII standards but rather simply looks to whether Abercrombie had a plan that was properly funded and implemented that was reasonably designed to meet the Benchmarks. Abercrombie clearly had such a plan (which it updated from time to time) to reach the Benchmarks and as outlined

above it and ATP successfully implemented that plan. That point is clearly made by among other things:

- Abercrombie's achievement of most of the Model Hiring Benchmarks for females and Asian-Americans throughout the life of the Decree.

- Abercrombie's increase in minority representation in the Model position during the life of the Decree. During the life of the Decree, Abercrombie has more than quadrupled the incumbency rate of African-Americans, Asian-Americans, and Latinos in the Model position, and more than quintupled the incumbency rate of people who self-identify as non-white. More than half of those holding the Model position on October 31, 2010 were nonwhite.

- Abercrombie's hire rates of Latinos, African-Americans, Asian-Americans, and African-American Females into the Model position have steadily risen since the inception of the Decree in April 2005.

- Applicant rates of African-Americans and Latinos have also steadily risen during the life of the Decree, reflecting Abercrombie's successful efforts to recruit and attract minority applicants.

Thus I find that Abercrombie has met its Best Efforts obligations under Section XIV of the Decree.

## **RELIEF**

The Plaintiffs are seeking in part the following relief:

1.    On an expedited basis, Abercrombie shall: (1) review its PSP and determine what component(s) of its PSP have adverse effect on African Americans and Latinos; and (2) develop (a) less discriminatory alternatives to the model selection procedure that are equally predictive of performance; or (b) alternative

uses of the existing model selection procedure that are equally predictive of

performance and cause less adverse impact; and

      2.      Abercrombie shall implement such alternatives or alternative uses of

the existing model selection procedure for a period of no less than two years.  (See

¶108 of Plaintiffs' Proposed Findings of Fact and Conclusions of Law.)

      The problem with that proposed relief is that it is not authorized by the

Decree.  The Decree language at issue provides:

> If the selection criteria cause such adverse impact and are challenged
> under Section X of this Decree, the selection criteria shall be affirmed
> if Abercrombie shows that it has used Best Efforts to determine
> whether alternative job-related selection criteria or whether an
> alternative use of job-related selection criteria has less adverse impact
> and would be equally predictive of job performance.

      This heavily negotiated Decree speaks in terms of the selection criteria being

"affirmed" if Abercrombie has carried its Best Efforts burden.  As discussed

above, I have found that Abercrombie has not met its XII.A.2. Best Efforts burden.

But the Decree does not authorize the relief outlined by Plaintiffs.  Contrary to the

Plaintiffs' proposed relief, there is nothing in Section XII.A.2. of the Decree that

requires Abercrombie to change its original selection criteria.  What the Decree

states is that Abercrombie can comply with its Best Efforts obligation by showing

that it has used Best Efforts to determine whether other selection criteria (or

alternate uses of selection criteria) have less impact and are equally predictive of

job performance --i.e. do a component analysis and using that additional

information to determine whether there are alternative job-related criteria (or

selection criteria uses) having less impact that are equally predictive.  Once

Abercrombie makes that determination, then it has complied with its Best Efforts

obligation under the Decree. [13]

Moreover, the Plaintiffs proposed relief assumes that there are in fact

alternatives with lesser impact that are equally predictive.  However, there is no

basis in the record to support the conclusion.  In fact, the record suggests just the

opposite in that the jointly selected organizational psychologist has opined

repeatedly that there are no other such alternatives.  While her opinion may change

after completion of the component analyses, there is nothing in the record that

necessarily leads to that conclusion.

Accordingly, the Special Master Orders the following relief:

1.      Abercrombie shall make an adverse impact review and assessment of

its selection criteria (which includes its group interview procedures) relative to

African-Americans and Latinos and determine whether alternative job-related

---

[13] As the Decree is, of course, an Order of the Court, the parties self-evidently
recognized that the Court has, in addition to the remedies expressly set forth in the
Decree, the authority to enforce its own Order.

selection criteria or whether an alternative use of job-related selection criteria has less adverse impact and would be equally predictive of job performance.

2.      The Special Master recommends to the Court that the Court consider modification of the Decree to permit the limited extension of the Decree for the purpose of making the review and determinations provided for above.

3.      At the completion of the review and required determinations, Abercrombie shall submit a report to the Plaintiffs and the Court concerning the subject review and determinations.

4.      The Special Master recommends that the parties submit to the Court a joint proposed extension of the Decree incorporating the above features to the Court or, if the parties are unable to agree, separate proposals.

All of the foregoing constitutes the Special Master's findings of fact and conclusions of law.  To the extent that the factual recitals also constitute legal conclusions and to the extent legal conclusions also constitute factual recitals, such recitals, findings and conclusions will be so construed.

**SO ORDERED** this 15th day of April, 2011.

*Hunter R. Hughes*
Hunter R. Hughes
Special Master

772769.7
4/15/11

- 42 -

**Exhibit 4**

1  Fred W. Alvarez, State Bar No. 068115
   WILSON SONSINI GOODRICH & ROSATI
2  650 Page Mill Road
   Palo Alto, CA  94304-1050
3  Telephone:  (650) 493-9300
   Facsimile:  (650) 493-6811
4
   Court-Appointed Monitor
5

6                   UNITED STATES DISTRICT COURT

7                 NORTHERN DISTRICT OF CALIFORNIA

8  EDUARDO GONZALEZ, ANTHONY OCAMPO,        )   CASE NOS.:  03-2817 SI, 04-4730 and 04-
   ENCARNACION GUTIERREZ, JOHAN MONTOYA,    )   4731
9  JUANCARLOS GÓMEZ-MONTEJANO, JENNIFER     )
   LU, AUSTIN CHU, IVY NGUYEN, ANGELINE WU, )   **COURT-APPOINTED MONITOR'S**
10 ERIC FIGHT, CARLA GRUBB, DAVID CULPEPPER,)   **FIFTH ANNUAL COMPLIANCE**
   PATRICE DOUGLASS, and ROBAIR SHERROD,    )   **REPORT**
11 BRANDY HAWK and ANDRE STEELE, on behalf of)
   themselves and all others,               )   **CONFIDENTIAL**
12                                          )
                Plaintiffs,                 )
13                                          )
                                            )
14         v.                               )
                                            )
15 ABERCROMBIE & FITCH STORES, INC., A&F     )
   CALIFORNIA, LLC, A&F OHIO, INC., and      )
16 ABERCROMBIE & FITCH MANAGEMENT CO.,       )
                                            )
17              Defendants.                  )
   _____)
18 ELIZABETH WEST and JENNIFER LU,          )
                                            )
19              Plaintiffs,                  )
                                            )
20         v.                               )
                                            )
21 ABERCROMBIE & FITCH STORES, INC., A&F     )
   CALIFORNIA, LLC, A&F OHIO, INC., and      )
22 ABERCROMBIE & FITCH MANAGEMENT CO.,       )
                                            )
23              Defendants.                  )
   _____)
24 EQUAL EMPLOYMENT OPPORTUNITY            )
   COMMISSION,                              )
25                                          )
           v.                               )
26                                          )
   ABERCROMBIE & FITCH STORES, INC., A&F     )
27 CALIFORNIA, LLC, A&F OHIO, INC., and      )
   ABERCROMBIE & FITCH MANAGEMENT CO.,       )
28                                          )
                Defendants.                  )
   _____)

1

**Table 6: Hiring Benchmarks and Hiring in the Model Position from Periods 1 – 10**



14   Abercrombie's hiring in the Fifth Compliance Period is consistent with trends from the

15 Fourth Compliance Period.  Abercrombie has achieved a pattern of success with respect to its

16 Asian American Hiring Benchmarks for Models, meeting them for the last four six-month

17 periods.  Although Abercrombie's hire rate for African American and Latino Models has been

18 growing, Abercrombie continues to struggle to meet the corresponding Hiring Benchmarks.  The

19 trend with respect to African American Female Models continues to be more problematic.

20    **b.  MITs**

21   Table 7, below, summarizes Abercrombie's hiring and Hiring Benchmarks for the MIT

22 position in the 9th six-month period.

23        **<u>Table 7</u>**
**9th Period Hiring Benchmarks and Hiring for the MIT Position**

|  | Hiring Benchmark | Hire Rate | Difference +/- | Hiring Benchmark Achieved? |
|---|---|---|---|---|
| **African American** | 14.1% | 9.7% | - 4.4 | Missed by 31% |
| **Asian American** | 7.9% | 8.0% | + 0.1 | Exceeded by 1% |
| **Latino** | 12.4% | 9.6% | - 2.8 | Missed by 23% |
| **Female** | 57.4% | 67.0% | + 9.6 | Exceeded by 17% |

and DMs, with a direct focus on the opportunities available to hire more Minorities.  For example, in one such communication, the Company may point out the percentage of MIT applicants in the RM's region who are African American or Latino and remind the RM to keep these groups in mind while making hiring decisions.

Also during the 9th six-month period, the Office of Diversity held its second Diversity Week,[53] a week where associates attend trainings and events focusing on diversity and inclusion. During Diversity Week, Abercrombie held an essay contest inviting associates to write about diversity.  Winning essays were compiled into a book distributed to stores.  One of the essays was also featured on store bulletin boards.

Concerned that it was not making sufficient strides towards diversity, Abercrombie gave each store a goal of hiring three (3) African American and three (3) Latino Models by October 12, 2009.  Abercrombie also limited all MIT hiring decisions to RMs, rather than DMs.   The Company believed RMs would have a "greater sense of the Company's benchmark goals overall, and . . . greater ability to hire qualified MITs into stores which had open positions available." Abercrombie stated that it realized, however, that "these types of short-term goals were not sustainable and, in fact, were likely to disrupt the long term mission of the Office of Diversity," and so the Company also developed long-term goals during the 9th six-month period.

Abercrombie began implementing its long-term goals in the 10th six-month period. These included replacing the "Bottom 50" list with the "Target Diversity Stores,"[54] requiring RMs to summarize the breakdown of MITs hired by race within their regions at monthly roundtables with Mr. Corley, distributing Diversity Scorecards bi-weekly rather than bi-monthly, meetings between Store Directors and the Office of Diversity to discuss each store's progress in meeting the benchmarks, and having the Diversity Department conduct audits of certain stores lacking a Recruiter.

---

[53] Diversity Week is discussed in further detail in Section X.B.13.

[54] This change increased the number of targeted stores from 50 to approximately 200 (20% of stores).

1   accompanying Image Book Activity; (4) providing clearer, more targeted communications to

2   DMs and RMs regarding Model Hiring Benchmark performance; (5) implementation of Senior

3   Recruiter Audit and revisions to the City Recruiter Audit; (6) inclusion of a space to record

4   Minority shortfalls in the mandatory Big Issues list to be completed by Store Managers; (7)

5   Broader Alignment Calls with Recruiters; (8) store visits by the Office of Diversity; and (9) a

6   campus resource recruiting guide.

7         In the 9th six-month period, facing large shortfalls for Latinos and African American

8   Models, Abercrombie imposed a "goal" for each store to hire three (3) African American and

9   three (3) Latino Models by October 12, 2009.  Despite this numeric "goal" Abercrombie missed

10  its Latino, African American, and African American Female Model Hiring Benchmarks in the

11  9th six-month periods.  A numeric "goal" was not imposed for the 10th six-month period, and

12  Abercrombie missed its Model Hiring Benchmarks for the same groups by a wider margin in

13  such period.

14        Like Abercrombie's plan with respect to MITs, Abercrombie's plan for Models

15  represents an extension of previous plans – primarily consisting of communicating information

16  to managers, making additional written resources available to them, and expanding existing

17  initiatives such as the Image Book and the Bottom 50 List.  The Monitor is troubled that even a

18  pointed action in the form of a specific, apparently inflexible, numeric goal in the 9th six-month

19  period did not bring Abercrombie's benchmarks within reach, and that considerable benchmark

20  gaps returned in the 10th six-month period when the numeric goal was lifted.  The Monitor is

21  particularly concerned about the large benchmark gaps for African American female Models.  As

22  with MIT Hiring Benchmarks, the Monitor is not persuaded that Abercrombie is on course to

23  meet its Latino, African American, and African American Female Model Hiring Benchmarks.

24        The Monitor urges Abercrombie to investigate whether fundamental components of its

25  recruitment, hiring and selection practices should be altered, with particular attention to

26  components that may be affecting African American women.  Although the Monitor is persuaded

27  that economically inducted regional disparities may be distorting Abercrombie's shortfalls to

28

1  some extent, the Monitor also notes that Abercrombie's struggles with its Model Hiring

2  Benchmarks predate the current economic environment.

3         As with MITs, the Monitor urges Abercrombie to re-examine its assumptions regarding

4  Model hiring.  For example, although Mr. Corley previously reported having been consulted as

5  to any changes to the Look Policy, Abercrombie may need to revisit that policy with an eye to

6  whether the policy imposes an extra burden on African Americans, Latinos, and especially

7  African American females.[59]  The Monitor likewise encourages Abercrombie to examine the

8  way managers are both formally and informally trained to recruit part-time employees.  During

9  store visits, managers reported that much of their training in recruitment was informally learned

10  through recruiting trips with their own managers, unless they had the benefit of a Recruiter

11  assigned to their store.[60]  Examining other aspects of recruiting – such as whether online

12  applications should continue to be limited to recruits who have been provided a specific website

---

14  [59] For instance, Abercrombie may want to examine whether the hairstyle standards impose
   additional complexities for African American female applicants, in particular.  The "Hairstyles"
15  section of the Look Policy states that "[h]airstyles for men and women should appear neat, clean,
   natural, kempt, and classic.  This means that the hairstyle must look as if it could have grown
16  that way."  The "Hairstyles" standards also provides that that "'[c]orn-row' hairstyles are not
   permitted" and that "[c]olor and/or highlights must appear natural."  Over the course of the
17  Consent Decree, the Monitor has received complaints from African American female
   complainants that they were reprimanded for failure to comply with the Company's hairstyle
18  policy for issues regarding highlights, braids, and the lack of straightness of their hair.
   Complainants have argued that the policy is at odds with practical hair options for African
19  American females.  For example, although braids qualify as "neat" they do not fit within the
   standard for styles that "could have grown that way."  Another complainant was displeased with
20  Abercrombie's restrictions on highlights because it is difficult for any highlights to look
   "natural" on African American hair.

21  Adding additional complexity to the enforcement of the Look Policy, some of the African
   American employees featured in the Image Book have hairstyles that would appear to violate the
22  Look Policy, such as "twists," a hairstyle achieved by twisting two sections of hair together.
   These inconsistencies can lead managers to perceive subtle differences in hairstyles as Look
23  Policy violations.  For instance, one complainant reported that his "twists" were deemed to be
   unkempt because, contrary to a Model featured on a Company bulletin, they were not twisted
24  from the scalp.

25  The Monitor recognizes that complainants are not necessarily representative of employees or
   applicants as a group, and that complaints do not always have merit.  The Monitor raises this
26  issue only as an avenue of future inquiry for Abercrombie.

27  [60] The Monitor acknowledges, however, that Abercrombie has already taken steps to
   systematize recruitment training through the Recruiting Video now mandatory for MITs,
28  discussed in Section III(d) above.

1   link and a code, and whether managers should continue to describe the positions available – may

2   be fruitful.

3        The Monitor also encourages Abercrombie to re-examine the PSP, the PSP interview

4   guides, and both the content and depth of the PSP training.  The issue of whether the

5   "appearance and sense of style" component of the PSP interview guides has resulted in a more

6   stringent standard for Latino and African American applicants is a difficult and thorny one, but is

7   a question that ought to be considered.  In effect, the aggregate message of a large number of

8   hiring decisions is that, on a per capita basis, fewer Latino and African American applicants have

9   the required "appearance and sense of style" when compared to non-Minority and Asian

10  applicants.  Obviously, African American females have been faring poorly under this hiring

11  regime.  Because even intense numeric pressure on managers has not "corrected" that imbalance,

12  the Best Efforts obligation entails an analysis of whether the current "plan" is "reasonably

13  calculated" to achieve benchmark success.

14       As with MITs, the Monitor encourages Abercrombie to examine questions like whether

15  SMs, and in practice, often AMs, should be responsible for making hiring decisions.  To the

16  extent that Abercrombie determines that an assessment of "appearance and sense of style" is a

17  subtle, complex and carefully considered matter, as opposed a snap judgment, one might ask

18  whether a decision like that should be restricted to higher level managers, or only those with a

19  certain amount of experience or in-depth training.  Indeed, it may be that the Image Book itself

20  presents too narrow of an image for African American and Latino Models, or SMs perceive it

21  that way.  As with MITs, Best Efforts is not a static target and when the most intense of "efforts"

22  fails to achieve the goal, the attention needs to turn to the question of what is "best" and that

23  entails re-examining accepted assumptions.  Therefore, the Monitor will reserve judgment on the

24  question of best efforts in Model hiring until Abercrombie has a final opportunity to thoroughly

25  examine all critical assumptions in the Model hiring process and address them directly.

26

27

28

around the same time and after Abercrombie imposed its "goal" of hiring three Latino and three African American Models in each store.

Unfortunately, based upon Abercrombie's Semi-Annual Progress Reports, some employees and managers apparently heard the message about benchmarks as a "quota." DMs asked Mr. Corley questions like how they should work through benchmarks "feeling like a quota." DMs also reported that African American and Latino part-time employee expressed concerns "that they feel they were hired solely because of the benchmark."

One of the unintended messages that accompany perceived "quotas" is that Abercrombie needed to "lower" its standards for certain Latino and African American applicants who would not have otherwise been hired. Ironically, the reverse may be true: given the persistently missed benchmarks for Latinos and African Americans, and given that "appearance and sense of style" is a determinative hiring criteria, an argument can be made that those applicants were held to higher, or more narrowly defined, standards. An unfortunate consequence of purely numeric pressure to meet benchmarks is that it perpetuates manager misapprehensions that Latinos and African Americans are less "qualified" – when the key qualification is decidedly in the eyes of the selecting official – but they nonetheless must be hired to meet those numeric targets. This message competed with the message that "quality" in hiring cannot be compromised. Although the Monitor recognizes that Abercrombie did not directly foster the ways in which managers may have misinterpreted its communications, the Monitor notes that misapprehension of the diversity messaging may be impeding further progress.

The Monitor does not believe the Company will be able to solve its hiring problem with numeric pressure alone. Rather, the Monitor believes that to achieve Hiring Benchmarks, the Company will have to directly analyze, and even deconstruct, how and why hiring decisions are

---

(...continued from previous page)

consistent" and the instructions in the Image Book Activity somehow failed to spur managers to reflect on their hiring practices.

4081865_9.DOC

being made.[87]  The Monitor is not making an assumption, and has no basis to believe, that managers are inherently biased.  Yet, the fact is that, despite a comprehensive Company effort to promote diversity, managers' hiring decisions have lead to significant disparities between the selection rates for African American, African American female, and Latino applicants, on the one hand, and the selection rates for nonminority applicants, on the other, for the Model position.[88]  To directly address this issue, the Monitor believes that Abercrombie must critically examine, at least, the following questions to ascertain whether potential barriers exist within its systems insofar as they affect managers' hiring decisions: (1) whether the Look Policy itself creates unintended but extra burdens on African Americans, African American females, and Latinos; (2) whether the Image Book presents too narrow a range of images of African Americans and Latinos who represent Abercrombie's "appearance and sense of style," and (3) whether higher level or more sophisticated managers should be making hiring decisions.[89]

The Monitor also notes that critical examination of the underlying assumptions embedded within these hiring systems can be overlooked if Abercrombie's focus solely emphasizes the diversity of its work force.  As in previous reports, Abercrombie justifiably highlighted its diverse work force in the Fifth Compliance Period and reported that it continues to compare favorably to the population of the United States, the federal work force, and other retailers. There is no doubt that the relative composition of its workforce is dramatically different than it was at the inception of the Decree and that the trend is decidedly positive with respect to Models. Indeed, the Monitor agrees with Abercrombie's statement that the diversity of the work force

---

[87] The Company did, however, revise its Model group interview guide to encourage managers to reflect on their hiring decisions.

[88] As in years past, the Monitor has engaged a statistician to analyze this data as an aid to understanding the context in which Benchmark performance is occurring.  The analysis performed by the Monitor's statistician indicates that statistical significance remains in the discrepancy between selection rates for African Americans, African American females, and Latinos compared to the selection rates for nonminority applicants with respect to Models.

[89] These potential barriers are discussed in further detail in Section VI.C.2.b.  The Monitor does not intend Abercrombie to consider <u>only</u> these questions but merely proposes them as a point of departure.

1   "would simply not be possible without a sustained commitment to diversity and the ultimate

2   goals of the Decree by all levels of the Company."

3        Nevertheless, a central purpose of the Consent Decree is for Abercrombie to make

4   selection decisions in such as way as to afford equal employment opportunity. Specifically,

5   compliance with the benchmark portions of the Decree requires that Abercrombie's hiring

6   decisions for African Americans and Latinos generally approximate the Company's applicant

7   flow rates for those groups in the preceding six-month period. If Abercrombie consistently

8   achieved this goal and employed a work force less diverse than it currently has, the Company

9   could still be in compliance with the Decree because its selection systems would be operating

10   similarly for all races, national origins, and genders. On the other hand, even if the Company

11   were to employ a work force even more diverse than it currently has, but continued to show a

12   persistent disparity in selection rates for African Americans and Latinos, the Company may still

13   not be in compliance with the Decree, absent a showing of Best Efforts. Simply put, the Decree

14   does not measure the diversity of Abercrombie's work force; rather it measures the relative

15   outcome of the selection process.

16        For these reasons, Abercrombie will need to answer the difficult question of whether

17   persistently missed benchmarks are attributable to some fundamental way in which it selects and

18   hires its employees. The hiring of African American and Latino Models – and strikingly African

19   American females – consistently lags behind benchmarks that are determined by applicant flow.

20   Now that Abercrombie has missed most of its African American and Latino Hiring Benchmarks

21   year after year, while at the same time having fully implemented its intended diversity initiatives,

22   the Monitor suggests that a pure focus on diversity not coupled with a searching, questioning

23   assessment of some basic operating assumptions on how hiring decisions are made may be a

24   barrier to compliance.

25   Dated: September 2, 2010          Fred W. Alvarez

26

27                   By: _____

                     Fred W. Alvarez

28                      WILSON SONSINI GOODRICH & ROSATI
                     Professional Corporation

                     Court-Appointed Monitor

**Exhibit 5**

1  Fred W. Alvarez, State Bar No. 068115
   WILSON SONSINI GOODRICH & ROSATI
2  650 Page Mill Road
   Palo Alto, CA  94304-1050
3  Telephone:  (650) 493-9300
   Facsimile:  (650) 493-6811
4
   Court-Appointed Monitor
5

6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8  EDUARDO GONZALEZ, ANTHONY OCAMPO,        )  CASE NOS.:  03-2817 SI, 04-4730 and 04-
   ENCARNACION GUTIERREZ, JOHAN MONTOYA,    )  4731
9  JUANCARLOS GÓMEZ-MONTEJANO, JENNIFER     )
   LU, AUSTIN CHU, IVY NGUYEN, ANGELINE WU, )  COURT-APPOINTED MONITOR'S
10 ERIC FIGHT, CARLA GRUBB, DAVID CULPEPPER,)  FOURTH ANNUAL COMPLIANCE
   PATRICE DOUGLASS, and ROBAIR SHERROD,    )  REPORT
11 BRANDY HAWK and ANDRE STEELE, on behalf of)
   themselves and all others,               )  CONFIDENTIAL
12                                           )
              Plaintiffs,                    )
13                                           )
                                             )
14        v.                                 )
                                             )
15 ABERCROMBIE & FITCH STORES, INC., A&F     )
   CALIFORNIA, LLC, A&F OHIO, INC., and      )
16 ABERCROMBIE & FITCH MANAGEMENT CO.,       )
                                             )
17            Defendants.                    )
                                             )
   _____)
18 ELIZABETH WEST and JENNIFER LU,           )
                                             )
19            Plaintiffs,                    )
                                             )
20        v.                                 )
                                             )
21 ABERCROMBIE & FITCH STORES, INC., A&F     )
   CALIFORNIA, LLC, A&F OHIO, INC., and      )
22 ABERCROMBIE & FITCH MANAGEMENT CO.,       )
                                             )
23            Defendants.                    )
   _____)
24 EQUAL EMPLOYMENT OPPORTUNITY             )
   COMMISSION,                               )
25                                           )
          v.                                 )
26                                           )
   ABERCROMBIE & FITCH STORES, INC., A&F     )
27 CALIFORNIA, LLC, A&F OHIO, INC., and      )
   ABERCROMBIE & FITCH MANAGEMENT CO.,       )
28                                           )
              Defendants.                    )
   _____)

### 1.  Overview of Prior Findings with Respect to Best Efforts

In the Monitor's First Annual Compliance Report, evaluating the 1st and 2nd six-month periods, the Monitor did not make a finding as to Best Efforts.  Abercrombie met all of its Hiring and Benchmarks[55] in the 1st six-month period but missed most of its Hiring Benchmarks in the 2nd six-month period, along with the African American Promotion Benchmark for the Assistant Manager position to the Store Manager and General Manager positions.

In the 1st and 2nd six-month periods, Abercrombie's plan for meeting benchmarks was focused on hiring and promoting diverse candidates in the MIT position with the objective that those diverse managers would recruit and hire diverse candidates for in-store positions.  The Monitor expressed skepticism as to the viability of that plan, given that Abercrombie had missed a number of its MIT Hiring Benchmarks, but concluded that "the efficacy of the plan will be further assessed in future compliance periods."  Abercrombie's plan at that time also featured a number of elements which are also common to its current plan – implementation of the PSP, PSP training, providing statistical information to Recruiters and Regional Managers, meetings with Regional Managers and Store Directors, and identifying regions struggling to hire Minority applicants.  The Monitor reserved judgment as to those aspects of Abercrombie's plan as well, and encouraged Abercrombie to report on the impact of its plan in its next Semi-Annual Progress Report.

In the 3rd and 4th six-month periods, Abercrombie missed its Minority Hiring Benchmarks for the Model position and a majority of its Minority Hiring Benchmarks for the MIT position.  However, Abercrombie appeared to be closing the gap between its Benchmarks and hiring, missing some Benchmarks by a fraction of a percentage point in the 4th six-month period.  At that time, Abercrombie noted that its failure to meet certain Hiring Benchmarks was attributable to the lack of sufficient time for the Company's changes to take effect.  Abercrombie noted that it had difficulty motivating managers to complete the EEO and Diversity Training and

---

[55] The Consent Decree did not impose any Promotion Benchmarks for the first six-month period.

the PSP Training, and that it faced resistance from some employees with respect to implementation of the PSP.

In the Monitor's Second Annual Compliance Report, the Monitor acknowledged that Abercrombie had demonstrated "energy, creativity, and commitment" toward achieving compliance.  Nevertheless, the Monitor expressed concern about the implementation aspect of Abercrombie's plan, noting that it "has fallen short in two key areas – training and its interview protocol."  The Monitor found that "until the planned corrective actions for training and structured hiring are executed and fully operational, the Monitor cannot conclude that the implementation aspect of the Best Efforts standard in this area has been achieved."

In the 6th and 7th six-month periods, Abercrombie missed most of its Minority Hiring Benchmarks for the Model position, half its Minority Hiring Benchmarks for the MIT position, and two of its Promotion Benchmarks.  At the same time, Abercrombie implemented an extensive audit of its PSP interview guides to assess completeness of the forms.  Abercrombie also substantially complied with its training obligations under the Consent Decree.  Based on such "considerable corrective action to remedy" its "shortcomings in the areas of training and its structured interview protocol," the Monitor concluded that Abercrombie had demonstrated Best Efforts.

Notwithstanding the Monitor's finding of Best Efforts in the Third Annual Compliance Report, the Monitor cautioned that "since the first six-month period, Abercrombie plans have not markedly changed from one period to another" and that "Abercrombie's 'stay the course' approach with respect to its plans for proceeding must be evaluated differently as time passes and operational changes have presumably had time to take effect."  The Monitor warned that persistent failure to meet Hiring Benchmarks "merits a more incisive analysis and revisions to the chartered course."  The Monitor concluded, "If Benchmark achievement remains a continually elusive goal, and if no more proactive solutions to recognized challenges are forthcoming, the Monitor can hardly conclude that a 'plan reasonably calculated' to address the shortcomings of the 'efforts' has been adopted or funded."

In the 7th and 8th periods, Abercrombie missed all of its Hiring Benchmarks for African American and Latino Models and MITs.  In several cases, Abercrombie missed those Hiring Benchmarks by a wide-margin.  Abercrombie also missed two Promotion Benchmarks in the 7th period.  As a result, the Monitor must once again assess whether Abercrombie exercised Best Efforts to meet those benchmarks.

### 2. Best Efforts in Connection with Promotion Benchmarks

In the Fourth Compliance Period, Abercrombie met all of its Promotion Benchmarks for women, Asian Americans and Latinos, rendering a finding as to Best Efforts unnecessary for those three groups.  With respect to African Americans, however, Abercrombie missed both of its Promotion Benchmarks in the 7th period, and met them in the 8th period.  As a result, the Monitor must assess whether Abercrombie exercised Best Efforts to meet its Promotion Benchmarks for African Americans in the 7th period.

The question with respect to whether Abercrombie "implement[ed] and adequately fund[ed] a plan reasonably designed to comply with" African American Promotion Benchmarks in the 7th period is made somewhat simpler by Abercrombie's success in meeting its Promotion Benchmarks in the 8th period.  In the 7th period, Abercrombie investigated possible reasons for its failure to promote African Americans from the Assistant Manager to the Store Manager and General Manager positions.  The investigation revealed that Abercrombie employed numerous African American Assistant Managers whose length of service suggested they were eligible for promotion but who, for whatever reason, had been overlooked.  Abercrombie addressed this issue by publishing a worksheet reminding District Managers to be consistent in their promotion practices by considering people of color in their promotion discussions.  This direct reminder, presented to managers at a crucial point in the decision-making process, may well have made the difference between meeting and missing a Promotion Benchmark.

With respect to the missed African American MIT Promotion Benchmark, Abercrombie addressed the shortfall by overhauling its MIT promotion process to be more systematic, allowing all MITs to be promoted upon completion of the training program.  This targeted change to the

MIT promotions process also appears to have remedied the 7th period disparity in African American MIT promotions.

Abercrombie's approach to meeting its Promotion Benchmarks for African Americans reflects Best Efforts.  It took a critical look at the variables involved in promotions, and implemented a plan designed specifically to address those variables in a way that could reasonably be expected to improve its performance with respect to the Promotion Benchmarks. The improvements in promotions of African American Assistant Managers appear to result from careful process adjustment made possible by a thorough investigation.  The improvements with respect to MIT promotions, by contrast, were not necessarily the result of careful examination, but of an entirely new promotion process intended to produce more consistent results.  Both approaches represent plans reasonably designed to achieve the Promotion Benchmarks.

### 3.    Best Efforts in Connection with Hiring Benchmarks

Abercrombie's performance with respect to each Benchmark group differed, necessitating a separate analysis of Best Efforts with respect to females, Asian Americans, Latinos and African Americans.

### a.    Females

Abercrombie met all of its Hiring Benchmarks for women[56] in the 7th and 8th six-month periods, with the exception of the female Model benchmark in the 8th six-month period, which Abercrombie missed by 0.1 percentage points.  Abercrombie has historically had great success in meeting its female Hiring Benchmarks.  Indeed, this small shortfall represents the first missed Benchmark with respect to females since the inception of the Consent Decree.

Given Abercrombie's historical success in meeting female Hiring Benchmarks, and the very small margin by which Abercrombie missed the Model Hiring Benchmark in the 8th period, the Monitor finds that the systems Abercrombie has already implemented with respect to females are "reasonably designed" to meet the female Hiring Benchmarks.  Accordingly, the Monitor can

---

[56] Abercrombie's efforts in connection with African American female Models are discussed along with African American Benchmarks, as Abercrombie's trends for hiring African American females corresponds more closely to African American trends than trends for all females.

1  conclude that Abercrombie exercised Best Efforts in connection with the hiring of female Models

2  in the 8th six-month period.

3        **b.**     **Asian Americans**

4       Abercrombie met its Asian American Hiring Benchmarks for Models in the 7th and 8th

5  six-month period, obviating the need for a finding as to Best Efforts in connection with Asian

6  American Model Hiring Benchmarks.  Abercrombie met its Asian American Hiring Benchmark

7  for MITs in the 7th six-month period but not the 8th six-month period.

8       The Monitor notes that Abercrombie's performance with respect to Asian Americans has

9  stabilized, such that it has been meeting its Hiring Benchmarks more often than not in recent six-

10  month periods.  Further evidence that Abercrombie is on solid footing with respect to meeting

11  Asian American Benchmarks can be found in comparing the rate at which Asian Americans were

12  hired compared to Caucasians.  Sixty-four percent (64%) of Caucasian applicants to the Model

13  position were hired in the 7th and 8th six-month periods, compared to a similar rate of 62% for

14  Asian American applicants.  Likewise, 32% of Caucasian applicants to the MIT position were

15  hired in the 7th and 8th six-month periods, compared to a similar 30% of Asian Americans.

16       When Abercrombie's shortfall in the 8th six-month period is viewed in the context of

17  longer term trends, it appears to the Monitor to be consistent with variation in hire rates that could

18  be expected in the normal course.  While the Monitor encourages Abercrombie to monitor its

19  performance with respect to Asian American MITs and correct any problems identified, the

20  Monitor finds that the systems Abercrombie has already implemented and its plan for continued

21  refinement of those systems are "reasonably designed" to meet Asian American MIT Hiring

22  Benchmarks.  Accordingly, the Monitor can conclude that Abercrombie exercised Best Efforts in

23  connection with the hiring of Asian American MITs in the 8th six-month period despite the

24  missed Benchmark.

25        **c.**     **Latinos**

26       Abercrombie missed all of its Latino Model and MIT Hiring Benchmarks.  Abercrombie

27  missed its Latino Model Benchmark by 0.4 percentage points in the 7th six month period and 1.5

28  percentage points in the 8th six-month period.  To put the 8th period shortfall in context, the 1.5

percentage point gap is equivalent to more than 600 Model positions.  Abercrombie missed its Latino MIT Hiring Benchmarks by large margins – missing it by 1.5 percentage points in the 7th six-month period and 3.3 percentage points in the 8th period.  In the Monitor's conference with Abercrombie's CEO, the Monitor was encouraged by Mr. Jeffries' observations about Abercrombie's performance with respect to MITs and his assurance that a renewed diagnostic effort would be forthcoming.

Abercrombie's results in the Fourth Compliance Period represent a step back from what had been a very positive trend for Latinos.  Abercrombie has achieved strong growth in hire rates for Latinos over the course of the Consent Decree, more than doubling since the first six-month period for both Models and MITs.  Indeed, Abercrombie managed to close the gap between Benchmarks and hiring in the 6th sixth period for Latino MITs and Models.  Abercrombie even maintained some growth in its hire rate for Latino Models in the 7th and 8th six-month period, but the gap between hiring and Hiring Benchmarks widened.

Abercrombie's shortfalls with respect to Latinos do not appear to result from the lagging nature of the Hiring Benchmarks, calculated from the applicant rate six months prior.  In the 7th and 8th six-month period, 53% of Latino applicants to the Model position were hired, compared to a much higher 64% of Caucasian applicants.  Likewise, in the 7th and 8th six-month period, 22% of Latino applicants to the Model position were hired, compared to 33% of Caucasian applicants.

The Monitor is encouraged that Abercrombie is taking a serious look into the issues and options for addressing them.  It remains unclear to the Monitor whether Abercrombie's current plan will enable Abercrombie to meet its Latino MIT and Model Benchmarks in the 9th and 10th six-month periods.  The "two or more" races category, which Abercrombie identified as a source of missed Hiring Benchmarks, does not influence the Latino category – as applicants who designate themselves as Latino are not asked whether they are "two or more" races.  Abercrombie also attributed its missed Hiring Benchmarks to the economy but did not present any strategies to address any economy-based challenges.

Abercrombie's current plan is largely a refinement of its pre-existing strategy. While a continuation of that strategy would reasonably be expected to result in meeting Hiring Benchmarks for women and Asian Americans, that conclusion cannot be made with respect to Latinos. What appeared to be steady progress towards Benchmark attainment has reversed itself, particularly for Latino MITs. In the absence of either a diagnosis of this reversal, or a plan to restore the momentum that was evident in Abercrombie's progress toward the Latino benchmarks, the Monitor does not have a basis to conclude that the Best Efforts standard has been met with respect to Latino Models and MITs. The Monitor hopes and expects that Abercrombie will develop an effective strategy to return to Abercrombie's previous success with respect to Latinos. [57]

### d.     African Americans and African American Females

Abercrombie continues to struggle with respect to Hiring Benchmarks for African Americans and African American females. Abercrombie has not met its Hiring Benchmarks for African American or African American female Models since the 1st six-month period. Abercrombie missed its Model Hiring Benchmark by a wide margin for both groups in the 8th six-month period – 2.5 percentage points for African Americans, and 4.3 percentage points for African American females. The 2.5 percentage point shortfall for African American Models is equivalent to more than 1,000 Model positions. With respect to MITs, Abercrombie's hire rate for African Americans decreased from the 6th to the 7th six-month period and again from the 7th to the 8th six-month period, missing the Benchmark by 1.6 percentage points and 2.2 percentage points, respectively.

The trends with respect to African Americans do not suggest that Abercrombie is close to meeting its Hiring Benchmarks – there is neither the strong positive growth in hiring rate present for Latinos, nor the pattern of success in meeting Hiring Benchmarks present for Asian Americans. Abercrombie's performance with respect to Hiring Benchmarks is not attributable to

---

[57] Indeed, Abercrombie appears to be moving towards a more targeted approach. In the days leading up to the completion of this Report, Abercrombie shared with the Monitor communications with managers advising them of specific shortfalls with respect to Latinos.

the manner in which the benchmarks are calculated – Abercrombie has been hiring African Americans at a much lower rate than Caucasian applicants.  Twenty four percent (24%) of African American MIT applicants were hired in the Fourth Compliance Period, compared to 32% of Caucasian applicants.    Forty-nine percent (49%) of African American Model applicants were hired in the Fourth Compliance Period, compared to 64% of Caucasian applicants.  Only forty-five percent (45%) of African American female Model applicants were hired, compared to 65% of Caucasian female Model applicants.  Success at Benchmark attainment is simply not possible with such large gaps in selection rates.

        In analyzing its Hiring Benchmark shortfalls, Abercrombie attributed the problem to the introduction of the "two or more" races category[58] and to the economy.   Regardless of the validity of these hypotheses, Abercrombie did not present a strategy to address the challenges posed by the "two or more" races category or the economy.  Abercrombie also noted that the missed benchmarks may have been attributable to regional variance, which Abercrombie plans to investigate further and to discuss further with Regional Managers.  The Monitor encourages Abercrombie to do so, and to devise other strategies, as appropriate, to address regional disparities.  Finally, Abercrombie noted that the overall diversity message has moved away from "black/white" terms in recent years, and plans to direct stores to focus on the particular Minority group for which they are under hiring.[59]  The Monitor is encouraged by this targeted approach in its instructions to stores, and believes such a strategy could be a component of an effective plan towards meeting Benchmarks for African Americans.

---

[58] The Monitor's understanding of the influence of the "two or more" category is that it may have affected results when the category was first introduced at the start of the 6th period – when the 6th period Hiring Benchmark included the "two or more" applicants from the 5th period but the 6th period hire rate did not.  Thereafter, the effect of the "two or more" races category could be expected to wash out, where both the Hiring Benchmarks and the hire rates for Minorities do not include those self-identified as "two or more."  Consistent with this theory, the Hiring Benchmarks for African Americans and Asian Americans adjusted downwards in the 7th period when the applicant rate for Minorities no longer included "two or more" applicants.

[59] Indeed, Abercrombie appears to have begun implementation of such strategy in the days leading up to the completion of this Report.  The Company is also preparing "Bottom 20 "reports for each Minority group, listing the 20 stores with the worst applicant to hire ratio for African Americans, Asian Americans, and Latinos, respectively.

Nevertheless, the Monitor remains concerned that Abercrombie's strategy is not sufficiently focused on shortfalls in Hiring Benchmarks, and African American shortfalls in particular.  Abercrombie's general strategy featuring investment in some large scale or long-term projects – such as the Diversity Week Essay Contest or the partnership with Georgetown University – have not seemed to pay dividends in achievement of Hiring Benchmarks for African Americans.  Abercrombie has also continued its communications through various publications: the Bottom 50 Initiative, the Diversity Scorecard, and revisions to audit forms.  However, the message accompanying these communications is that shortfalls should be addressed through increased recruiting of Minorities.  Given that Abercrombie has already achieved success in attracting Minority applicants, the Monitor is not convinced that recruiting will fix Abercrombie's hiring problems.  Likewise, Abercrombie's plan to improve recruiting at African American colleges is welcome, but may not be sufficient to overcome large hiring shortfalls, particularly for the Model position, which has no educational requirement.  Just as Abercrombie addressed its promotion problem with respect to African Americans by revisiting its promotions process and by encouraging a discussion of diverse promotion candidates, so too should Abercrombie consider ways to engage its managers to discuss and reflect on their hiring practices.  For example, the "Cast Of" program has been helpful in encouraging managers to reflect on what it means to have a great looking, diverse staff, and has served as a reference point in hiring decisions.  More focused attention to the persistent gaps between applicants and hiring, particularly with reference to African Americans and African American females, is needed before the Monitor can conclude that Abercrombie has demonstrated Best Efforts with respect to African American and African American female Hiring Benchmarks.

## VII.   DIVISION SHORTFALLS

### A.   Summary of Terms of Consent Decree

The Consent Decree requires Abercrombie to disclose any division (Abercrombie & Fitch, abercrombie, Hollister, Ruehl, Gilly Hicks, or any other subsequently created brand) with hiring rates at less than 80% of Company-wide rates for Benchmark groups ("Division Shortfalls").

department within the organization whose budget was not cut as a result of the ongoing recession but, instead has increased.

Given this stability in Abercrombie's Decree-related programs, Abercrombie's disappointing performance with respect to Hiring Benchmarks[80], particularly for African Americans, is a challenge to diagnose and address.  For example, Abercrombie's marketing materials do not appear to track Abercrombie's hiring shortfalls with respect to African Americans, as African Americans are fairly represented in the marketing.  Similarly, Benchmark shortfalls do not seem to result from an absence of applicants – Abercrombie has achieved high Minority applicant rates and the recession has appeared to boost Minority applicants further.  Notwithstanding the inherent uncertainty in identifying barriers to compliance, the Monitor suggests the following areas for analysis as possible contributors to Abercrombie's shortfalls.

### 1.    A "One Size Fits All" Plan

The Monitor's analysis of Abercrombie's performance with respect to Hiring Benchmarks over time indicates that trends with respect to Minorities are not uniform.   Rather, Abercrombie's trends with respect to Asian Americans, Latinos and African Americans have markedly diverged.  Over the course of the Decree, Abercrombie has had the most success in meetings its Asian American Hiring Benchmarks, even without significant growth in applicant and hire rates.  With respect to Latinos, Abercrombie has successfully increased its hire rate over time, particularly with respect to Models, but such growth has lagged behind Hiring Benchmarks.  Abercrombie's performance with respect to African Americans and African American females has become problematic – with stagnating hire rates and large Hiring Benchmark shortfalls.

Abercrombie's plan to achieve Hiring Benchmarks, by and large, does not seem to address these differing trends.  Although Abercrombie plans to attend more recruiting events at historically African American colleges, Abercrombie's plan largely consists of continuing past initiatives in the hopes that incremental improvements and the passage of time will ultimately improve Benchmark performance across all Minority groups.  At this stage in the life of the

---

[80] The Monitor continues to observe significant disparities between applicant rates and hiring rates for both the Model and MIT position with respect to African Americans and Latinos.

Decree, a realistic basis for those hopes is increasingly hard to find, particularly with respect to African American Hiring Benchmarks.  A more targeted analysis and plan of action – similar to Abercrombie's investigation and strategies for addressing shortfalls in African American promotions – may prove more effective.  For example, an examination of Abercrombie's success in meeting Hiring Benchmarks with respect to Asian Americans and its past successes with Latinos, may offer some insight into strategies for improving performance with respect to African Americans.

### 2.    Using Recruiting to Fix a Hiring Problem

Throughout the Decree, Abercrombie's strategy with respect to addressing hiring shortfalls has been to increase its recruiting.  The Company's communications counsel stores on the Bottom 50 to address their gap between hiring and applicant rates by recruiting Minorities in the community.[81]  Likewise, Recruiters counsel stores that they are expected to recruit high quality Minority candidates in community events.  Perhaps as a result of this emphasis on recruiting, Abercrombie's applicant rate among Minorities is quite high.  The emphasis on recruiting has not, however, addressed Abercrombie's Hiring Benchmark shortfalls.

Conspicuously absent from Abercrombie's diversity strategy and communications with stores have been a discussion and examination of hiring practices.  Although store managers are made aware of gaps between hiring and applicant rates, it is done largely in the context of encouraging them to recruit suitable Minority candidates to make up the difference going forward.  To the Monitor's knowledge, managers are rarely, if ever, encouraged to reflect on their hiring practices and decision-making at the critical point when the hiring decisions are being made.  This differs from Abercrombie's strategy with respect to Promotion Benchmarks, where managers were instructed that they needed to "be consistent" and reminded to consider people of color at the time of their decision-making.  A strategy focused exclusively on recruiting to

---

[81] For example, a frequently asked questions worksheet for stores in the Bottom 50, advises managers to "take a look at the specific population you are under hiring (Asian American, African American, Hispanic)" and asks whether the manager has seen these populations in the mall, shopping in the store, or in the community.  The worksheet then advises "If you answered yes to these questions, it tells us that the population you are under-hiring is present within your city!  They are out there, we just aren't actively recruiting them!  The challenge is to recruit from this specific population of people."

3751792_9.DOC

1   Fred W. Alvarez, State Bar No. 068115
    WILSON SONSINI GOODRICH & ROSATI
2   650 Page Mill Road
    Palo Alto, CA  94304-1050
3   Telephone:  (650) 493-9300
    Facsimile:  (650) 493-6811
4
    Court-Appointed Monitor
5
                    UNITED STATES DISTRICT COURT
6
                  NORTHERN DISTRICT OF CALIFORNIA
7

8   EDUARDO GONZALEZ, ANTHONY OCAMPO,     )    CASE NOS.:  03-2817 SI, 04-4730 and 04-
    ENCARNACION GUTIERREZ, JOHAN MONTOYA, )    4731
    JUANCARLOS GÓMEZ-MONTEJANO, JENNIFER  )
9   LU, AUSTIN CHU, IVY NGUYEN, ANGELINE WU, )  **COURT-APPOINTED MONITOR'S**
    ERIC FIGHT, CARLA GRUBB, DAVID         )    **THIRD ANNUAL COMPLIANCE**
10  CULPEPPER, PATRICE DOUGLASS, and ROBAIR )   **REPORT**
    SHERROD, BRANDY HAWK and ANDRE STEELE, )
11  on behalf of themselves and all others,     )    **CONFIDENTIAL**
                                           )
12               Plaintiffs,               )
                                           )
13          v.                             )
                                           )
14  ABERCROMBIE & FITCH STORES, INC., A&F  )
    CALIFORNIA, LLC, A&F OHIO, INC., and   )
15  ABERCROMBIE & FITCH MANAGEMENT CO.,    )
                                           )
16               Defendants.               )
                                           )
17  ELIZABETH WEST and JENNIFER LU,        )
                                           )
18               Plaintiffs,               )
                                           )
19          v.                             )
                                           )
20  ABERCROMBIE & FITCH STORES, INC., A&F  )
    CALIFORNIA, LLC, A&F OHIO, INC., and   )
21  ABERCROMBIE & FITCH MANAGEMENT CO.,    )
                                           )
22  Defendants.                            )
                                           )
23  EQUAL EMPLOYMENT OPPORTUNITY           )
    COMMISSION,                            )
24                                         )
                                           )
25          v.                             )
                                           )
26  ABERCROMBIE & FITCH STORES, INC., A&F  )
    CALIFORNIA, LLC, A&F OHIO, INC., and   )
27  ABERCROMBIE & FITCH MANAGEMENT CO.,    )
                                           )
28  Defendants.                            )
                                           )

**B.      Status Conference with the Court**

The Consent Decree requires that Abercrombie, Lead Counsel, and the EEOC conduct an annual Status Conference with the Court.  The third annual Status Conference is scheduled for October 30, 2008.

## XIV.   IDENTIFICATION OF BARRIERS

**A.      Summary of Terms of Consent Decree**

Section XVI.A.2 of the Consent Decree requires that the Monitor, as part of the Annual Compliance Report, identify any barriers to Abercrombie's fulfillment of the objectives of the Consent Decree.

**B.      Identification of Barriers to Achieving Compliance**

During the Third Compliance Period, Abercrombie continued to refine many of the important initiatives introduced during the First and Second Compliance Periods.  Abercrombie also expended a significant amount of effort and energy with respect to its training obligations and the PSP.  Continued attention to these areas will undoubtedly aid Abercrombie's compliance with its future obligations under the Consent Decree, but it appears that other areas of Abercrombie's arsenal require similar refinements and attention in upcoming compliance periods.

Significant disparities remain between Minority applicant rates and hiring rates for the Model position.[69]  Moreover, in the sixth six-month period, there was a decrease in the hire rates for Asian American Models and MITs, African American Models, and African American female Models.  There was also a decrease in the applicant rates for African American Models, Asian American Models, African American female Models, and Asian American MITs.  While

---

[69] As in years past, the Monitor has engaged a statistician to analyze this data as an aid to understanding the context in which Benchmark performance is occurring.  The analysis performed by the Monitor's statistician indicates that statistical significance remains in the discrepancy between Minority applicant rates and hiring rates with respect to Models.

1 | Fred W. Alvarez, State Bar No. 068115
WILSON SONSINI GOODRICH & ROSATI
2 | 650 Page Mill Road
Palo Alto, CA  94304-1050
3 | Telephone:  (650) 493-9300
Facsimile:  (650) 493-6811
4 |
Court-Appointed Monitor
5 |
UNITED STATES DISTRICT COURT
6 |
NORTHERN DISTRICT OF CALIFORNIA
7 |
8 | EDUARDO GONZALEZ, ANTHONY          )   CASE NOS.:  03-2817 SI, 04-4730 and
OCAMPO, ENCARNACION GUTIERREZ,    )   04-4731
9 | JOHAN MONTOYA, JUANCARLOS GÓMEZ-  )
MONTEJANO, JENNIFER LU, AUSTIN CHU, )   **COURT-APPOINTED MONITOR'S**
10 | IVY NGUYEN, ANGELINE WU, ERIC FIGHT, )   **SECOND ANNUAL COMPLIANCE**
CARLA GRUBB, DAVID CULPEPPER,      )   **REPORT**
PATRICE DOUGLASS, and ROBAIR       )
11 | SHERROD, BRANDY HAWK and ANDRE     )   **CONFIDENTIAL**
STEELE, on behalf of themselves and all others, )
12 |                                    )
                  Plaintiffs,         )
13 |                                    )
              v.                       )
14 |                                    )
ABERCROMBIE & FITCH STORES, INC.,  )
15 | A&F CALIFORNIA, LLC, A&F OHIO, INC., )
and ABERCROMBIE & FITCH            )
16 | MANAGEMENT CO.,                    )
                                    )
17 | _____Defendants._____     )
ELIZABETH WEST and JENNIFER LU,    )
18 |                                    )
                  Plaintiffs,         )
19 |                                    )
              v.                       )
20 |                                    )
ABERCROMBIE & FITCH STORES, INC.,  )
21 | A&F CALIFORNIA, LLC, A&F OHIO, INC., )
and ABERCROMBIE & FITCH            )
22 | MANAGEMENT CO.,                    )
                                    )
23 | _____Defendants._____     )
EQUAL EMPLOYMENT OPPORTUNITY       )
24 | COMMISSION,                        )
                                    )
25 |               v.                    )
                                    )
26 | ABERCROMBIE & FITCH STORES, INC.,  )
A&F CALIFORNIA, LLC, A&F OHIO, INC., )
27 | and ABERCROMBIE & FITCH            )
MANAGEMENT CO.,                    )
28 |                                    )
          _____Defendants._____ )

COURT-APPOINTED MONITOR'S SECOND ANNUAL
COMPLIANCE REPORT                                    **CONFIDENTIAL**

1    demonstrated gradual but sustained improvement in the applicant rates, hiring rates, and

2    incumbency rates for Minorities.  At the same time, significant discrepancies remain between

3    Minority applicant and hiring rates for the both the Model and the MIT positions.[89]  During

4    the third and fourth six-month periods, reacting to more current data, the Monitor and

5    Abercrombie actively explored several possible reasons for the discrepancy between applicant

6    and hiring rates.  It would be speculative to conclude that any particular practice or

7    circumstance accounts for Abercrombie's progress, on the one hand, or, for that matter, its

8    continuing shortfall in meeting Benchmarks, or gaps between Minority applicant and hiring

9    rates, on the other.  Nonetheless, certain recurring areas suggest themselves as possible

10   contributors to these discrepancies, or at least, areas which if improved compliance is attained,

11   more progress seems possible.

12              **2.    Marketing.**

13        Abercrombie did not achieve compliance with the Consent Decree's requirement that

14   the Company's marketing materials, taken as a whole, reflect diversity in either the First or

15   Second Compliance Periods.  While each brand's marketing materials depicted at least one

16   African American print model every season during the Second Compliance Period, the vast

17   majority of the images depicted Caucasian print models.  Moreover, Abercrombie's marketing

18   materials included only a handful of images containing print models whose apparent

19   race/ethnicity was Asian American or Latino.

20        The Monitor is not prepared to conclude that compliance with the marketing obligation

21   will lead Abercrombie to meet its Minority Hiring Benchmarks or close the gaps that exist

22   between Minority applicant and hiring rates.  However, one can hardly question that the

23   _____

24        [89] The Monitor's statistician reported that, while the difference between Abercrombie's
     applicant and hire rates for Minorities versus Caucasians passed the 80% threshold commonly
25   used as a "rule of thumb" in most instances, the actual differences were still statistically
     significant.  Statistically significant differences between applicant rates and hire rates for
26   Minorities versus Caucasians were especially pronounced with respect to the Model position.
     While even small differences can lead to statistical significance in large samples such as the
27   sample size for the Model position, the Monitor's statistician has advised that these disparities
     in hiring rates for the Model position are substantial enough that they would remain
28   statistically significant with a much smaller sample size of applicants.

1  Fred W. Alvarez, State Bar No. 068115
   WILSON SONSINI GOODRICH & ROSATI
2  650 Page Mill Road
   Palo Alto, CA  94304-1050
3  Telephone:  (650) 493-9300
   Facsimile:  (650) 493-6811
4
   Court-Appointed Monitor
5
                    UNITED STATES DISTRICT COURT
6
                  NORTHERN DISTRICT OF CALIFORNIA
7

8  EDUARDO GONZALEZ, ANTHONY            )   CASE NOS.:  03-2817 SI, 04-4730 and
   OCAMPO, ENCARNACION GUTIERREZ,       )   04-4731
9  JOHAN MONTOYA, JUANCARLOS GÓMEZ-     )
   MONTEJANO, JENNIFER LU, AUSTIN CHU,  )   **COURT-APPOINTED MONITOR'S**
   IVY NGUYEN, ANGELINE WU, ERIC FIGHT, )   **FIRST ANNUAL COMPLIANCE**
10 CARLA GRUBB, DAVID CULPEPPER,        )   **REPORT**
   PATRICE DOUGLASS, and ROBAIR         )
11 SHERROD, BRANDY HAWK and ANDRE       )   **CONFIDENTIAL**
   STEELE, on behalf of themselves and all others, )
12                                      )
              Plaintiffs,               )
13                                      )
          v.                            )
14                                      )
   ABERCROMBIE & FITCH STORES, INC.,    )
15 A&F CALIFORNIA, LLC, A&F OHIO, INC., )
   and ABERCROMBIE & FITCH             )
16 MANAGEMENT CO.,                      )
                                        )
17 _____Defendants._____)
   ELIZABETH WEST and JENNIFER LU,      )
18                                      )
              Plaintiffs,               )
19                                      )
          v.                            )
20                                      )
   ABERCROMBIE & FITCH STORES, INC.,    )
21 A&F CALIFORNIA, LLC, A&F OHIO, INC., )
   and ABERCROMBIE & FITCH             )
22 MANAGEMENT CO.,                      )
                                        )
23 _____Defendants._____)
   EQUAL EMPLOYMENT OPPORTUNITY         )
24 COMMISSION,                          )
                                        )
25        v.                            )
                                        )
26 ABERCROMBIE & FITCH STORES, INC.,    )
   A&F CALIFORNIA, LLC, A&F OHIO, INC., )
27 and ABERCROMBIE & FITCH             )
   MANAGEMENT CO.,                      )
28                                      )
   _____Defendants._____)

1  infrastructure has been designed and implemented at Abercrombie since the Approval Date.

2  Moreover, the installation and implementation of the new employment structure had to be

3  superimposed in "real time" as a major national company continued to operate and grow.

4        However, it must be observed that substantial discrepancies between Minority applicant

5  rates and hiring rates in the Brand Representative and Manager-in-Training positions exist, and

6  without further analysis of potential barriers to the fulfillment of the objectives of the Consent

7  Decree, one could conclude that equal employment opportunity was not being achieved in the

8  implementation of the new infrastructure.  With so many recent, fundamental changes to the

9  manner in which the Company recruits applicants, it is too early to draw any concrete

10  conclusions from the obvious disparities in applicant and hiring rates.[33]  The Monitor will

11  examine all possible sources of, and explanations for, the discrepancy between applicant and

12  hiring rates.  Upon reflection, certain areas suggest themselves as possible contributors to these

13  discrepancies and warrant further attention to ensure that they do not become barriers to overall

14  compliance.

15              **2.    Marketing**

16        Abercrombie did not achieve compliance with the Consent Decree's requirement that the

17  Company's marketing materials, taken as a whole, reflect diversity.  Most of Abercrombie's

18  marketing materials did not include any images of Latinos or Asian Americans.  Although each

19  brand's marketing materials depicted at least one African American model every season, the vast

20  majority of the images depicted Caucasian models.  Significantly, Abercrombie's "look" is

21  reflected through its marketing materials.  Abercrombie's Recruiters and managers are instructed

22  to recruit applicants and hire candidates that are "consistent with the Abercrombie brand" (as set

23  forth in the RHP and the Recruiter job description).  One must consider whether the Company's

24  shortfalls in its Hiring Benchmarks during the second six-month compliance period, particularly

25

26        [33] Indeed, the federal Uniform Guidelines on Employee Selection Procedures suggest that
      "greater differences in selection rate[s] may not constitute adverse impact where the differences
27  are based on … special recruiting or other programs [that] cause the pool of minority or female
      candidates to be atypical of the normal pool."  41 C.F.R. § 60-3.4D (1978).
28

**Exhibit 6**

EXPERT REPORT OF SHELDON ZEDECK

FEBRUARY 23, 2011

ABERCROMBIE & FITCH SELECTION SYSTEM FOR THE "MODEL" POSITION

The following report presents my professional opinions regarding the potential issues underlying the use of the selection procedure implemented for the Abercrombie & Fitch (A&F) "model" position. The selection procedure was implemented in 2006 (with some modifications over time).  Under the assumption that there is adverse impact with the current implementation of the structured interview system used by A&F, I will address a number of selection and validation issues that should be considered as one examines the potential reasons for the adverse impact and ways to reduce it.

The guiding principles for my review are the Uniform Guidelines on Employee Selection Procedures (UGESP, 1978).  The "Guidelines" indicate that "If adverse impact exists, it [the selection system] must be justified on grounds of business necessity.  Normally this means by validation which demonstrates the relation between the selection procedure and performance on the job. " [Section II] Furthermore, Section IV states that "In the language of industrial psychology, the employer must validate the selection procedure."  Another issue of relevance to this report is the "Guidelines" section on reliability.  Section 14, C (5) – Technical Standards for Content Validity – states that "The reliability of selection procedures justified on the basis of content validity should be a matter of concern to the user. Whenever it is feasible, appropriate statistical estimates should be made of the reliability of the selection procedure."  The "Guidelines" [Technical Section 4C] also indicate that "If the information called for by sections 4A and B ... shows that the total selection process for a job has an adverse impact, the individual components of the selection process should be evaluated for adverse impact."  Finally,

1

"Guidelines" call for consideration and investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible to determine the appropriateness of using or validating them (Section 3B.).

With the above as a basis, I undertook an examination and analysis of the validation and selection procedure and the following opinions are based on the material provided to me (see Attachment A).  In my professional opinion, the selection system currently used by A&F to select applicants for the "Model" position presents problems and can be questioned because of the following: (a) the inclusion/exclusion of particular competencies in the selection system; the use of competencies that were less important than some excluded; (b) the overlap in measurement of two of the competencies; (c) the lack of behavioral definition of anchors and standards;  (d) the lack of information about the relationship among the three competencies as well as their impact on the total score and adverse impact; (e) the lack of demonstration of reliability of the ratings; (f) the potential problems with a group structured interview; and (g) the need to consider alternative selection instruments, alternative scoring/weighting of the selection instruments, and alternative strategies for using test results (e.g., one test result or competency rating as a screening device and other competency ratings for ranking applicants); in addition, some job requirements, such as those concerned with appearance and sense of style can be addressed as a condition of hire once other competencies are assessed.

QUALIFICATIONS AND COMPENSATION

Attachment B contains my curriculum vita.  I have not testified at a trial as a witness or by deposition in the last four years.  I am being compensated for my involvement in this case at the rate of $500.00 per hour.

2

VALIDATION STRATEGY

As presented in the "APT Technical Documentation:  Development and Validation of Hiring

Procedures for Store Positions" report (September 2005) and as reviewed/summarized in the "Expert

Report of Dr. Kathleen K. Lundquist" document (December 31, 2010), the strategy for validation of the

implemented selection procedure, the structured interview, was one of content validity.  This is a

reasonable strategy and one commonly accepted in the profession.  The underlying basis for content

validation is the job analysis for the position.

JOB ANALYSIS

The job analysis undertaken by APT generally follows the procedure in which job tasks and

knowledge, skills, and abilities (KSAs or competencies) are identified via observation and followed by

collection of ratings of the identified tasks and KSAs.  Tests are then developed based on the linkages

between tasks and KSAs and for which there are also linkages between the test content and the KSAs.  In

general, APT followed the procedure, though there are some concerns and questions that were not

addressed in the documents I reviewed.  I believe these issues are relevant to evaluating the use of the

selection procedure (its results) and provide potential for modification of the procedure to address the

adverse impact.  In particular:

(1) The number of observations prior to generating the task/KSA surveys was rather limited.

Page 8 of the Lundquist Expert Report indicates that observations were conducted by two

staff of APT in one location – White Plains, NY.  Three A&F staff were interviewed during this

process.  My view is that more observations are needed, one that samples the stores from

across the country.  Given that more than five years have passed since the initial job

3

analysis, a new one might be undertaken – with greater sampling and observation than in the initial job analysis.

(2) Once surveys were developed, rating scales were chosen to identify the most important and frequently performed tasks as well as the most important competencies (KSAs). For KSAs, additional information was collected regarding whether the KSA is "required upon entry" (RUE). These were reasonable scale categories. The concern I have is whether the RUE scale was elaborated upon to indicate whether the respondents to the survey were asked whether the applicant needed the KSA prior to training or prior to actual performance on the job. This is a critical distinction, since selection systems need to take into account whether the applicants will be trained to perform certain activities. If there is training, then the selection system should focus on trainability as opposed to performance once placed into the position. The Lundquist Report and the Technical Report do not discuss the focus of the RUE rating.

(3) The Task Survey contained 90 activities in nine task areas for the non-management position (the "Model" position). The Competency Survey included 55 competencies grouped under nine competency areas. Typically, averages and standard deviations are computed for all items contained in job analysis surveys. The reporting of standard deviations (SDs) is critical since it provides an indication of the amount of agreement among the respondents. The range of possible SDs is from zero (which indicates all respondents provided the same rating to an item) to a larger number that is a function of the range of the scale. Large SDs indicate disagreement among the respondents in, for example, the importance of the task, which

4

further suggests that perhaps the task should not be the basis for selection test

development and implementation.  My concern is that I did not see any reporting of SDs for

the tasks or competencies contained in the two surveys.

(4)  Results of the Ratings.  For the "Model" position, APT identified the 10 "top important

competencies" (see pp. 15-16 of the Lundquist Report).  APT concluded that "to ensure the

reliability and practical administration of the interviews, the number of competencies to be

assessed in each interview needed to be reduced."  (I will return to the issue of "interview

reliability" in below sections of this report.).  Accordingly, and based on the extensive

knowledge of store positions, the Abercrombie Project Steering Committee was asked to

review interview competencies for each job and identify the ones "… that were most critical

to job success." [Lundquist Report, p. 17).  I have several concerns with this latter

procedure.  One, the reliance on a small project steering committee (five A&F staff as well

as three from APT and one from the legal arena) to further identify the "most critical"

competencies from a list that has already identified as the "top 10" causes concern about a

small group's influence over the final outcomes of the job analysis.  Two, and related, the

result of such a process could lead to the elimination of some competencies that were

identified as more important than those subsequently retained.  The critical issue is whether

the inclusion of particular competencies would change the adverse impact obtained in the

hiring of applicants for the "Model" position.

For the "model" position, there were 22 competencies at the outset that were

considered critical before consolidation, seven that remained after consolidation, and three

5

chosen for inclusion in the selection interview.  The three chosen for the "Model" position

are presented and defined on Page 21 of the Lundquist Report (I believe that the heading is

incorrect in the report – it reads "Manager-in-Training Interview Competencies" when I

believe it should be "Model Interview Competencies.").

I present below the three competencies as consolidated by APT/A&F with parenthesis

following some of the descriptions that indicate the original competency number as shown

in Table 2B of the Lundquist Report.

Outgoing & Promotes Diversity:  *The ability to be extroverted, fun, friendly, active and social.*

*This includes projecting an energetic, dynamic, vigorous and lively personality, actively*

*seeking out interaction with others (#8).  This includes maintaining liveliness and*

*enthusiasm, having a positive demeanor, displaying a passion and enjoyment for life, and*

*focusing on success (#9).  This also includes the ability to work and relate well to people from*

*diverse backgrounds (e.g., racial, cultural, ethnic, gender, sexual orientation, age, etc.);*

*being aware of, understanding, respecting, valuing, being sensitive to, and promoting*

*diversity and adapting one's own behavior based on that understanding  (#2).  This includes*

*seeking out, valuing, and utilizing these individual differences to implement and realize*

*Abercrombie's commitment to diversity and inclusion.*

In summary of the above consolidated competency, it incorporates three of the original

competencies -- #'s 2, 8, and 9.

Sophistication & Aspiration:  *The ability to show confidence, poise, and maturity.  This*

*includes believing in oneself and one's own abilities (#10), the ability to think positively about*

*actions and events and anticipate the best possible outcomes, maintaining liveliness and*

*enthusiasm, have a positive demeanor, displaying a passion and enjoyment for life, and*

*focusing on success (#9); influencing customers' aspirations to dress in Abercrombie brand*

*clothing (#24).*

In summary of the above consolidated competency, it incorporates three of the original

competencies -- #'s 9, 10, and 24.

<u>Appearance & Sense of Style</u>: *The ability to present oneself attractively, appear well*

*groomed, and wear attractive, stylish, fashionable clothes and hairstyle, make-up, and*

*accessories that are consistent with the Abercrombie brand.  This includes having personal*

*attractiveness that exhibits personal appeal and wearing clothes that fit the brand and*

*setting the example of the brand lifestyle (#19).*

In summary of the above consolidated competency, it incorporates one of the original

competencies -- #19.

     In summary of the set of consolidated competencies, they incorporate six of the original

competencies -- #'s 2, 8, 9, 10, 19, and 24.  One competency, #9, is repeated in two of the

consolidated competencies.  This poses a potential problem for rating of the competencies,

an issue discussed further below.  Of most relevance here is the fact that though six

competencies are retained, some that had higher importance and RUE ratings than those

retained were eliminated from the actual basis for testing.  For example, Interpersonal

Interaction (#1), Drive (#12), Dependability (#13), and Integrity (#16), to name a few, were

not part of the structured interview process.  It is my opinion that all of these competencies

7

and, in particular, Interpersonal Interaction and Dependability could have been adapted for

testing in the structured interview.  Or, other testing modes might be used to assess such

competencies (more on alternatives below).

THE SELECTION TOOL – THE STRUCTURED INTERVIEW

Based on the job analysis results, and following a content validation strategy, APT developed a

Group Structured Interview for the "Model" position (see pp. 23-29 of the Lundquist Report).  In

summary, this selection device involves the store manager interviewing a group of applicants –

anywhere from one to eight – and by covering the three competencies noted above – "Outgoing &

Promotes Diversity,"  "Sophistication & Aspiration," and "Appearance & Sense of Style."  One rationale

for this mode of interviewing presented by APT is that the "three competencies are more directly

observable without an in-depth discussion with each candidate" and that the process for assessing these

"competencies can be consistently and accurately assessed in a group context" (page 26, Lundquist

Report).   It is also indicated (see page 27) that "to ensure that the interviews were used consistently,

APT also developed a script for use with the group interview. … This was done to ensure reliability in all

interviews …"  The essence of the quoted sections is a concern for "reliability" of measurement, a topic

that will be discussed below.

The actual interview protocol is presented in Exhibit 4 of the Declaration of Todd Corley (January

4, 2011).  The interviewer asks one question from a set within the "Outgoing & Promotes Diversity" and

'Sophistication & Aspiration" competencies and provides a rating for each; there is also a rating of

"Appearance & Sense of Style."  Exhibit 4 also presents the "interview evaluation standards" that are to

guide the interviewer's rating.

8

One prime concern with the use of the group structured interview is the impact of one interviewee on another in the same interview session.  I am concerned that the response of one interviewee, for example, the first interviewee, could influence the responses of the second interviewee.  Cues given off by the interviewer to one interviewee's response also could influence the response of subsequent interviewees.  Issues of influence and cueing were noted by Lundquist in her "APT Responses to Questions" (email of December 23, 2005), but I saw no study of the impact of the order of interviewees in any of the documents read.  Order effects, priming, cueing, influence, and other characteristics that are common to group sessions need to be studied and analyzed.  These issues may relate to the adverse impact assumed in the use of the selection process.

Another concern with the group structured interview process as implemented by A&F is the "interview evaluation standards" shown on page 9 of Exhibit 4 of the Declaration of Todd Corley document.  Throughout almost all of the documents that I reviewed, APT notes correctly that behaviors should be emphasized in ratings.  The scales used by A&F, however, are far from behaviorally oriented.  To elaborate, each of the three competencies are rated on a 3-point anchors or scales – Outstanding, Meets Expectations, and Below Expectations.  None of the descriptors within each of the points is very behavioral, but instead rather vague.  For example, one aspect of an "Outstanding" rating for "Outgoing & Promotes Diversity" is "Is extraordinarily extroverted, fun, friendly, active, and social."  For "Meets Expectations," the anchor notes "Is friendly and social."  There is no indication of what behavioral examples provided by the interviewee would differentiate "extraordinarily extroverted … friendly, …" from simply "is friendly."  Another illustration of the issue is found in another anchor within the same competency.  For "Outstanding" "Outgoing & Promotes Diversity," there is an anchor that states

9

"demonstrates tremendous enthusiasm ..."  For a rating of  "Meets Expectations, " the anchor is "is

positive, enthusiastic, and optimistic ..."  What responses or behaviors differentiate "tremendous" from

less than "tremendous?"  What responses or behaviors, or what situations, described by the applicant

would lead a  rater to conclude that the applicant is "positive," or "enthusiastic," or "optimistic?"  Other

examples can be shown from the other anchors within this competency as well as for the

"Sophistication & Aspiration" competency.  The point is that the "interview evaluation standards" are

rather vague and I saw no discussion of training on how to differentiate levels within the 3-point scale in

terms of behaviors that could come from responses to the questions asked by the interviewer.

The same concern is raised for the "Appearance & Sense of Style" competency.  "Outstanding" is

determined in part by "Has exceptional personal attractiveness that is classic, natural, diverse."  "Meets

expectations" is noted by "Has personal attractiveness that is classic, natural, diverse."  What is the

definition of "exceptional" that would differentiate a "3" rating from a "2" rating?  What information or

definition is provided to the interviewer regarding what is "classic," "natural," or "diverse"

attractiveness?

I recognize that A&F provides an "image book" to store managers for the purpose of reflecting

their hiring standards and to educate their managers on the company's "definition of great-looking

models" (see A&F01881 for an example of a statement re:  image book purpose).   However, I could not

find any written guidance that provides characteristics that should be considered in judging

attractiveness.  Furthermore, store managers are requested to identify and submit individuals from their

stores "who are the best looking out there" (see A&F01683) for inclusion in the "image book."

Assuming that the selection system identified the "best looking," what differentiation is the store

10

manager being asked to make when he/she is requested to choose from his/her already hired "best-looking" models for inclusion in the "image book?"

Related to the above issues is a question already posed:  What competencies should be included/excluded from assessment in the hiring procedure?  Could the need for having "Models" with requisite "Appearance & Sense of Style" be accommodated by having the hiring based on other competencies (such as "Outgoing & Promotes Diversity" and "Sophistication and Aspiration") and whereby the offer of a position would be contingent on the applicant agreeing to A&F dress and grooming standards and codes?

Given the above concerns about the vagueness of the anchors and standards for the raters, a critical issue that I could not find addressed in any of the documents that I reviewed is the **reliability** of the interviews conducted by A&F store managers.  Reliability is the degree to which ratings for a group of interviewees are consistent over time, raters, and competencies.  Reliability puts a limit on validity; if a competency cannot be measured very well or reliably, that competency assessment cannot predict how well someone will do on the job (the relationship between the test and performance is an indication of validity).  Nowhere in the documents that I reviewed did I find information, analysis, or results about the consistency of ratings within a rater or information about consistency between raters for the same applicants.  A critical question is whether an applicant would be rated similarly by two store managers. Also, what are the relationships among the three competency ratings?  These are a few questions that relate to the adequacy of the use of the group structured interview.   The Technical Standards of UGESP (1978), Section 14, C (5) – Technical Standards for Content Validity – state that "The reliability of selection procedures justified on the basis of content validity should be a matter of concern

11

to the user.  Whenever it is feasible, appropriate statistical estimates should be made of the reliability of the selection procedure." My view is that it is feasible, possible, and important to conduct reliability studies of the structured interviews.  This can be accomplished in several ways such as by having a sample of applicants independently rated by different interviewers, or by videotaping interviews of applicants and having those interviews independently rated by a different set of raters.

I find the need for reliability studies to be further reinforced by the fact that as noted above, two of the competencies – "Outgoing & Promotes Diversity" and "Sophistication & Aspiration" were consolidated such that the same original competency – "Positive Outlook" (#9) – was incorporated into both of the rated competencies.  This creates an issue of confounding the ratings and poses the potential problem of spurious correlation among the two ratings – if you are looking for the same type of "construct" in each rating, you are likely to be identical in the rating of two different competencies. The relationship between these two competencies should be analyzed.  In addition, if the competencies are retained for future use, modification of the definitions should be undertaken to eliminate the overlap in the descriptions.  Finally, as noted above, analyses should be undertaken to study if there are differential impacts of the competency ratings on adverse impact (see UGESP, Technical Section 4C).

EXAMINATION OF ACTUAL RATINGS PROVIDED BY STORE MANAGERS

In order to understand how the rating system was used, I reviewed a sample of ratings that were made by A&F store managers.  I was particularly interested in examining the comments made by raters in support of their ratings (A&F04013 through A&F05061).   A particular concern for a new system that is implemented for selection/hiring purposes is the analysis/assessment of the quality of the ratings and its documentation.  In general, the comments from the store managers are quite vague and

12

sometimes not responsive to the competency being evaluated.  The following is a small sample of ratings that I reviewed that illustrate some notable concerns:

A&F04076:  For "Appearance & Sense of Style," the rater notes that one applicant was "from Puerto Rico."  How does that relate to "Appearance & Sense of Style?"

A&F04088:  For "Appearance & Sense of Style," there is a rater comment that the applicant is "friendly." "Friendly" is part of the "Outgoing & Promotes Diversity" competency, and not part of the "Appearance & Sense of Style."  Also, the rater noted that "personal attractiveness is below expectations" but provides no comment as to why the applicant was "below expectations."  What was it about the applicant that influenced the rater to note "below expectations?"

A&F04713:  For each of three applicants, the rater effectively uses the terms on the "interview evaluation standard" form as his/her notes.  That is, the rater comments that one candidate is "inconsistent w/Abercrombie brand;" for another candidate, the rater notes the candidate "has exceptional attractiveness, classic, natural & diverse!"  These are descriptors taken directly from the standards, but provide no description of either of the candidates' appearance at the interview.

A&F05054:  This rating illustrates a potential general problem with the structured interview questions. For example, one question on the "Outgoing & Promotes Diversity" competency is "How have you helped create a situation where people of different backgrounds felt included and respected."  How are responses to such questions verified for accuracy?  For this rating session, candidate Jack evidently described a situation of "no drummer for the band" and he had to "interview all kinds of people."  Jack received a rating of "3" for this competency.  Candidate Tom received a similar rating for "plays soccer –

13

very diverse sport – keeps all team members included in all activities."  Would other raters provide similar ratings to such comments – the question of "reliability?"

The above examples suggest that additional training of raters is needed as well as better definitions – behavioral ones - of the standards and anchors.  Effectively, there is need for a greater degree of monitoring of the ratings actually provided to ensure that the system is being used as developed and planned.

CONSIDERATION OF SUITABLE ALTERNATIVE SELECTION PROCEDURES

The UGESP call for consideration and investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible to determine the appropriateness of using or validating them (Section 3B.)  APT presents its rationale for consideration of alternatives (see pp. 23-25 of the Lundquist Report; page 3 of "APT Responses to Questions" (December 23, 2005 email).  I suggest several options that can be considered alternatives – alternatives to the current selection system, additions to the current selection system, modifications to the scoring of the selection procedures, modification of the use of the test results, and other similar strategies that might address the issue of adverse impact.

(1) My view is that a situational judgment test (SJT) as well as personality tests could be considered as alternatives or additions to the current structured interview; these instrument types can measure some of the competencies identified in the job analysis (those included as well as important ones excluded) and have shown less adverse impact than cognitive tests.  (See the following references:

14

Hough, L.M., Oswald, F.L., & Ployhart, R.E. (2001).  Determinants, detection, and amelioration of

adverse impact in personnel selection procedures: issues, evidence and lessons learned.

*International Journal of Selection and Assessment, 9,* 152-194.

Oswald, F. L., & Hough, L. M.  (2010).  Personality and its assessment in organizations:

Theoretical and empirical developments.  In S. Zedeck (Ed.), APA *Handbook of Industrial and*

*Organizational Psychology: Volume 2.* Washington, D.C.: APA.

Ployhart, R. E., & MacKenzie, W. I. Jr.  (2010).  Situational judgment tests:  A critical review and

agenda for the future.  In S. Zedeck (Ed.), APA *Handbook of Industrial and Organizational*

*Psychology: Volume 2.* Washington, D.C.: APA.

(2) Alternative cutoffs could be considered for the present system.  That is, to be "highly

recommended," the applicant needs a score of "2" or "3" on "Appearance & Sense of Style" and

a total score of "8" or "9."  Would a different weighting produce different adverse impact?  This

question should be examined, particularly the influence of each competencies' weight on the

total score.

(3) Consider an individual interview rather than a group interview.  I recognize that this increases

the amount of time spent by the store manager in making hiring decisions, but my observation

is that only two competencies are currently evaluated and these are based on short

questions/answers provided by an applicant.  In addition, I noted several instances of only one

applicant in the interview session – thus, the practice of a single interviewee is currently being

used in some instances.  A single interviewee/session would reduce the potential problems

noted above with group interviews.

(4) Consider using some paper and pencil tests, such as SJT or personality instruments, as a screening device, followed by an interview.  Increasing the number of instrument devices allows for assessment of more competencies than is currently used and/or the potential for increasing the reliability of assessment, and consequently increasing validity of the selection system.

SUMMARY

My professional opinions pertain to issues of validation, selection, and job analysis, and aspects of the selection process that might account for some of the assumed adverse impact.  These relate to: (a) the inclusion/exclusion of particular competencies in the selection system; the use of competencies that were less important than some excluded; (b) the overlap in measurement of two of the competencies; (c) the lack of behavioral definition of anchors and standards;  (d) the lack of information about the relationship among the three competencies as well as their impact on the total score and adverse impact; (e) the lack of demonstration of reliability of the ratings; (f) the potential problems with a group structured interview; and (g) the need to consider alternative selection instruments, alternative scoring/weighting of the selection instruments, and alternative strategies for using test results (e.g., one test result or competency rating as a screening device and other competency ratings for ranking applicants); in addition, some job requirements, such as those concerned with appearance and sense of style can be addressed as a condition of hire once other competencies are assessed.

2/24/11

Sheldon Zedeck

16

**ATTACHMENT A:**

**Documents Reviewed**

1. Consent Decree
2. Expert Report of Dr. Kathleen K. Lundquist
3. Adverse Impact Analysis Reports for Model and MIT positions (submitted with Dr. Lundquist's Report)
4. Declaration of Todd Corley dated January 4, 2011 (with all exhibits)
5. Court-Appointed Monitor's Fifth Annual Compliance Report
6. Court-Appointed Monitor's Fourth Annual Compliance Report and Executive Summary
7. Court-Appointed Monitor's Third Annual Compliance Report and Executive Summary
8. Court-Appointed Monitor's Second Annual Compliance Report and Executive Summary
9. Court-Appointed Monitor's Annual Compliance Report and Executive Summary
10. Recruiting and Hiring Protocol and Structured Interviews (emailed from Mark Kneuve on Aug. 10, 2005)
    a. AF Specialty Group Interview (Final)
    b. AF Entry Level Managers Interview (Final)
    c. AF Full Time Stock Interview (Final)
    d. AF Brand Rep Group Interview (Final)
    e. Abercrombie External Hiring Protocol (Final)
11. APT: Technical Documentation Development and Validation of Hiring Procedures for Store Positions (Sept. 2005)
12. Hiring & Interviewing Training Participant Guide (Aug. 2005)
13. Hiring & Interviewing Training Trainer Guide (Aug. 2005)
14. AF Brand Representative Group Interview (Final) (emailed from Mark Kneuve on Aug. 30, 2005)
15. The revised Recruitment and Hiring Protocol, emailed from Mark Kneuve on Dec. 1, 2005
16. APT Responses to Questions, emailed from Mark Kneuve on Dec. 23, 2005
17. Letter from Abercrombie's counsel dated February 1, 2006 regarding Abercrombie's position on analyzing each interview question or item or for determinations of the "appearance and sense of style" criterion.
    a. Revised Group Interview Guide, February 2006
    b. Revised Group Interview Guide, February 2006 (redline copy)
18. April 24, 2006 letter from Mark Kneuve re: change of title to "Model"
19. Revised Model Group Interview Guide, August 2006, A&F00033-044
20. Statements in PSP Training Module, from People Selection Program, October 2006, A&F00045-48
21. PSP Interview Guides, from HR411 4/10/07, A&F00144
22. HR 411 Info: Greeting Applicants at the Kiosk, undated but included with July 2009 materials, A&F01740

17

23. Model Group Interview Guide, July 2009, A&F01741-1752
24. A&F Model Group Interview (DRAFT 10.30.09) (emailed from Mark Kneuve on Nov. 13, 2009)
25. HR 411 info, A&F 00656
26. People Selection Program, undated, A&F01691-1714
27. Group Interview Prep, undated, A&F01722
28. PSP Interview Guide, June 9, 2009, A&F01782-1798
29. HR-411 Regarding People Selection Program, A&F00162-163
30. Miscellaneous Communications from the Office of Diversity, A&F 00485-489
31. Management meeting, December week 3, A&F01690
32. Job description for part-time impact and model positions, A&F01762-1765
33. HR 411 info, May 2010, A&F02481
34.  Answers – PSP Training Mail Response, A&F02487-88
35. PSP Audit Results, A&F01723
36. PSP Audit Results, A&F01685
37. PSP Audit Results, A&F01733
38. PSP Audit Results, A&F03817
39.  Recruiter Assessment and Senior Recruiter Audit, A&F02076-A&F02085
40. Recruiter Audit Form, A&F00182-187
41. City Recruiter Audit Tracker, A&F01687-88
42. Examples of Communications from Office of Diversity, A&F00247-51
43. Sample Documents Relating To Broader Alignment Diversity Calls, A&F00531-538
44. Performance Evaluation Forms for Store Managers, 8/19/2008, A&F 00237-244
45. Communications regarding benchmark goals dated 9/17 and 9/18/2009, A&F 00503-507
46. E-mail from Mark Kneuve dated November 13, 2009 with attachments:
    a. Revised 2008 Senior Recruiter evaluation form ((2008 Senior Recruiter Review Form (with changes))
    b. Revised City Recruiter evaluation form (2008 City Recruiter Review Form_with_changes)
    c. 2008 Performance Management Content of Annual Performance Review (Reviews updated proposed changes)
    d. Sample of Communications sent to SMs in the form of "Management Meeting" agendas
    e. Sample of communications from Office of Diversity sent to RMs on 10/19/2009
47. E-mail from Mark Kneuve dated November 19, 2009 (w/out attachment)
48. Diversity & Inclusion Awareness Week Activity, March 2009, A&F00664
49. Hairstyle Sketchbook, September 2010, A&F00564-68
50. HR 411 info, A&F00590
51. HR 411 info, A&F00593
52. Store operations instructions regarding the image book sent via the program, 4/16/07, A&F00111-126
53. Example of HR 411, Oct. 2008, A&F00235-236
54. Image Book Activity, A&F00453-55
55. Image Book – Activity, A&F00685
56. Image Book, submissions guidelines, A&F01683-A&F01684

18

57. Sample Image Book Activity, A&F00528-530
58. Image Book Packet, attached to email from Mark Kneuve on Nov. 13, 2009
59. Image Book Packet, fall 2009, A&F01837-01838
60. Image Book Activity, 4/13/10, A&F01881
61. Instructions Regarding Placement of Hard Copy of Image Book In Stores, A&F00160-161
62. Image Book Submissions, A&F 00604
63. Global Lead Training Materials
    a. E-learning Script (June 2005) (2 versions – June 1 and June 17, 2005)
    b. Inclusive Coaching, June 14, 2005
    c. A Class Divided, June 14, 2005
64. Focus on Inclusion, A&F01908-01924
65. Diversity Training Quiz to be reviewed with management staff, March 2009, A&F 00694-696
66. Diversity & Inclusion Week Agenda, A&F 01859
67. Diversity & Inclusion Week materials, 4/27/10, A&F 01860-1892
68. Management Meeting March 1, 2009; diversity week materials; A&F00666-669
69. Image Book, A&F 00252-267
70. Image Book, A&F 00512-527
71. Image Book, A&F 00670-684
72. Image Book, A&F 01839-1853
73. "Cast of" Christmas 2008, A&F 00268-323
74. "Cast of" instructions, March 2009, A&F 00701
75. "Cast of" instructions, undated, A&F 01736
76. Diversity reports summary, A&F 00563
77. Diversity Store Reports, A&F 00713-1680
78. Diversity Reports: Company Results, A&F 01761
79. Diversity Reports, A&F 01927-2074
80. Diversity Reports, A&F 2094-2427
81. Diversity Reports; Top 25 briefing, Bottom 50 briefing (A&F 2489-3816)
82. Hiring Shortfalls Analysis as of August, 2008, A&F 3818
83. Communication from CEO to DMs (1/16/07) and script for all-store conference calls with VP of diversity (1/26/07), A&F 00025-32
84. Communications from Office of Diversity to DMs on 3/26/2007, A&F00127-128
85. Recruiting Series sent to stores via HR 411 (4/10/07), A&F 000141-147
86. Documents relating to the bottom 50 process, 4/16/2008, A&F000171-174
87. HR 411 info; recruiting game plan 5/13/08; HR 411 info; Diversity Scorecard Call 5/13/2008; A&F 000569-574
88. Communications to RMs in May 2009, A&F 1737-1739
89. Sample Script from Bottom 50 Call, A&F000456-458
90. Diversity Scorecard, Bottom 50 calls, 8/11/09, A&F 1775
91. DM Recaps 6/17/09 "Quality Through Standards," DM Recap 7/17/09, Diversity Scorecard/Bottom 50 calls notes 7/14/2009, A&F 01799-1826
92. HR 411 info, A&F 00558-561

19

93. HR 411 info, A&F 002484
94. Recruiter Assessment Form, Senior Recruiter Audit Form, CR Audit Form, DM Audit Form (A&F 2076-2093)
95. DM audit form, recruiter audit form (undated), A&F000129-140
96. Sample DM audit form (undated),  A&F000164-168
97. DM Audit form, A&D000177-181
98. Sample DM Scorecard, A&F 000169-170
99. Recruiter Audit Form, A&F 000556-557
100.        Documents relating to Diversity Week Feb/March 2009, A&F0357-434
101.        Image Book, A&F03968-87
102.        White Paper prepared by APT dated July 24, 2007, A&F03988-994
103.        APT Responses to Questions, A&F03995-4005
104.        APT's Responses to Plaintiff's Counsel's Questions, A&F04006-12
105.        Completed Model Group Interview Guide Forms, A&F04013-5061
106.        Emails from Christina Norris-Watts to Todd Corley and Mark Kneuve (with attachments), A&F05062-5111
107.        Abercrombie & Fitch Website, Our Brands,
        http://www.abercrombie.com/anf/careers/brands.html

**ATTACHMENT B**

**VITA**

**Name**:      Sheldon Zedeck

**Address**:      15 Windsor Avenue
              Kensington, CA 94708
              PH: (510) 527-0719
              FAX: (510) 528-4366

Department of Psychology
University of California
Berkeley, CA 94720-1650
PH: (510) 642-7130
FAX: (510) 642-5293
e-mail: zedeck@socrates.berkeley.edu

**Born**:      June 8, 1944
            Brooklyn, New York

**Marital Status**:  Married, three children


## EDUCATION

B. S., 1965      Brooklyn College
              Brooklyn, New York

M. A., 1967      Bowling Green State University
              Bowling Green, Ohio 43403
              Thesis: "A Psychophysical Determination of Equitable Payment: A
              Methodological Study"
              (Patricia Cain Smith, Major Professor)

PhD., 1969      Bowling Green State University
              Bowling Green, Ohio 43403
              Dissertation: "Identification of Moderator Variables by Discriminant
              Analysis in a Multi-Predictable Group Validation Model"
              (Patricia Cain Smith, Major Professor)

21

## EXPERIENCE

| | |
|---|---|
| **January 2011 -**<br>**present** | **Professor of the Graduate School**<br>**Department of Psychology**<br>**University of California**<br>**Berkeley, CA 94720-1650** |
| **July 2007 -**<br>**December 2010** | **Vice Provost, Academic Affairs & Faculty Welfare**<br>**University of California**<br>**200 California Hall, MC 1500**<br>**Berkeley, CA 94720-1500** |
| **July 1982 -**<br>**present** | **Professor**<br>**Department of Psychology**<br>**University of California**<br>**Berkeley, CA 94720-1650** |
| **March 2005 -**<br>**present** | **Adjunct Professor**<br>**School of Business**<br>    **Hong Kong Baptist University** |
| Fall 2004 | Sabbatical, Visiting Professor,<br>Baruch College, CUNY, New York |
| Spring 2005 | Sabbatical, Visiting Professor,<br>University of Amsterdam<br>Work and Organizational Psychology Program |
| July 2003-<br>June 2004 | Chair, Department of Psychology<br>Department of Psychology<br>University of California<br>Berkeley, CA 94720-1650 |
| October 2002-<br>October 2004 | Guest Professor of Peking University<br>Beijing, China |
| July 2002-<br>June 2003 | Interim Director, Institute of Personality and<br>Social Research |
| July 1970 -<br>present | Member, Institute of Industrial Relations<br>University of California<br>Berkeley, CA 94720-1650 |

22

| | |
|---|---|
| September 2000-<br>November 2000 | Sabbatical, Visiting Professor,<br>Baruch College, CUNY, New York |
| December 2000-<br>February 2001 | Sabbatical, Visiting Professor,<br>University of Sydney, Australia |
| March 2001 -<br>April 2001 | Sabbatical, Visiting Professor,<br>Beijing University, Beijing, China |
| July 1993 -<br>June 1998 | Chair<br>Department of Psychology<br>University of California<br>Berkeley, CA 94720-1650 |
| October 1992-<br>April 1993 | Sabbatical, Visiting Professor<br>Faculty of Management<br>Graduate School of Business Administration<br>Tel Aviv University<br>Ramat Aviv, Tel Aviv<br>Israel 69978 |
| July  1992-<br>September 1992 | Sabbatical, Visitor<br>Arbetslivscentrum (Swedish Center for  Working Life)<br>Stockholm, Sweden |
| October 1992-<br>April 1993 | Sabbatical, Visiting Professor<br>Dept. of Work & Organizational Psychology<br>University of Amsterdam<br>Roetersstraat 15<br>1018 WB Amsterdam<br>Netherlands |
| July 1988 -<br>June 1992 | Director<br>Institute of Industrial Relations<br>University of California<br>Berkeley, CA 94720 |
| July 1987 -<br>June 1988 | Acting Director<br>Institute of Industrial Relations<br>University of California<br>Berkeley, CA 94720 |

| | |
|---|---|
| August 1983 - June 1987 | Associate Director<br>Institute of Industrial Relations<br>(Acting Director, January - June 1986)<br>University of California<br>Berkeley, CA 94720 |
| August 1982 - June 1983 | Sabbatical, Visitor<br>Human Resources Department<br>AT&T, Morristown/Basking Ridge, New Jersey |
| July 1976 - June 1982 | Associate Professor<br>Department of Psychology<br>University of California<br>Berkeley, CA 94720 |
| July 1976 - June 1977 | Sabbatical, Visiting Associate Professor<br>Hebrew University (Dept. of<br>Psychology, Jerusalem) and Tel Aviv University (Graduate School of<br>Business Administration, Tel Aviv) |
| July 1970 - June 1976 | Assistant Professor<br>Department of Psychology<br>University of California<br>Berkeley, CA 94720 |
| July 1969 - June 1970 | Visiting Lecturer<br>Department of Psychology<br>University of California<br>Berkeley, CA 94720 |
| Sept. 1967 - June 1969 | Teaching Fellow<br>Department of Psychology<br>Bowling Green State University<br>Bowling Green, Ohio 43403 |
| Feb. 1966 - August 1967 | Research and Teaching Assistant<br>Department of Psychology<br>Bowling Green State University<br>Bowling Green, Ohio 43403 |
| June 1968 - August 1968 | Statistics Analyst<br>Economic Opportunity Planning Association of<br>Greater Toledo, Toledo, Ohio |

24

## GRANTS

| | |
|---|---|
| **2003-08** | **Identification and Development of Predictors for Successful Lawyering- Phase II: Grant from the Law School Admissions Council (with Marjorie Shultz)** |
| **2001-03** | **Identification and Development of Job-Oriented Criteria and Predictors of Successful Lawyering - Phase I: Grant from the Law School Admissions Council (with Marjorie Shultz)** |
| 2000-01 Diane Halpern) | Applying the Science of Learning: Grant from Spencer Foundation (with |
| May 1985 - April 1986 | Berkeley Campus Biomedical Sciences Support Grant Funds |
| January 1981 - Dec. 1981 | Office of Naval Research and Office of Personnel Management, Grant to run a conference on performance appraisal (with Dr. Frank Landy) |
| June 1973 - May 1974 | Berkeley Campus Biomedical Sciences Support Grant Funds |
| July 1973 - Dec. 1973 | National Science Foundation Contract: Technological change, product, proliferation, and consumer decision processes. |
| July 1969 - present | Committee on Research, University of California, Berkeley |
| 1968 - 1969 | Grant from the Graduate School Research Fund, Bowling Green State University |
| 1966 - 1967 | Grant from the Committee on Faculty Leave and Research, Bowling Green State University |

## AWARDS

| | |
|---|---|
| April 2010 | Bowling Green State University Centennial Award Recipient; 100 Distinguished Alumni |
| April 2007 | Division III Award for Distinction in Industrial/Organizational Psychology, California Psychological Association |

May 2006            Distinguished Service Award, Academic Senate, Berkeley Campus

May 1998            Distinguished Service Award, Social Science Division, Berkeley Campus

April 1997          SIOP Distinguished Service Award

## PROFESSIONAL SERVICE

## EDITORIAL SERVICE

 Editor, *Journal of Applied Psychology* (2003-2008)

 **Editor-in-Chief, APA *Handbook of Industrial and Organizational Psychology* (2010).  American Psychological Association, Washington, D.C.**

 **Editor in Chief, APA Dictionary of Statistics and Research Methods in Psychology (in preparation)**

 *Buros Mental Measurements Yearbook* Series, Distinguished Reviewer Award, 2005

 *Encyclopedia of Applied Psychology*, 2004, Elsevier Ltd., Amsterdam.

 Section Editor, *Encyclopedia of Applied Psychology*, 2004, Elsevier Ltd., Amsterdam.

 Senior Advisory Editor (2006), *Encyclopedia of Industrial and Organizational Psychology*, Volumes 1 and 2, (2007), edited by Steven G. Rogelberg, Sage Publications

 Editorial Advisory Board (2005 – present), *Management and Organization Review*

 Senior Advisory Board (2009 – present), *Journal of Business and Psychology*

 Guest Editor, *Annual Review of Psychology*, 2009 Volume (2006)

 Member of the Editorial Boards of:
 *Industrial Relations* (1970 - 1993)
 *Journal of Applied Psychology* (1976-1988)
 *Contemporary Psychology* (1987 - 1991)
 ***Human Performance* (1988 - present)**
 ***International Journal of Selection and Assessment* (2008 – present)**

 **Associate Editor (1988-1991; 1994 - 2003)** and Co-founder of ***Human Performance***, a journal published by Lawrence Erlbaum Associates, first issue in 1988
 Editor of *Human Performance* (1992 - 1994)

26

 Associate Editor (1998 - 2003) of *Applied Psychology: An International Review*

 Have reviewed articles for Editors of:

American Psychologist, Applied Psychological Measurement, California Management Review, International Journal of Manpower, International Journal of Selection and Assessment, Journal of Management Studies, Journal of Occupational Psychology, Journal of Occupational Health Psychology, Journal of Organizational Behavior, Management & Service Operations Management, Organizational Behavior and Human Decision Processes, Personnel Psychology, Psychological Bulletin, Psychological Methods, Manufacturing & Service Operations Management, and Social Indicators Research

 Editor, *The Industrial-Organizational Psychologist* newsletter, Division 14 (Industrial/Organizational Psychology) of the American Psychological Association; 1979-82

 Editorial Review Board, *Job Analysis Handbook*, Gael, S. (Ed.), published by Wiley & Sons, 1988

 Series Editor, *People and Organizations*; a book series devoted to advanced research in industrial and organizational psychology and organizational behavior; initially published by Allen & Unwin, now published by Routledge, 1986 - 1995

 Member of the Editorial Board, *Frontiers Series*, Society for Industrial and Organizational Psychology (Division 14), 1988-1993
 Series Editor, *Frontiers Series*, 1993-1998

## ADVISORY SERVICE

 **Member of the Psychological Services Incorporated (PSI) Technical Advisory Board, 2005 – present**

 Member of the College Board's Advisory Committee on Research, 2005 – 2008

 Member of the Task Force to develop licensing exam for psychologists, Psychology Examining Services, 1985

 Research Advisory Panel Member, Air Force Human Resources Laboratory, Brooks AFB, Texas, Feb. 1984 and May 1985

 Advisor to the American Association of State Psychology Boards on the ETS Psychology Job Analysis Project, 1981-83

 Member of the Staff Personnel Board of the University of California, September 1977-August 1980; Chair, 1979-80

 Member of the California Fair Employment Practices Commission Technical Advisory Committee on Testing, 1975-76

## PROFESSIONAL MEMBERSHIP

 **American Psychological Association**
 **Committees**
 **Scientific Conference Review Committee (1999 - 2003)**
 **Committee on Psychological Tests and Assessment (2000 - 2003)**
 **Advisory Panel; Board of Educational Affairs Task Force on Undergraduate Psychology Major Competencies (2001)**
 **Board of Scientific Affairs (2010-11)**

 **Society for Industrial and Organizational Psychology** (SIOP, Division 14), Member (1970) and  Fellow (1977)
 Member of Education and Training Committee (1972-74)
 Chair, Education and Training Committee (1974-75)
 Member of Workshop Committee (1975-76; 1977-79)
 Member of Ad Hoc Committee to revise the *Principles for the Validation and Use of Personnel Selection Procedures*, (1978-79, 1985-86, 2000-2003)
 Editor, *The Industrial and Organizational Psychologist* newsletter (1979-82)
 Member-at-Large of Executive Committee (1982-85)
 President-Elect (1985-86)
 President (1986-87)
 Representative to APA Council of Representatives (1989-92)
 Editorial Board, Frontiers Series (1988-93)
 **Awards Committee (2000 - present)**
 **Ad Hoc Committee on Relations with APA and APS (2000-present)**
 SIOP Conference Program Review Committee (2000-01; 2001-2002)
 **Distinguished Service Award (1997)**

 **Division of Evaluation and Measurement** (Division 5), Member (1982) and Fellow (2002)

 **American Psychological Society**; Charter Member and Fellow (1988)

 **Western Psychological Association**
 Program Co-chair, 1974 convention

 **California Psychological Association**
 Membership Committee, 1999 - 2000

28

- **Academy of Management**
- Executive Committee, Personnel/Human Resources Division  (1985-88)
- Reviewer for the Personnel/Human Resources Division's 1983 and 1987 Academy of Management convention programs
- Reviewer for the Organizational Behavior Division's 1994, 1995, 1996, 1997, and 1998 Academy of Management convention program

- **Council of Graduate Departments of Psychology**, Chair, 1997-98.

- **Council of California Departments of Psychology**, Chair 1998 - 2000

- **International Association of Applied Psychology**

- **Society of Organizational Behavior**
- Executive Board, 1984-89

## RESEARCH INTERESTS

- Prediction and selection models
- Performance appraisal systems
- Worker attitudes and motivations
- Work values (cross-cultural)
- Information processing and decision making
- Work and family relationships

## TEACHING INTERESTS

- Industrial/Organizational Psychology
- Personnel Psychology
- Motivation
- Psychological Measurement and Statistics
- Research Design
- Test Theory
- Work and Family

## RESEARCH/CONSULTING IN ORGANIZATIONS (Partial List)

- Alabama Department of Transportation
- Alameda County, Office of Program Evaluation
- Allstate Insurance Co., Judson Branch Research Center
- American President Lines
- American Telephone and Telegraph Co.
- Armco Steel
- B. W. Norton Manufacturing Co.
- Blue Cross of Northern California
- California State Automobile Association
- City of Miami, Department of Human Resources
- City Manager of Pinole, California
- Conti Commodity
- Contra Costa County Fire Protection District
- Crocker Bank
- Ed Blank and Associates
- Food Marketing Institute
- Georgia Pacific
- Golden State Warriors Professional Basketball Team
- IBEW Local 125
- Klein Institute for Aptitude Testing
- Military Psychology Unit of the Israel Defense Forces: Applied Research Group and Assessment and Classification Group
- Mt. Diablo Hospital in Concord, CA.
- National Employment Agency Association
- Oakland Firefighters' Association
- Oakland Police Officers' Association
- Pacific Gas and Electric Co.
- Pacific Telephone and Telegraph Co.
- Public Health Nurses:  City and County of San Francisco, Alameda County, Santa Clara County, and Humboldt County
- Reynolds Electrical and Engineering Co.
- San Francisco Civil Service Commission
- Stanford Medical Center
- State of Minnesota, Department of Human Rights
- U. S. Department of State
- U. S. Department of Justice
- U. S. Department of Labor
- University of California Medical Center, San Francisco
- V. A. Hospital, San Francisco
- Verizon Communications

## PAPERS PUBLISHED

Zedeck, S., & Smith, P. C. (1968).  A psychophysical determination of equitable payment:  A methodological study.  Journal of Applied Psychology, 52, 343-347.

Zedeck, S., Cranny, C. J., & Vale, C. A.  (1969).  A demonstration of face validity.  Experimental Publication System, Issue No. 2, MS No. 068C.

Renwick, P. A., Zedeck, S., & Graham, W. K.  (1971).  Use of wage and benefit preferences in the formulation of bargaining goals.  Experimental Publication System,  Issue No. 12, MS No. 645-12.

Zedeck, S., Cranny, C. J., Vale, C. A., & Smith, P. C.  (1971).  Comparison of "joint moderators" in three prediction techniques.  Journal of Applied Psychology, 55, 234-240.

Zedeck, S.,  (1971).  Identification of moderator variables by discriminant analysis in a multi-predictable group validation model.  Journal of Applied Psychology, 55, 364-371.

Zedeck, S.  (1971).  Problems with the use of "moderator" variables.  Psychological Bulletin, 76, 295-310.

Zedeck, S., & Baker, H. T.  (1972).  Nursing performance as measured by behavioral expectation scales: A multitrait-multirater analysis.  Organizational Behavior and Human Performance, 7, 457- 466.

Frisch, J., & Zedeck, S.,  (1972).  Status, interest, and proximity as factors in interaction and communication channels.  The Journal of Psychology, 82, 259-267.

Oleno, T., & Zedeck, S.  (1972).  Examination of difference scores as a measure of satisfaction.  Journal Supplement  Abstract Service Catalog of Selected Documents in Psychology, 2, 146 (MS 273).

Holmes, G. P., & Zedeck, S.  (1973).  Judgment analysis for assessing paintings.  Journal of Experimental Education, 41 (4), 26-30.
(Reprinted in S. R. Houston (Ed.), Judgment analysis:  Tool for decision makers.  New York: MSS Information Corp., 1974.)

Harari, O., & Zedeck, S.  (1973).  Development of behaviorally anchored scales for the evaluation of faculty teaching.  Journal of Applied Psychology, 58, 261-265.
(Reprinted in K. N. Wexley & G. Yukl (Eds.), Readings in organizational behavior and industrial psychology (2nd ed.).  New York:  Oxford Press, 1975.)

Zedeck, S., Imparato, N., Krausz, M., & Oleno, T.  (1974).  Development of behaviorally anchored rating scales as a function of organizational level.  Journal of Applied Psychology, 59, 249-252.

Zedeck, S., Frisch, J., & Zawadski, R. (1974). Information processing and decision-making as influenced by product proliferation (Vol. 3). In Technological change, product proliferation, and consumer decision processes. NSF Technical Report.

Zedeck, S, & Oleno, T. (1975). The relationship between organizational preference and opportunity for goal fulfillment. Journal Supplement Abstract Service Catalog of Selected Documents, 5, 351 (MS 1148).

Yates, V., & Zedeck, S. (1976). Job needs and satisfactions: A comparison of high-risk and low-risk occupations. Journal Supplement Abstract Service Catalog of Selected Documents, 6, 25 (MS 1214).

Zedeck, S., Jacobs, R., & Kafry, D. (1976). Behavioral expectations: Development of parallel forms and analysis of scale assumptions. Journal of Applied Psychology, 61, 112-115.

Zedeck, S., Kafry, D., & Jacobs, R. (1976). Format and scoring variations in behavioral expectation evaluations. Organizational Behavior and Human Performance, 17, 171-184.

Kafry, D., Zedeck, S., & Jacobs, R. (1976). The scalability of behavioral expectation scales as a function of developmental criteria. Journal of Applied Psychology, 61, 519-522.

Zedeck, S. (1977). An information processing model and approach to the study of motivation. Organizational Behavior and Human Performance, 18, 47-77.

Zedeck, S., & Kafry, D. (1977). Capturing rater policies for processing evaluation data. Organizational Behavior and Human Performance, 18, 269- 294.

Reilly, R. R., Zedeck, S., & Tenopyr, M. L. (1979). Validity and fairness of physical ability tests for predicting performance in craft jobs. Journal of Applied Psychology, 64, 262-274.

Kafry, D., Jacobs, R., & Zedeck, S. (1979). Discriminability in multidimensional performance evaluations. Applied Psychological Measurement, 3. 187-192.

Jacobs, R., Kafry, D., & Zedeck, S. (1979). Consistency in multidimensional performance evaluations: An analysis of raters and dimensions. Journal Supplement Abstract Service Catalog of Selected Documents, 9, 25.

Jacobs, R., Kafry, D., & Zedeck, S. (1980). Expectations of behaviorally anchored rating scales. Personnel Psychology, 33, 595-640.

Zedeck, S. (1981). Behaviorally based performance appraisals. Aging and Work, 4, 89-100.

Krausz, M., & Zedeck, S. (1981). Differences between candidates and recruiters in perceived attainability of job-related outcomes. Vocational Guidance Quarterly, 30, 43-49.

Zedeck, S., Middlestadt, S., & Hayes, E.  (1981).  Police work values:  A comparison of police science students and current officers.  Journal of Occupational Psychology, 54, 187-194.

Zedeck, S., & Cascio, W. F.  (1982).  Performance appraisal decisions as a function of rater training and purpose of the appraisal.  Journal of Applied Psychology, 67, 752-758.

Jackson, S. E., & Zedeck, S.  (1982).  Explaining performance variability:  Contributions of goal setting, task characteristics, and evaluative contexts.  Journal of Applied Psychology, 67, 759-768.

Zedeck, S., Jackson, S. E., & Summers, E.  (1983).  Shift work schedules and their relationship to health, adaptation, satisfaction, and turnover intention.  Academy of Management Journal, 26, 297-310.

Zedeck, S., Tziner, A., & Middlestadt, S.  (1983).  Interviewer validity and reliability:  An individual analysis approach.  Personnel Psychology, 36, 355-370.

Cascio, W. F., & Zedeck, S.  (1983).  Open a new window in rational research planning:  Adjust alpha to maximize statistical power.  Personnel Psychology, 36, 517-526.

Zedeck, S., & Cascio, W. F.,  (1984).  Psychological issues in personnel decisions.  Annual Review of Psychology, 35, 461-518.

Zedeck, S.  (1984).  Performance measurement:  Forms or samples?  Proceedings of the 1984 International Personnel Management Association Assessment Council Conference on Public Personnel Assessment.  Washington, D. C.:  IPMA.

Jackson, S. E., Zedeck, S., & Summers, E.  (1985).  Family life disruptions:  Impact of job-induced functional and emotional interference.  Academy of Management Journal, 28, 74-86.

Sackett, P. R., Schmitt, N., Tenopyr, M. L., Kehoe, J., & Zedeck, S.  (1985).  Commentary on forty questions about validity generalization and meta-analysis.  Personnel Psychology, 38, 697-798.

Blood, M. R., Zedeck, S., & Graham, W. K.  (1987).  Resolving compensation disputes with three-party job evaluation.  Applied Psychology:  An International Review, 36, 39-50.

Sackett, P. R., Zedeck, S., & Fogli, L.  (1988).  Relations between measures of typical and maximum job performance.  Journal of Applied Psychology, 73, 482-486.
(To be published in The International Library of Management volume Performance Evaluation, Borman, W. C. (Ed.).  England:  Dartmouth Publishing Company.)

Zedeck, S., Maslach, C., Mosier, K., & Skitka, L.  (1988).  Affective response to work and quality of family life:  Employee and spouse perspectives.  Journal of Social Behavior and Personality, 3, 135-157.

33

Zedeck, S., & Mosier, K. L. (1990). Work in the family and employing organization. <u>American Psychologist</u>, <u>45</u>, 240-251.

Cascio, W. F., Outtz, J., Zedeck, S., & Goldstein, I. L. (1991). Statistical implications of six methods of test score use in personnel selection. <u>Human Performance</u>, <u>4</u>, 233-264.

Zedeck, S., Outtz, J., Cascio, W. F., & Goldstein, I. L. (1991). Why do "testing experts" have such limited vision? <u>Human Performance</u>, <u>4</u>, 297-308.

DuBois, C. L. Z., Sackett, P. R., Zedeck, S., & Fogli, L. (1993). Further exploration of typical and maximum performance criteria: Definitional issues, prediction, and White-Black differences. <u>Journal of Applied Psychology</u>, <u>78</u>, 205-211.

Cascio, W. F., Goldstein, I. L., Outtz, J., & Zedeck, S. (1995). Twenty issues and answers about sliding bands. <u>Human Performance</u>, <u>8</u>, 227-242.

Cascio, W. F., Goldstein, I. L., Zedeck, S., & Outtz, J. (1995). Selective science or selective interpretation? <u>American Psychologist</u>, <u>50</u>, 881-882.

Zedeck, S. (1996). Use of sliding bands as a selection procedure to obtain a diverse workforce. <u>Employment Testing: Law & Policy Reporter</u>, <u>5 (3)</u>, 39-43, 48.

Zedeck, S. (1996). Commentary. <u>Human Performance</u>, <u>9</u>, 303-307.

Zedeck, S. (1998). Commentary: Additional roles for the chair. <u>The Psychologist-Manager Journal</u>, <u>2 (1)</u>, 74-76.

Campion, M. A., Outtz, J. L, Zedeck, S., Schmidt, F. L., Kehoe, J. F., Murphy, K. R., & Guion, R. M. (2001). The controversy over score banding in personnel selection: Answers to 10 key questions. <u>Personnel Psychology</u>, <u>54 (1)</u>, 149-185.

Goldstein, H. W., Zedeck, S., & Goldstein, I. L. (2002). g: Is this your final answer? <u>Human Performance</u>, <u>15</u>, 123-142.

Craik, K. H., Ware, A. P., Kamp, J., O'Reilly, C. O. III, Staw, B., & Zedeck, S. (2002). Explorations of construct validity in a combined managerial and personality assessment programme. <u>Journal of Occupational and Organizational Psychology</u>, <u>75</u>, 171-193.

Zedeck, S. (2004). Who gets in? The quest for diversity after Grutter. *Buffalo Law Review, 52*, 531-596.

Klein, K. J., & Zedeck, S. (2004). Theory in applied psychology: Lessons (re)learned. <u>Journal of Applied Psychology</u>, 89, 931-933.

Goldstein, I. G., & Zedeck, S.  (2009).  Content validity and Murphy's angst.  *Industrial and Organizational Psychology*, *2*, 496–496.

Brief of Industrial-Organizational Psychologists as *Amici Curiae in support of respondents*; Ricci vs. DeStefano et al.  Submitted to U.S. Supreme Court.  New Have Firefighters Case. March 25, 2009.

Shultz, M., & Zedeck, S.  (Accepted pending successful revision).  Predicting Lawyer Effectiveness: Broadening the Basis for Law School Admission Decisions.  *Law and Society Inquiry*.


## CHAPTERS IN BOOKS

Zedeck, S., & Tenopyr, M. L.  (1977).  Issues in selection, testing, and the law.  In L. J. Hausman et al (Eds.), Equal rights and industrial relations (pp. 167-195).  Madison, WI: Industrial Relations Research Association.

Landy, F. J., & Zedeck, S.  Introduction.  (1983).  In F. J. Landy, S. Zedeck, & J. Cleveland (Eds.), Performance measurement and theory (pp. 1-7).  Hillsdale, NJ:  Lawrence Erlbaum Associates.

Zedeck, S., & Landy, F. J.  (1983).  Concluding remarks.  In F. J. Landy, S. Zedeck, & J. Cleveland (Eds.), Performance measurement and theory (pp. 363-381).  Hillsdale, NJ: Lawrence Erlbaum Associates.

Zedeck, S.  (1986).  A process analysis of the assessment center method.  In B. Staw & L. Cummings (Eds.), Research in organizational behavior (pp. 259-296).  Vol. 8. Greenwich, CT:  JAI Press.
(Reprinted in L. L. Cummings & B. M. Staw (Eds.).  (1990).  Evaluation and employment in organizations.  Greenwich, CT:  JAI Press.

Zedeck, S.  (1992).  Introduction:  Exploring the domain of work and family concerns.  In S. Zedeck (Ed.), Work, families, and organizations (pp. 1-32).  San Francisco:  Jossey-Bass.

Goldstein, I. L., Zedeck, S., & Schneider, B.  (1993).  An exploration of the job analysis-content validity process.  In N. Schmitt & W. C. Borman (Eds.), Personnel selection in organizations (pp. 3-34).  San Francisco:  Jossey-Bass.

Goldstein, I. L., & Zedeck, S.  (1996).  Content validation.  In R. Barrett (Ed.), Handbook of fair employment strategies (pp. 27-37).  Westport, CT:  Quorum.

Zedeck, S., Cascio, W. F., Goldstein, I. L., & Outtz, J.  (1996).  Sliding bands: An alternative to top-down selection.  In R. Barrett (Ed.), Handbook of fair employment strategies (pp. 222-234).  Westport, CT:  Quorum.

35

Zedeck, S.  (1997).  Commentary on diversity and work-family values.  In P. C. Earley & M. Erez (Eds.), <u>New perspectives on international industrial/organizational psychology</u> (pp. 319-332).  San Francisco:  New Lexington Press.

Zedeck, S., & Goldstein, I. L.  (2000).  The relationship between I/O psychology and public policy: A commentary.  In J. F. Kehoe (Ed.), <u>Managing selection in changing organizations</u> (pp. 371-396).  San Francisco: Jossey-Bass.

Cascio, W. F., Goldstein, I. L., Outtz, J., & Zedeck, S.  (2004).  Social and technical issues in staffing decisions.  In H. Aguinis (Ed.), <u>Test-Score Banding in Human Resource Selection: Technical, Legal, and Societal Issues</u> (pp. 7-28).  NY: Quorum Books.

Zedeck, S.  Industrial/Organizational psychology, overview.  (2004).  In C. Spielberger (Editor in Chief.), <u>Encyclopedia of Applied Psychology</u>, Vol. 2 (pp. 285-292).  Amsterdam, Elsevier Ltd.

Zedeck, S., & Goldstein, I. L.  (2008).  Combining an academic and consulting career.  In W. C. Borman & J. W. Hedge (Eds.), <u>The I/O consultant's handbook</u> (pp. 81-89).  Washington, D. C.:  American Psychological Association.

Zedeck, S.  (2008).  Editing a top academic journal.  In Y. Baruch, A. M. Konrad, H. Aguinis, & W. H. Starbuck (Eds.), <u>Opening the black box of editorship</u> (pp. 145-156).  NY: Palgrave-Macmillan.

Zedeck, S.  (2009).  Adverse impact:  History and evolution.  In J. L. Outtz (Ed.), <u>Adverse Impact: Implications for Organizational Staffing and High Stakes Selection</u> (pp. 3-27). NY: Routledge, Taylor & Frances Group.

Jeanneret, P. R., & Zedeck, S.  (2010).  Professional guidelines/standards.  In J. L.  Farr and N. T. Tippins (Eds.), <u>Handbook of Employee Selection</u> (pp. 593-625).  NY:  Routledge.


## BOOKS

Zedeck, S., & Blood, M R.  (1974).  <u>Foundations of behavioral science research in organizations</u>.  Monterey, CA:  Brooks/Cole Publishing Co.
(Chapter 5 reprinted in J. R. Hackman, E. E. Lawler, & L. W. Porter (Eds.).  (1983). <u>Perspectives on behavior in organizations</u> (2nd ed.).  New York:  McGraw-Hill.

Ghiselli, E. E., Campbell, J. P., & Zedeck, S.  (1981).  <u>Measurement theory for the behavioral sciences</u>.  San Francisco:  Freeman.

Landy, F. J., Zedeck, S., & Cleveland, J.  (Eds.).  (1983).  <u>Performance measurement and theory</u>.  Hillsdale, NJ:  Lawrence Erlbaum Associates.

Keppel, G., & Zedeck, S.  (1989).  <u>Data analysis for research designs:  Analysis of variance and multiple regression/correlation approaches</u>.   New York:  W. H. Freeman.

Zedeck, S. (Ed.)  (1992).  <u>Work, families, and organizations</u>.  San Francisco:  Jossey-Bass.

## REVIEWS

Buros, O. K.  <u>Mental measurements yearbook (8th ed.)</u>.  Highland Park, NJ:  Gryphon Press, 1978.  (1)  Minnesota Importance Questionnaire, 1967 ed., ; and (2) Minnesota Job Description Questionnaire.

Regression/ANOVA:  A glossary of formulas.  (Review of <u>Multiple regression and the analysis of variance and covariance</u> by A. L. Edwards.)  <u>Contemporary Psychology</u>, 1980, <u>25</u>, 741-742.

Mitchell, J. V., Jr.  <u>Mental measurements yearbook (9th ed.)</u>.  Lincoln, NE:  University of Nebraska Press, 1985.  (1) Situational Leadership; and (2) PSI Basic Skills Tests for Business, Industry, and Government.

Kramer, J. J., & Conoley, J. C. (Eds.).  <u>Mental measurements yearbook</u> (11th ed.).  Lincoln, NE:  University of Nebraska Press, 1992.  (1) Managerial and Professional Functions Inventory; and (2) Supervisory Profile Record.

Zedeck, S.  (1994).  Review of the Reality Check Survey.  Accession number AN-12181261, Mental Measurements Yearbook Database (Search Label MMYD), BRS Information Technologies.

Zedeck, S.  (1994).  Review of Benchmarks.  Accession number AN-12181333, Mental Measurements Yearbook Database (Search Label MMYD), BRS Information Technologies.

Conoley, J. C., & Impara, J.  (Eds.). (1995).  <u>Mental measurements yearbook</u> (12th ed.).  Lincoln, NE:  University of Nebraska Press, 1995.  (1) Reality Check Survey; and (2) Benchmarks:  Developmental Research Points for Managers and Executives.

Zedeck, S.  (1996).  Review of Rumsey, M. G., Walker, C. B., & Harris, J. H. (Eds.)  <u>Personnel selection and classification</u>.  Hillsdale, NJ:  Erlbaum.  1994.  In <u>Contemporary Psychology</u>, <u>41</u>, 839-840

Impara, J., & Plake, B.  (Eds.).  <u>Mental measurements yearbook</u> (13th ed.).  Lincoln, NE:  University of Nebraska Press, 1998.  (1) Job Search Inventory; and (2) Career Interest Inventory.

Plake, B., & Impara, J.  ((Eds.).  <u>Mental measurements yearbook</u> (14th ed.).  Lincoln, NE:  University of Nebraska Press, 2001.  (1) Sales Motivation Survey; and (2) Motives, Values, Preferences Inventory.

**PRESENTATIONS, INVITED LECTURES, AND SYMPOSIA**

Zedeck, S., Lewis, P., Defran, R. H., & Badia, P.  (1968, April).  Suppression of rat vocalizations to shock as a function of interstimulus interval and unconditioned stimulus duration.  Paper presented at the meeting of the Ohio Academy of Science, Bowling Green, Ohio.

Zedeck, S. Moderator variables.  (1979).  University of California, Institute of Industrial Relations Staff Colloquium.

Zedeck, S. (1971, April).  Ipsative and normative-ipsative work value measures.  In N. Imparato (Chair), Work values and work rewards:  Research problems and social issues.  Symposium presented at the meeting of the Western Psychological Association, San Francisco.

Zedeck, S., & Baker, H. T.  (1971, May).  Evaluation of behavioral expectation scales.  Paper presented at the meeting of the Midwestern Psychological Association, Detroit.

With W. K. Graham.  (1971, October).  Values and limitations of types and tests:  Biographical inventories, skills and abilities, vocational interests, and personality.  Paper presented at the UCB Institute of Industrial Relations Conference, San Francisco.

Harari, O., & Zedeck, S.  (1972, April)  Evaluation of university faculty teaching.  Paper presented at the meeting of the Western Psychological Association, Portland.

Zedeck, S. (1972, April).  Performance appraisal techniques.  University of California, Berkeley, Institute of Industrial Relations, Social Science Management Seminar, San Francisco.

Zedeck, S. (1972, August).  An approach to personnel evaluation (invited talk).  Center for Training in Community Psychiatry and Mental Health Administration,  Berkeley.

Zedeck, S. (1972, February).  Personnel selection and evaluation (invited talk).  Center for Training in Community Psychiatry and Mental Health Administration, Berkeley.

Zedeck, S. (1973, February).  Validation and testing (invited talk).  University of California, Berkeley, Industrial Relations Association.

Zedeck, S. (1973, April).  New developments in performance appraisal techniques (invited talk).  Western Regional Conference of the American Compensation Association, Berkeley.

Zedeck, S. (1973, July).  A research model for measuring motivation:  A suggested approach (invited talk).  Navy Personnel Research and Development Center Conference on "Occupational Research and the Navy:  Prospectus 1980."  San Diego.

Zedeck, S. (1973, August).  Behaviorally anchored rating scales:  View from two organizational levels.  In S. Miller (Chair), Performance appraisal methodology:  Issues and

applications.  Symposium presented at the meeting of the American Psychological Association, Montreal.

Zedeck, S.  (1973, November).  Performance evaluation and management by objectives:  An integration (invited talk).  United Bay Area Crusade Conference, Berkeley.

Zedeck, S.  (1974, February).  Organizational choice:  A decision-making model for a motivation problem (invited colloquium).  NIMH- Organizational Research Training Program and the Graduate School of Business, Stanford University.

Zedeck, S. (1974, April and June).  Chair and discussant of a symposium:  Employee selection, testing, discrimination, and the courts.  Presented at the meetings of (a) Western Psychological Association, San Francisco, and (b) American Psychology- Law Society, San Francisco.

Zedeck, S.  (1974, October).  Performance appraisal -- Developing meaningful criteria (invited talk).  University of California, Berkeley Library Management Seminars.

With J. Vetter.  (1975, January).  The relationship between industrial psychology and the legal system:  Employee selection and discrimination.  Presented at the Bay Area Seminar on Labor Studies, UCB.

Zedeck, S.  (1975, March).  An information processing model for the study of work motivation.  Presented at a University of Houston Psychology Department Colloquium.

Zedeck, S.  (1975, March).  Organizational choice and information processing.  Presented at a New York University Psychology Department Colloquium.

Zedeck, S.  (1976, April).  Barricades to motivation (invited talk).  Western Regional Conference, International Personnel Management Association, Salt Lake City.

Zedeck, S.  (1976, September).  Validation of physical ability tests for prediction of training criteria.  In M. Tenopyr (Chair), Physical ability tests:  Development, validity, and equal employment opportunity.  Symposium presented at the meeting of the American Psychological Association, Washington, D. C.

Zedeck, S.  (1977, February).  A new approach to motivation assessment (invited talk).  Social-Industrial Psychology section of the Israel Psychological Association, Ramat-Gan, Israel.

Zedeck, S.  (1977, February).  How performance is assessed with behavioral expectation scales.  Presented at a Bar Ilan University Colloquium, Israel.

Zedeck, S.  (1977, September).  Validation of physical abilities  (invited talk).  Personnel Testing Council of Southern California, Los Angeles.

Zedeck, S. (1978, May). <u>Capturing and assessing interviewer policies for interview decisions</u>. Presented at a University of California, Irvine, Graduate School of Administration Colloquium.

Zedeck, S. (1978, June). <u>Moderator variables</u>. Presented at a University of Sheffield, Social and Applied Psychology Unit, Colloquium.

Zedeck, S. (1978, July). <u>Current trends in American Psychology</u>. Presented at a University of Sheffield, Social and Applied Psychology Unit, Colloquium.

Zedeck, S. (1979, April). <u>Behaviorally anchored performance appraisal methodology</u>. Paper presented at a UCB Institute of Industrial Relations Conference, San Francisco.

Zedeck, S. (1979, July). <u>Behaviorally based performance appraisal systems</u> (invited talk). Presented at the 17th Annual Industrial Relations Counselors Symposium on Advanced Research in Industrial Relations, Princeton, NJ.

Zedeck, S. (1979, December). <u>Job analysis: Generalizability versus specificity</u> (invited talk). California Fair Employment Practice Commission's Technical Advisory Committee on Testing, San Francisco.

Zedeck, S. (1980, March). <u>Problems and approaches to effective performance appraisals</u> (invited talk). Presented at a UCLA Institute of Industrial Relations Conference on "Age Discrimination Amendments on Mandatory Retirement -- Impact on Personnel Policies," Los Angeles.

Zedeck, S. (1980, April). <u>Comments on Cascio's presentation and other performance appraisal issues</u>. Presented at the First Annual Scientist-Practitioner Conference on Industrial/Organizational Psychology, Old Dominion University, Virginia.

Zedeck, S., Tziner, A., & Middlestadt, S. (1980, May). <u>Capturing and assessing interviewer policies for interview decisions</u>. Paper presented at a meeting of the Western Psychological Association, Hawaii.

Zedeck, S. (1980, July). <u>Behaviorally anchored performance appraisal methodology</u> (invited talk). Presented at a UCLA Institute of Industrial Relations Conference on "Performance Appraisal," Los Angeles.

Jackson, S. E., & Zedeck, S. (1981, April). <u>The when and why of goal setting effectiveness</u>. Paper presented at a meeting of the Western Psychological Association, Los Angeles.

Jackson, S. E., & Zedeck, S. (1981, August). Alternative explanations of the goal-setting phenomenon. In L. Cummings (Chair), <u>Advances in goal-setting research and theory: Processes and boundaries</u>. Symposium presented at the meeting of the American Psychological Association, Los Angeles.

Zedeck, S. (1981, August). Discussant in a symposium: W. Tornow (Chair), <u>New directions in improving performance appraisal effectiveness</u>. Symposium presented at the meeting of the American Psychological Association, Los Angeles.

Blood, M. R., Zedeck, S., & Graham, W. K. (1982, July). <u>Resolving compensation disputes with three-party job evaluation</u>. Paper presented at the International Association of Applied Psychology, Edinburgh, Scotland.

Zedeck, S. (1982, August). Discussant in a symposium: C. Banks (Chair), <u>Methods for investigating the rating process</u>. Symposium presented at the meeting of the American Psychological Association, Washington, D. C.

Zedeck, S. (1983, May). <u>Preview of the "Annual Review."</u> Presented at a Stevens Institute of Technology Management Science Department Colloquium, Hoboken, NJ.

Zedeck, S. (1983, May). Chair and presented in an invited symposium: <u>Current issues and perspective in human resource management</u>. Symposium presented at the meeting of the Eastern Academy of Management, Pittsburgh, PA.

Zedeck, S., & Cascio, W. F. (1983, August). Personnel selection and placement. In I. L. Goldstein (Chair), <u>Conversation with the 1984 Annual Review Authors</u>. Symposium conducted at the meeting of the American Psychological Association, Anaheim, CA.

Zedeck, S. (1984, May). <u>Performance measurement: Forms or samples?</u> (invited address). Paper presented at the meeting of the International Personnel Management Association Assessment Council, Seattle, WA.

Zedeck, S. (1984, August). Chair and discussant in a symposium: <u>Moderator variables: An exposition and debate of controversial issues</u>. Symposium presented at the meeting of the American Psychological Association, Toronto, Canada.

Zedeck, S. (1986, March). <u>An analysis of assessment centers</u> (invited talk). Personnel Testing Council of Northern California, Oakland, CA.

Zedeck, S. (1986, June). <u>Using assessment centers to select personnel officers</u> (invited address). Presented at the tenth annual meeting of the International Personnel Management Assessment Council, San Francisco, CA.

Zedeck, S., Shapira, Z., & DeStigter, K. (1986, July). Work values as a function of worker-parent origin. In D. Elizur (Chair), <u>Work values</u>. Symposium presented at the meeting of the International Association of Applied Psychology, Jerusalem, Israel.

Zedeck, S. (1986, July). Performance appraisal: Use of samples instead of ratings. In S. Zedeck (Chair), <u>Performance appraisal: The state-of-the-art</u>. Symposium presented at the meeting of the International Association of Applied Psychology, Jerusalem, Israel.

Zedeck, S.  (1986, July).  Assessing sales and marketing potential.  J. L. Moses (Chair), Assessment centers.  Symposium presented at the meeting of the International Association of Applied Psychology, Jerusalem, Israel.

Zedeck, S.  (1986, November).  Process analysis of assessment centers.  Presented at a University of California, Irvine, Graduate School of Administration Colloquium.

Zedeck, S.  (1987, March).  An overview of assessment centers:  From selecting spies to selecting "right-brained" engineers (invited talk).  Presented at the meeting of the first annual conference of the Personnel Testing Council of Northern California, Concord, CA.

Zedeck, S.  (1987, March).  The IPAR MBA managerial assessment program.  In K. Craik (Chair), Combining personality and managerial assessment programs.  Symposium presented at the meeting of the Society for Personality Assessment, San Francisco, CA.

Zedeck, S.  (1987, April).  A subtle criterion contamination explanation.  In R. Klimoski (Chair), Alternative explanations of why assessment centers work.  Symposium presented at the meeting of the Second Annual Conference of the Society for Industrial and Organizational Psychology, Atlanta, GA.

Zedeck, S.  (1987, April).  Work:  In families and "other" organizations (invited keynote address).  Presented at the meeting of the 1987 I/O and OB Graduate Student Conference, Knoxville, TN.

Sackett, P. R., Zedeck, S., & Fogli, L.  (1987, August).  Relationships between measures of typical and maximum job performance.  Paper presented at the meeting of the American Psychological Association, New York.

Zedeck, S.  (1987, August).  Work, family, and organizations:  An untapped research triangle (Division 14 Presidential Address).  Presented at the meeting of the American Psychological Association, New York.

Zedeck, S. (1987, October).  Spousal view of and relationship to employee satisfaction (invited talk).  Presented at the Bowling Green State University Conference on "Job Satisfaction: Advances in Research and Applications,"  Bowling Green, Ohio.

Zedeck, S. (1988, January).  Job analysis and content related validation of a selection system (invited talk).  Presented at the meeting of the Metropolitan New York Association for Applied Psychology, New York.

Zedeck, S. (with Hurley, K) (1988, March).  Innovations to satisfy legal and professional requirements (invited talk).  Presented at the meeting of the second annual conference of the Personnel Testing Council of Northern California, Sacramento, CA.

Zedeck, S. (1988, April).  Job analysis and content-oriented test development.  Workshop presented at the Ninth Annual I/O & OB Graduate Student Conference, Toledo, Ohio.

Zedeck, S. (1988, April).  Discussant in a symposium:  J. F. Kehoe (Chair), Validation of non-test predictors.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Dallas, Texas.

Mosier, K. L., & Zedeck, S.  (1988, April).  Job satisfaction:  The other perspective.  Paper presented at the meeting of the Western Psychological Association, Santa Clara, CA.

Zedeck, S.  (1988, May).  Job analysis and content related validation of a selection system (invited talk).  Presented at the meeting of the Personnel Testing Council of Southern California, Los Angeles.

Mosier, K. L., Skitka, L. J., Zedeck, S., & Maslach, C.  (1989, April).  Supervision and comfort: Salient aspects of working life.  Paper presented at the meeting of the Western Psychological Association, Reno, NV.

Zedeck, S.  (1989, June).  Chair and presented in an invited symposium:  Testing in the public sector under a consent decree.  Symposium presented at the meeting of the International Personnel Management Assessment Council, Orlando, Fl.

Zedeck, S.  (1989, July).  Translation from case law to workplace standards.  Presentation at a conference on "EEO Update:  Employee selection and promotion."  University of California at Los Angeles and Berkeley, Institute of Industrial Relations, Los Angeles, CA.

Skitka, L. J., Mosier, K., Maslach, C., & Zedeck, S.  (1990, April).  Job stress and health:  Is it all in your head?  Paper presented at the meeting of the Western Psychological Association, Los Angeles, CA.

Zedeck, S.  (1990, July).  Use of video technology in training and selection of employees.  In I. Goldstein (Chair), Training issues facing work organizations in the year 2000. Symposium presented at the meeting of the International Association of Applied Psychology, Kyoto, Japan.

Zedeck, S.  (1990, October).  How to intelligently use personality tests in your candidate screening (invited talk).  Presented at the meeting of the Northern California Human Resources Council, Oakland, CA.

Zedeck, S.  (1990, October).  Work and family.  Presented at a Baruch College, City University of New York, Department of Psychology Colloquium.

Zedeck, S.  (1990, October).  An alternative to traditional selection procedures:  The sliding band procedure (invited talk).  Presented at the meeting of the Metropolitan New York Association for Applied Psychology, New York.

43

Zedeck, S.  (1991, April).  Job analysis for test development:  Some methodological issues.  In M. Rosenfeld (Chair), Job analysis for test development:  Some methodological issues.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, St. Louis, Missouri.

Zedeck, S.  (1991, May).  Alternative model for personnel selection:  The sliding band.  Presented at Tel Aviv University, School of Business Administration Colloquium.

Zedeck, S.  (1991, August).  Conversation with the Editor -- Frontiers volume on Work and Family.  Presented at the meeting of the American Psychological Association, San Francisco.

Zedeck, S.  (1992, March).  Generational and lifestyle differences in the work ethic (invited talk).  Presented at the conference, "Work-Family Issues and the Work Ethic," sponsored by The Conference Board and The Families and Work Institute, San Francisco.

Goldstein, I. L., & Zedeck, S. (1992, April).  A systems approach to content validity.  Workshop presented at the meeting of the Society for Industrial and Organizational Psychology, Montreal, Canada.

Zedeck, S. (1992, May).  Discussant in a symposium:  B. Schneider (Chair), Non-traditional research on and use of job analyses.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Montreal, Canada.

Zedeck, S. (1992, May).  Discussant in a symposium:  P. J. Dyer (Chair), Computer-based, multimedia testing:  Merging technology, reality, and scientific uncertainty.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Montreal, Canada.

DuBois, C. L. Z., Sackett, P. R., Zedeck, S., & Fogli, L.  (1992, May).  Further exploration of typical and maximum performance criteria:  Definitional issues, prediction, and white-black differences.  Paper presented at the meeting of the Society for Industrial and Organizational Psychology, Montreal, Canada.

Zedeck, S.  (1992, November).  Another view of making selection decisions:  The sliding band.  Presented at a National Institute for Testing and Evaluation Colloquium, Jerusalem, Israel.

Zedeck, S.  (1992, December).  The sliding band:  Another view of making selection decisions.  Presented at a Technion University Faculty of Industrial Engineering and Management Colloquium, Haifa, Israel.

Zedeck, S.  (1993, January).  Current issues in human resources selection.  Presented at a Tel Aviv University Faculty of Management Colloquium, Tel Aviv, Israel.

Zedeck, S.  (1993, February).  Selection and placement of manpower:  Development of assessment centers (invited seminar).  Presented at the meeting of the Israeli Association for Organizational Development, Caesarea, Israel.

Zedeck, S. (1993, March). The influence of work on the family-work relationship. Presented at a Technion University Faculty of Industrial Engineering and Management Colloquium, Haifa, Israel.

Zedeck, S. (1993, March). New approaches in selection. Presented at a Bar Ilan University Department of Psychology Colloquium, Ramat Gan, Tel Aviv, Israel.

Zedeck, S. (1993, March). Test theory and issues of discrimination. Presented at a Hebrew University Departments of Business Administration, Psychology, and Sociology joint colloquium, Jerusalem, Israel.

Zedeck, S. (1993, March). New developments in human resources management. Seminar presented to Human Resources Management instructors, Open University, Tel Aviv, Israel.

Zedeck, S. (1993, April). Test development from a content validity perspective. Workshop presented at the Israeli Psychological Association meeting, Industrial/Organizational Psychology section, Kibbutz Shefayim, Israel.

Zedeck, S. (1993, June). Content validity. (Invited talk). Presented at a meeting of Work and Organizational Psychologists, Open University, Heerlen, Netherlands.

Zedeck, S. (1993, June). Recent developments in test development and selection. Presented at a University of Amsterdam Department of Work and Organizational Psychology colloquium, Amsterdam, Netherlands.

Zedeck, S. (1994, March). An alternate selection strategy: Use of the sliding band. (Invited talk). Personnel Testing Council of Northern California, Folsom, CA.

Zedeck, S. (1994, July). Alternatives to rank order selection. In I. L. Goldstein (Chair), Emerging issues in selection research in complex organizational environments. Symposium presented at the meeting of the International Association of Applied Psychology, Madrid, Spain.

Zedeck, S. (1994, July). Chair, Work and family issues: An international perspective. Symposium presented at the meeting of the International Association of Applied Psychology, Madrid, Spain.

Zedeck, S. (1995, May). Discussant in a symposium: D. Davis (Chair), Work and organizational psychology in the Netherlands. Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Orlando, Florida.

Zedeck, S. (1995, August). Discussant in a symposium: K. Jenn and L. Van Dyne (Chairs), Work/family issues and work outcomes (affect and performance) in high encounter

service jobs:  Future research and human resource policy implications.  Symposium presented at the meeting of the Academy of Management, Vancouver, Canada.

Zedeck, S. (1996, March).  A video-based test of situational judgment (invited talk).  Personnel Testing Council of Northern California, Sacramento.

Zedeck, S. (1996, April).  Discussant in a symposium:  M. Erez (Chair), New perspectives on international industrial/ organizational psychology.  Commentary on the emerging role of diversity and work-family values in an international context.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, San Diego.

Zedeck, S. (1996, June).  Industrial and Organizational Psychology in the Year 2000 (invited address).  Presented at the meeting of the American Psychological Society, San Francisco, CA.

Zedeck, S. (1996, August).  The Pro's and Con's of Banded Certification (invited talk).  Presented at the meeting of the California State Personnel Board, "2001 - A Selection Odyssey," Sacramento, CA.

Zedeck, S.  (1997, June).  Issues in public sector testing:  The good, the bad, and the ugly! (invited talk).  International Personnel Management Association Assessment Council Conference, Newport Beach, CA.

Maslach, C., Zedeck, S., Skitka, L. J., & Mosier, K.  (1997, April).  Health outcomes of job burnout.  Paper presented at the meeting of the Society of Behavioral Medicine, San Francisco, CA.

Zedeck, S.  (1997, August).  Participant on a panel discussion.  Affirmative action:  The national debate.  American Bar Association meeting, San Francisco, CA.

Zedeck, S. (1998, March).  Panelist: The impact of Proposition 209 on hiring and promotion decisions. Panel discussion presented at the meeting of the Personnel Testing Counsel of Northern California, Concord, CA.

Zedeck, S. (1998, April).  Panelist in a panel discussion:  M. Campion  (Chair), <u>The controversy over score banding in personnel selection</u>.  Panel discussion presented at the meeting of the Society for Industrial and Organizational Psychology, Dallas.

Zedeck, S.  (1998, September).  Video-based testing for assessing judgment and ability (invited talk).  Presented at the meeting of the Personnel Testing Council of Southern California, Los Angeles.

Zedeck, S.  (1999, March).  Now on video: Employee testing (invited talk; MCEP credit).  Presented at the meeting of the California Psychological Association, San Diego.

Zedeck, S. (1999, May).  Discussant in a symposium: J. A. Ryer (Chair), <u>The validity of job analysis judgments</u>.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Atlanta.

Zedeck, S. (1999, May).  Discussant in a symposium: N. R. French (Chair), <u>Perspectives on the future of personnel research</u>.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Atlanta.

Zedeck, S. (1999, May).  Panelist in a panel discussion: L. B. Hammer (Chair), <u>Theory, or lack thereof, in work-family research</u>.  Panel discussion presented at the meeting of the Society for Industrial and Organizational Psychology, Atlanta.

Zedeck, S.  (2000, November).  <u>Employment testing and adverse impact</u>. Presented at a Baruch College, CUNY, Department of Psychology Colloquium, New York City.

Zedeck, S.  (2001, February).  <u>Employment testing and adverse impact</u>. Presented at a University of Sydney, Department of Psychology Colloquium, Sydney, Australia.

Zedeck, S.  (2001, February).  Employment testing -- Issues and alternatives.  Invited talk to the College of Organisational Psychology, Australian Psychology Society, Sydney, Australia.

Zedeck, S.  (2001, February).  From law to science.  Invited talk to the Society of Organizational Behavior, Australia. Sydney, Australia.

Zedeck, S.  (2001, March).  Human Resources Issues in the 21st Century: Trends and Changes  Implications for HR for HR Managers.  Invited talk to on-line recruiters, Shen Zhen, China.

Zedeck, S.  (2001, April).  Human Resources Issues in the 21st Century: Trends and Changes  Implications for HR for HR Managers.  Invited talk to HR managers, Beijing, China

Zedeck, S.  (2002, February).  Predicting Lawyering Success: How and Why?  Invited talk to Bay Area Applied Psychology group, Oakland, California.

Zedeck, S.  (2002, February).  Update on the Revision of the *Principles for the Validation and use of Personnel Selection Procedures*.  Invited talk to the PTC/NC, Pacific Grove, California.

Zedeck, S.  (2003, January).  Where Are We Headed?  Improving the Competence of Law Schools.  Invited talk to the Association of American Law Schools, Washington, D.C.

Wong, E., & Zedeck, S.  (2003, August).  Post-Retirement Work: Factors Related to the Return to Paid or Unpaid Work.  Paper presented at the meetings of the Academy of Management, Seattle, WA.

Zedeck, S.  (2004, March).  Assessing and Predicting Lawyering Effectiveness.  Invited talk as part of the 2004 Mitchell Lecture, University of Buffalo Law School, Buffalo, NY.

Zedeck, S., Shultz, M., & Clark, J. H.  (2004, April).  Effectiveness Factors for Lawyering Performance.  In W. Camara (Chair), Complementary Tests for Admissions to Academic Institutions: Beyond Cognitive Ability.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Chicago, Illinois.

Zedeck, S.  (2004, June).  Work values of Chinese employees.  Keynote Panel Address, International Association for Chinese Management Research, Beijing, China.

Zedeck, S.  (2004, June).  Predicting performance effectiveness: The case of lawyers.  Invited talk to Department of Psychology, Peking University, Beijing, China.

Zedeck, S.  (2004, June).  Predicting performance effectiveness: The case of lawyers.  Invited talk to Ghuanghua School of Management, Peking University, Beijing, China.

Zedeck, S.  (2004, June).  Predicting performance effectiveness: The case of lawyers.  Invited talk to HR group, Guangzhou, China.

Zedeck, S.  (2004, November).  Assessing and predicting lawyering effectiveness.  Invited talk to the I/O group, Pennsylvania State University.

Zedeck, S.  (2004, December).  Assessing and predicting lawyering effectiveness.  Invited talk to the I/O group, Baruch College, City University of New York.

Cascio, W., Cowieson, N., & Zedeck, S.  (2005, February 28).  Recent developments in test-score use in personnel selection.  Panel discussion sponsored by the Hong Kong Baptist University Department of Management, Hong Kong.

Zedeck, S.  (2005, March).  Assessing and predicting lawyering effectiveness.  Invited talk to the Department of Management & Marketing, The Hong Kong Polytechnic University.

Zedeck, S.  (2005, April).  Dimensions of merit for successful lawyering.  Invited talk to the National Conference of Bar Examiners, Seattle.

Zedeck, S.  (2005, May).  Assessing and predicting effectiveness of lawyering.  Invited talk to the Department of Psychology, University of Amsterdam, Amsterdam.

Zedeck, S.  (2005, May).  Assessing and predicting effectiveness of lawyering.  Invited talk to the PHRRG, University of Amsterdam, Amsterdam.

Zedeck, S.  (2006, February).  Assessing and predicting effectiveness of lawyering:  Trials and Tribulations.  Invited talk to the Department of Psychology, Rice University, Houston.

Zedeck, S. (2006, May).  Chair, A Frank Discussion of Adverse Impact.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Dallas.

Zedeck, S. (2006, May).  Discussant in a symposium: L. Duan & K. Yusko  (Co-Chairs), Testing Strategies for Reducing Adverse Impact.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Dallas.

Zedeck, S.  (2006, May 24).  Shut out:  Is higher education truly public?  Ten years after Proposition 209.  Panel discussion sponsored by the Asian Pacific American Bar Association of Los Angeles County, Los Angeles.

Zedeck, S.  (2006, May 25).  Prop 209 ten years later:  The decline of blacks and browns in higher education.  Panel discussion sponsored by the African American and Latino Bar Associations of Los Angeles County, Los Angeles.

Zedeck, S.  (2006, June 25).  Social justice in the development and defense of employment selection systems.  Invited talk to the Society for the Psychological Study of Social Issues, Long Beach, CA.

Zedeck, S. (2007, April).  Discussant in a symposium: R. Ilies  (Chair), Effects of Work Demands on Employee Health and Well-Being.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, New York.

Zedeck, S. (2007, April).  Discussant in a symposium: H. Aguinis, Y. Baruch, A. Konrad, and W. Starbuck  (Co-Chairs), Journal Editing: An Opening of the Black Box.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, New York.

Zedeck, S.  (2007, October).  Predicting Lawyering Effectiveness:  Alternative Strategies.  Invited talk to the Division III group of the California Psychological Association, Alliant University, San Francisco.

Zedeck, S.  (2008, January).  Participant in a "Forum on Social Science Research and Title VII Class Action Litigation."  Sponsored by a joint project of Cornell University ILR Labor and Employment Law Program and The Impact Fund, New York City.

Zedeck, S.  (2008, April).  Discussant in a symposium: L. Nieminen and J. Arnold  (Co-Chairs), Validation Strategies:  Ensuring Situational Sufficiency and "Appropriate" Professional Rigor.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, San Francisco.

Zedeck, S.  (2008, May).  Measuring the effectiveness of lawyers' performance and its predictability:  Results of a 7-year study.  Invited talk at Tsinghua University, Beijing, China.

Zedeck, S.  (2008, May).  How to publish in a top-tiered journal:  Background and advice.  Invited talk at Tsinghua University, Beijing, China.

Zedeck, S.  (2009, October).  Barriers to employment:  The selection process.  Invited talk to the Public Interest Law Center of Philadelphia, Philadelphia, PA.

Zedeck, S., & Shultz, M.  (2009, October).  Predicting lawyer effectiveness: A new assessment for use in law school admission decisions.  Invited talk to the American Bar Association, President's Advisory Council on Diversity.  Spokane, WA.

Zedeck, S.  (2009, October).  Invited panelist:  Ricci vs. DeStefano:  How the Supreme Court got it wrong and why we should care.  Sponsored by the Bar Association of San Francisco, Lawyers' Committee for Civil Rights.  San Francisco, CA.

Shultz, M., & Zedeck, S.  (2009, November).  Predicting lawyer effectiveness: A new assessment for use in law school admission decisions.  Presented at the Conference for Legal Studies, Los Angeles, CA.

Zedeck, S.  (2010, March).  Predicting lawyer effectiveness: A new assessment for use in law school admission decisions.  Presented at the 2010 IOOB Conference, Houston, TX.

Zedeck, S.  (2010, April).  Discussant in a symposium: H. Aguinis (Chair), Solutions for Solving the Adverse Impact-Validity Dilemma.  Symposium presented at the meeting of the Society for Industrial and Organizational Psychology, Atlanta, GA.

Zedeck, S.  (2010, April).  Predicting lawyer effectiveness: A new assessment for use in law school admission decisions.  Invited talk at Department of Psychology, Bowling Green State University, Bowling Green, OH.

Zedeck, S., and Shultz, M.  (2010, May).  New Constructs and Measures for Law School Admissions.  In P. Kyllonen (Chair), New Constructs and New Measures for Higher Education Admissions.  Symposium presented at the meeting of the National Council on Measurement in Education, Denver, CO.

**Exhibit 7**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No. C03-2817 SI, 04-4730 and 04-4731

------------------------------------------X

EDUARDO GONZALEZ, ANTHONY OCAMPO, ENCARNACION
GUTIERREZ, JOHAN MONTOYA, JUANCARLOS
GOMEZ-MONTEJANO, JENNIFER LU, AUSTIN CHU, IVY
NGUYEN, ANGELINE WU, ERIC FIGHT, CARLA GRUBB,
DAVID CULPEPPER, PATRICE DOUGLASS and ROBAIR
SHERROD on behalf of themselves and all others
similarly situated,

                    Plaintiffs,

  vs.

ABERCROMBIE & FITCH STORES, INC., A&F
CALIFORNIA, LLC and A&F OHIO, INC.,

                    Defendants.
------------------------------------------X


                    DEPOSITION

                        of

            KATHLEEN K. LUNDQUIST, Ph.D.

               STAMFORD, CONNECTICUT

                  MARCH 4, 2011

                   4:00 P.M.



ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

Nancy Anne Flynn, RPR
FILE NO.:  A502468

1              Kathleen K. Lundquist, Ph.D.

2      ratings on causing adverse effect?

3          A     No, we did not.

4          Q     With respect again to the pink districts

5      on Exhibit 1, did APT conduct an empirical study on

6      inter-relator reliability of the interview ratings

7      of raters in order to determine the cause of adverse

8      effect in the pink districts?

9          A     No, and I would not have imagined under

10     any basis that we would examine inter-rater

11     reliability to determine adverse impact.

12         Q     Did APT ever conduct an empirical study

13     of inter-rater reliability?

14         A     We did not conduct a statistical study of

15     inter-rater reliability.  We did take other measures

16     to try to ensure reliability, to the best of our

17     ability.

18         Q     Was it feasible to conduct an empirical

19     study of inter-rater reliability during the test

20     development stage?

21         A     No.

22         Q     Why?

23         A     At the point of the test development, and

24     particularly we are not talking about the kind of

25     test like a paper and pencil test, but rather a

16

1                    Kathleen K. Lundquist, Ph.D.

2      structured interview, it is generally not the case

3      that you have applicants on whom you can gather that

4      kind of information.  If you gather that kind of

5      information from incumbents, it's contaminated

6      oftentimes by their exposure and experience on the

7      job.  So we did not conduct an empirical study at

8      that point in time.

9           Q     Did you ever conduct an empirical study

10     of inter-rater reliability between raters?

11          A     Well, that's what inter-rater reliability

12     is, between raters.

13          Q     Is the answer you didn't?

14          A     Yes, it's the same answer I gave you when

15     you asked me the question before.

16          Q     Okay.  Did you ever conduct an empirical

17     study of inter-rater reliability of the same rater

18     over time?

19          A     I don't understand your question.

20          Q     Did you ever conduct a study that looked

21     at whether the same rater gave the same ratings

22     over, you know, month one and month two, month

23     three?

24          A     To the same person or to different

25     people?

1                    Kathleen K. Lundquist, Ph.D.

2       the purposes of examining whether training changes

3       changed the adverse impact.  The changes to training

4       were part of our response to continuously trying to

5       remove as much as possible any adverse impact that

6       was in the system.

7                    So other than looking at whether there

8       were changes in the quarterly patterns, there were

9       no other studies that I can think of directly tied

10      to training.  It was more of a response to the data.

11           Q     And were there any statistical reports

12      that were specifically designed to determine if

13      changes or let's say use of the image book,

14      minimized adverse effect?

15           A     There were no specific studies tied

16      directly to the implementation of the image book

17      other than the ongoing adverse impact analyses that

18      were done, and again, our recommendation that the

19      image book would provide visual cues in training

20      that would supplement the existing written training

21      for making appearance and sense of style judgments.

22           Q     Did APT conduct an empirical study of the

23      use of a single structured interview versus a group

24      structured interview in order to determine the cause

25      of adverse impact in the pink districts?

```
1                    Kathleen K. Lundquist, Ph.D.

2         A     No.  I think that would --

3         Q     Do you agree such a study would have been

4    feasible?

5         A     You're asking me if panel interviews

6    would have been feasible instead of individual

7    interviews, or are you asking me if individual

8    candidate interviews versus group interviews would

9    have been feasible?

10        Q     I am asking you whether it would have

11   been feasible to look at single interviews versus

12   group interviews?

13        A     Okay, but the single would be a single

14   candidate as opposed to a single interview; is that

15   correct?

16        Q     Yes, single candidate.

17        A     We did not empirically study whether that

18   would be better.  The volume of hiring for this job

19   and the turnover that occurs in this job probably

20   didn't warrant going from a group interview to an

21   individual interview, and I would have no basis for

22   a determination that that would impact, adverse

23   impact one way or the other.

24        Q     Did you seek to determine if it would

25   affect adverse impact?
```

1                    Kathleen K. Lundquist, Ph.D.

2          A     I do not.

3          Q     Has APT ever recommended to Abercrombie

4     that managers hire a set number of African-American

5     models or Hispanic models by a certain date?

6          A     You mean have we recommended quotas?

7          Q     Yes.

8          A     No.  Not that I'm aware of.

9          Q     Do you know if in fact Abercrombie has

10    instructed managers to hire a certain number of

11    African-American models or Hispanic models by a

12    certain date in order to meet benchmarks?

13         A     I do not.

14         Q     Do you know if the documentation

15    requirements for appearance and sense of style have

16    changed?

17         A     They have --

18         Q     On the interview form?

19         A     -- they've changed a couple of times.

20         Q     Do you know if store managers are

21    required to fill in, to provide reasons why -- well,

22    strike that -- to provide reasons in support of

23    ratings for appearance and sense of style?

24         A     I'm sorry.  Can you restate the question,

25    or repeat it?

1                    Kathleen K. Lundquist, Ph.D.

2          A      This is dated March 2010.

3          Q      Yes, March 2010.

4          A      Yes, okay.

5          Q      This is Exhibit 4 to Zedeck?

6          A      Yes.

7          Q      The sentence I want you to focus on is

8     "Has personal attractiveness that is classic,

9     natural, diverse."

10         A      Yes.

11         Q      How is classic defined?

12         A      It's defined in the sense of the pictures

13    that define it in the image book.  And in the

14    criteria that are explained associated with the look

15    policy.

16         Q      Well, can you show me what you are

17    talking about?  Is this something you train people

18    on?  Because it's an exhibit, the people selection

19    program training is an exhibit, so where do you

20    discuss --

21         A      There are a couple of --

22         Q      My question is, where do you discuss what

23    classic means?

24         A      I'm not sure that we define the word

25    "classic."  What we do is define what is consistent

1               Kathleen K. Lundquist, Ph.D.

2     with the look policy both here in this interview on

3     page 8, as well as in the image books which show

4     visual examples of what we're talking about, and in

5     both the full day training and the training that was

6     attached to my declaration or to my expert report.

7          Q     Okay.  If you could walk me through page

8     8, the look policy, tell me what, does this discuss

9     what classic means?

10         A     It discusses generally, for instance,

11    "Hair styles must appear to be neat, clean, natural,

12    kempt, and classic."  Does it define classic per se,

13    no; it defined overall appearance and sense of style

14    that is consistent with the brand as defined by the

15    company.

16         Q     I believe managers are instructed to

17    select one or two pictures out of a page of the

18    image book; is that correct?

19               MR. KNUEVE:  I will object.

20               But you can answer.

21         A     I don't understand to what you are

22    referring.

23         Q     Well, let me ask you this:  What is your

24    understanding, what instructions are provided to

25    managers about the use of the image book?

73

1                     Kathleen K. Lundquist, Ph.D.

2          A    Managers are supposed to understand,

3      supposed to use the image books as demonstrations of

4      the range of looks and sense of style that are

5      consistent with the brand.

6          Q    Is that the same thing as classic?

7          A    There isn't a definition of classic that

8      is out of context of the entire definition of "the

9      look" for the brand.  So we do not define classic,

10     per se, as one word; natural, per se, as one word,

11     but rather, as I think we've discussed before, these

12     anchors are used as all three anchors in conjunction

13     with one another, and consistent with the other

14     words and training available relative to appearance

15     and sense of style.

16         Q    So natural isn't defined either; is that

17     right?

18              MR. KNUEVE:  I will object.

19              But you can answer.

20         A    It's defined in the context of, for

21     instance, "Hair color and highlights should appear

22     natural."  There are definitions and words that

23     operationalize some of what that image and that look

24     is, in terms of the look policy, and then is

25     demonstrated in the image book and the cast-of

1                    Kathleen K. Lundquist, Ph.D.

2      books.

3          Q     Here, I'm trying to understand what you

4      are telling me.  I think under the look policy on

5      page eight, there is a statement that "Hair styles

6      must appear to be neat, clean, natural, kempt, and

7      classic."  Are you telling me that that sentence

8      helps define natural, what the term natural means?

9          A     Well, I think I was referring to the next

10     sentence, but it really, it doesn't matter.  What I

11     am saying is that the descriptions here that talk

12     about natural colors for your nails and your hair,

13     the way your hair is portrayed, excessive styling

14     products, excessive makeup, some of those things go

15     into defining the look policy.

16              But beyond that, the image books

17     operationalize that in terms of what you would

18     expect to see visually in the person in front of

19     you, if they are consistent with the look the brand

20     is trying to hire for the model position.

21         Q     Well, with respect to the next sentence,

22     "Hair color and highlights should appear natural,"

23     how does this help the reader understand what

24     natural means?

25              A     It helps to some extent.  It doesn't

```
1                    Kathleen K. Lundquist, Ph.D.

2      define what natural means, though it might to me

3      imply that they wouldn't be purple or pink.  But

4      there is, relative to hair style, a special hair

5      style sketch book, I think it's called, that's been

6      put out to give more concrete guidance as to what is

7      meant by these things.

8           Q    Are you aware of any instructions to

9      managers to pick one picture off a page of the image

10     book?

11          A    I really don't understand, I don't

12     recognize that as an instruction from anywhere.

13          Q    I see.  Is it your understanding that a

14     manager is supposed to look at all of the pictures

15     in the image book or only some of them?

16          A    Well, it's my understanding that the

17     managers are directed to look at the image book and

18     to use it as a way of demonstrating the diversity of

19     the ways that people can be consistent with the look

20     that the brand is trying to hire for.

21          Q    In your training of managers for

22     interviewing, do you direct -- how do you

23     operationalize the "classic, natural, diverse"

24     terms?

25          A    We do that in the sense of both the
```

76

1                    Kathleen K. Lundquist, Ph.D.

2       definitions of appearance and sense of style; we do

3       it in terms of the visuals that are in the image

4       book; we do it in terms of visuals and content in

5       the training that is provided; and we seek

6       consistency based on providing that kind of training

7       and feedback to individuals.  And that goes to the

8       image book as well as to the cast-of books where if

9       people are not sending in pictures of people who are

10      consistent with the look policy, that feedback is

11      provided.

12           Q    Are there instructions on how to use the

13      image book?

14           A    Well, there are instructions to use the

15      image book.  So that even in the interview guide it

16      references the image book, to be sure that the

17      hiring decisions are consistent with appearance and

18      sense of style standards.

19           Q    How does a manager learn that classic,

20      natural, are to be determined based on the image

21      book or the cast-of book?

22           A    Through the training that is provided to

23      them when they take interviewer training is

24      certainly one source of that, and reinforced as they

25      get new image books that come out periodically.

Kathleen K. Lundquist, Ph.D.

1

2      Q      Now, tell me the difference between "has

3   personal attractiveness that is classic, natural,

4   diverse," and "has exceptional personal

5   attractiveness that is classic, natural, diverse,"

6   which is what is under 3, outstanding?

7      A      It would be a higher level of that.  I

8   would concede that it's not the most descriptive

9   difference that we have ever written between two

10  anchors, but we do train the raters to use all of

11  the bullet points, not just single words or single

12  bullet points, and to anchor their judgments back to

13  those visual standards that we provided.

14     Q      Have you ever done any empirical studies

15  of whether these personal attractiveness criteria

16  are being consistently applied by managers?

17     A      Other than the kind of auditing and

18  feedback that occurs in terms of the monitoring, no.

19     Q      Now, moving in the other direction, one

20  below expectations, "Personal attractiveness is

21  below expectations, is not," there's an emphasis,

22  "classic, natural, diverse."

23     A      Right.

24     Q      How is a manager supposed to determine

25  below expectations?

1                    Kathleen K. Lundquist, Ph.D.

2          A      I think again the look policy kind of

3     description that I referred you to before would give

4     you some examples that would be helpful there, as

5     well as some of the training shows people who do not

6     meet the look policy.  So there are I believe

7     discussion of things like excessive makeup, teased

8     hair, Mohawks, cornrows, however they are

9     operationalized at a given point in time as defined

10    by the business; if they do not meet those standards

11    they would be below expectations in terms of that.

12         Q      Is a manager expected to determine if

13    someone is below expectations in the classic

14    criteria?

15         A      In isolation, no; they are expected to

16    make that determination in conjunction with all of

17    the information that's listed in those bullet

18    points, what they have in training, and what the

19    visual models are that they have.

20         Q      Then what is the difference between

21    classic and natural?

22         A      I think that they go together.  I think

23    "classic, natural, diverse," is the message that

24    defines the brand.  They are not unique and

25    individual standards word by word by word.

1                  Kathleen K. Lundquist, Ph.D.

2          Q     Well, is classic different from natural?

3               MR. KNUEVE:  Objection, asked and

4       answered.

5               You can answer it again.

6          A     I think, as I mentioned before,

7       oftentimes they go together.  This is a global

8       judgment that's made about somebody's appearance and

9       sense of style based on a number of different

10      factors, including hair color, makeup, the other

11      things that we've discussed, personal

12      attractiveness, et cetera.

13         Q     And you've conducted no empirical studies

14      to determine if these global determinations are

15      being made consistently; is that correct?

16              MR. KNUEVE:  Objection.  Asked and

17       answered.

18              You can answer again.

19         A     We've not conducted empirical studies on

20      them.  We have provided extensive training and we've

21      monitored the amount of adverse impact, and tried to

22      provide as much structure to the decision making as

23      we could, within the context of the fact that

24      appearance and sense of style is very important to

25      this job and is fairly unusual to be evaluated for a

1

2                        CERTIFICATION

3          I, NANCY ANNE FLYNN, Registered Professional

4     Reporter and a Notary Public in and for the State of

5     Connecticut, certify;

6          That the foregoing proceedings were taken before

7     me at the time and place therein set forth, at which

8     time the witness was put under oath by me;

9          That the testimony of the witness, the questions

10    propounded, and all objections and statements made at

11    the time of the examination were recorded

12    stenographically by me and were thereafter

13    transcribed;

14         That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16         I further certify that I am not a relative or

17    employee of any attorney of the parties, nor

18    financially interested in the action.

19         I declare under penalty of perjury that the

20    foregoing is true and correct.

21         Dated this 8th day of March 2011.

22

23    _____

24         NANCY ANNE FLYNN, RPR

25

**Exhibit 8**

Bill Lann Lee (SBN 108452)
Julie Wilensky (SBN 271765)
LEWIS, FEINBERG, LEE, RENAKER &
JACKSON, P.C.
476 9th Street
Oakland, CA 94607
Telephone: (510) 839-6824
Facsimile: (510) 839-7839
Email: blee@lewisfeinberg.com
Email: jwilensky@lewisfeinberg.com

John C. Hendrickson (IL SBN 1187589)
Gregory M. Gochanour (IL SBN 6210804)
EQUAL EMPLOYMENT
OPPORTUNITY
COMMISSION
500 West Madison Street, Suite 2800
Chicago, IL 60661
Telephone: (312) 869-8100
Facsimile: (312) 869-8124
Email: gregory.gochanour@eeoc.gov

Kelly M. Dermody (SBN 171716)
Jahan C. Sagafi (SBN 224887)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: kdermody@lchb.com
Email: jsagafi@lchb.com

Jack W. Lee (SBN 071626)
Sean Tamura-Sato (SBN 254092)
MINAMI TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
Telephone: (415) 788-9000
Facsimile: (415) 398-3887
Email: jlee@minamitamaki.com
Email: seant@minamitamaki.com

*Lead Counsel and the EEOC, on behalf of the Plaintiff Class Members*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDUARDO GONZALEZ et al., | ) | Case Nos. 03-2817 SI, 04-4730 SI, |
| Plaintiffs, | ) | and 04-4731 |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **JULIE WILENSKY** |
| ABERCROMBIE & FITCH | ) | **IN SUPPORT OF PLAINTIFFS'** |
| STORES, INC., et al., | ) | **MOTION IN THE** |
| Defendants. | ) | **ENFORCEMENT PROCEEDING** |
| _____ | ) | |
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| v. | ) | **Before Special Master** |
| | ) | **Hunter R. Hughes** |
| ABERCROMBIE & FITCH | ) | |
| STORES, INC., et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DECLARATION OF JULIE WILENSKY IN SUPPORT OF PLAINTIFFS'
MOTION IN THE ENFORCEMENT PROCEEDING**

I, Julie Wilensky, declare as follows:

1. I am an associate with the law firm of Lewis, Feinberg, Lee, Renaker & Jackson, P.C., which is lead counsel for the Plaintiffs in the above-captioned action. This declaration is submitted in support of Plaintiffs' Motion in the pending enforcement proceeding. I make this declaration based on my own personal knowledge and, if called as a witness, I could testify competently as to the matters set forth herein.

2. I have reviewed the sample completed Model Group Interview Guides that Abercrombie provided to Plaintiffs on February 12, 2001, A&F 4013-5061. It is my understanding based on telephone calls with Abercrombie's counsel that these documents are the same samples that were previously provided to the court-appointed Monitor.

3. The sample contains interview forms for 90 interviews evaluating 169 candidates. Forty-five of the interviews were single-candidate interviews. At least 10% of the forms were outdated or missing pages.

4. Attached as Exhibit 1 are true and correct copies of the Model Group Interview Guides cited in Plaintiffs' Memorandum in Support of Plaintiff's Enforcement Action and in Opposition to Abercrombie's Motion:

   a. A&F 4013-4025

   b. A&F 4072-4083

   c. A&F 4084-4094

1

d.  A&F 4095-4107

e.  A&F 4121-4131

f.  A&F 4251-4262

g.  A&F 4263-4274

h.  A&F 4275-4286

i.  A&F 4287-4298

j.  A&F 4333-4345

k.  A&F 4367-4379

l.  A&F 4380-4391

m.  A&F 4417-4428

n.  A&F 4429-4440

o.  A&F 4497-4507

p.  A&F 4577-4588

q.  A&F 4589-4600

r.  A&F 4626-4637

s.  A&F 4650-4661

t.  A&F 4662-4672

u.  A&F 4685-4696

v.  A&F 4721-4732

w.  A&F 4733-4744

x.  A&F 4839-4850

y.  A&F 4851-4862

z.  A&F 4899-4911

aa.  A&F 4990-5001

I declare, under penalty of perjury and the laws of the State of California, that the

foregoing is true and correct.

Executed this 21st day of March, 2011, at Oakland, California.


_/s Julie Wilensky_____
Julie Wilensky
Lewis, Feinberg, Lee,
Renaker & Jackson, P.C.

**Exhibit 9**

# Abercrombie & Fitch

## model group interview guide



date: _____

store: _____

division: _____

interviewer name: _____

**CONFIDENTIAL**

**PLEASE KEEP COMPLETED FORMS FOR MONTHLY HR MAILING**

*March 2010*

**As an interviewer, prior to administering this structured interview, you must:**

- make sure <u>all</u> candidates sign in below
- collect the sign-in sheet before beginning the interview

# Please Print Clearly!

| | first name | last name | date |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |
| 5. | _____ | _____ | _____ |
| 6. | _____ | _____ | _____ |
| 7. | _____ | _____ | _____ |
| 8. | _____ | _____ | _____ |

**As an interviewer, prior to administering this structured interview, you should:**

- review and utilize the image book in order to ensure that hiring decisions are consistent with the appearance and sense of style Abercrombie expects across all racial and ethnic groups.
- review competency descriptions:
    - **outgoing & promotes diversity:** The ability to be extroverted, fun, friendly, active, and social. This includes projecting an energetic, dynamic, vigorous and lively personality, actively seeking out interaction with others. This includes maintaining liveliness and enthusiasm, having a positive demeanor, displaying a passion and enjoyment for life, and focusing on success.  This also includes the ability to work and relate well to people from diverse backgrounds (e.g., racial, cultural, ethnic, gender, sexual orientation, age, etc.); being aware of, understanding, respecting, valuing, being sensitive to, and promoting diversity  and adapting one's own behavior based on that understanding. This includes seeking out, valuing, and utilizing these individual differences to implement and realize Abercrombie's commitment to diversity and inclusion.
    - **sophistication & aspiration:** The ability to show confidence, poise, and maturity. This includes believing in oneself and one's own abilities, the ability to think positively about actions and events and anticipate the best possible outcomes, maintaining liveliness and enthusiasm, having a positive demeanor, displaying a passion and enjoyment for life, and focusing on success; influencing customers' aspiration to dress in Abercrombie brand clothing.
    - **appearance & sense of style:** The ability to present oneself attractively, appear well groomed, and wear attractive, stylish, fashionable clothes and hairstyle, make-up, and accessories that are consistent with the Abercrombie brand.  This includes having personal attractiveness that exhibits personal appeal and wearing clothes that fit the brand and setting the example of the brand lifestyle.
- review interview questions and evaluation standards on the following pages
- review candidates' applications for past jobs and experiences related to the interview
- review minimum qualifications for the position:
    - Education: none, Specialty Retail Experience: none; Supervisory/Managerial Experience: none

**The interviewer should take detailed notes during the interview.  Your notes should:**

- be legible;
- record what was actually said;
- be specific and focus on behaviors;
- include relevant details;
- use descriptive and concrete terms;
- ensure that you have enough information about each candidate to rate him/her on each competency;
- not be concerned with correct spelling; and
- ***NOT BE REVEALED TO THE CANDIDATE***.

**Upon completion of the interview, you should:**

- review notes and highlight important behaviors;
- review the evaluation standards associated with each competency;
- compare candidates' behaviors to evaluation standards for each competency and assign a score (note:  be sure to document your ratings in the appropriate column);
- record comments on candidates' overall strengths and weaknesses;
- add individual competency scores to determine the candidates' final scores;
- compare the candidates' final scores to hiring recommendation (e.g., Below Expectations, Meets Expectations, and Outstanding);
- record hiring recommendation in Application Management System; and
- ensure all interview materials are securely stored.

**section II: outline for opening the interview**

**BEFORE YOU BEGIN THE INTERVIEW:**

Part of your role as an interviewer includes the responsibility for helping candidates perform their best during the interview. You can help candidates feel comfortable by:

- ensuring a quiet, distraction-free environment;
- building rapport; and
- avoiding inappropriate questions during initial conversations.

**INTRODUCTION:**

1) Introduce yourself by giving your name and your position.
2) Welcome them to the interview and thank them for being interested in Abercrombie & Fitch.
3) Let applicants know that it is really important that everyone fill out an application on the kiosk before the interview. ASK: Has anyone NOT completed an application on the kiosk? If they have not, please tell them that they need to do so, and they should attend an interview on a later date, once their application is completed.
4) Let the applicants know that we use a structured interview and that you will be reading from a guide during the interview to make sure that you cover everything completely.

**Opening Script: (Read to candidates AFTER you've gone through the introduction above)**

**Remember to read slowly, pause when effective, and maintain eye contact as much as possible**

The purpose of the interview today is to help me get to know you a little better, and for you to learn a little more about Abercrombie & Fitch and this position.

Abercrombie & Fitch is committed to increasing and leveraging the diversity of our associates and management across the organization. We are promoting the diversity of our workforce through recruitment and by providing equal opportunities to all applicants and associates, regardless of race, ethnicity, or gender.

This is a model group interview, so I'd like to talk to you briefly about the model position. The model projects the image of the brand through personal style, providing customer service, and maintaining presentation standards. Hopefully you all had a chance to look at the job description of the model position, but let me give you a brief overview of what a model does in the store on a typical day. A model:

- represents the brand by creating a fun and engaging environment in the store;
- cleans, organizes, and maintains the presentation of the store;
- interacts with customers and answers their questions about the clothes;
- typically works one to two shifts per week, and each shift is about 5 hours , although schedules will vary throughout the year;
- is expected to be on-call at least one shift per week.

Does anyone have any questions for me about the Model position at this point?

During the interview, I will be asking questions to get specific information about your job related experiences. Everyone who interviews for a model job will be asked the same types of questions. It is totally fine for you to take some time and think about your answer before you respond. I will be taking notes on your responses to help me remember what you all said during the interview. You will have a chance to ask me questions at the end of the interview.

**This interview will evaluate your fit solely for the Model position. However, we have many other store positions, and if you would like more specific information on these positions, please talk to me after this interview.**

**Introduction of Applicants:**

Please introduce yourself by telling us your name, something you like to do for fun, and why you want to work for Abercrombie.

**Additional Conversational Questions: (Optional)**

➢ Who is your favorite band or group right now?
➢ If you could have any job in the world, what would it be?
➢ What makes a job fun for you?

section III: interview questions & notes

Choose 1 question from each group. Repeat the question to each candidate. Questions in italics are probe questions that you may or may not need to ask in order to get at specific behavioral examples.

| name | appearance & sense of style | outgoing & promotes diversity | |
|---|---|---|---|
| | | group a questions | group b questions |
| | use the space below to record your description of the candidates' appearance and sense of style *(optional)* | 1. How would others (e.g., friends, family, coworkers) describe your personality? What are the strongest characteristics of your personality? *Please give me an example.* <br> 2. How much of your time do you like to have to yourself versus hanging out with others? *Please give me an example. What do you like most about interacting with others?* <br> 3. How have you maintained positive and friendly interactions with others? *Please give me an example.* | 1. What is your definition of diversity? Is diversity important in the workplace? Why or why not? <br> 2. How have you helped create a situation where people of different backgrounds felt included and respected? *Please give me an example.* |
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

## continued from previous page

| name | appearance & sense of style | outgoing & promotes diversity | |
|---|---|---|---|
| | | group a questions (repeated) | group b questions (repeated) |
| | use the space below to record your description of the candidates' appearance and sense of style<br><br>(optional) | 1. How would others (e.g., friends, family, coworkers) describe your personality? What are the strongest characteristics of your personality? *Please give me an example.*<br>2. How much of your time do you like to have to yourself versus hanging out with others? *Please give me an example. What do you like most about interacting with others?*<br>3. How have you maintained positive and friendly interactions with others? *Please give me an example.* | 1. What is your definition of diversity? Is diversity important in the workplace? Why or why not?<br>2. How have you helped create a situation where people of different backgrounds felt included and respected? *Please give me an example.* |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |

section III: interview questions & notes

> **Choose 1 question from each group.** Repeat the question to each candidate. Questions in italics are probe questions that you may or may not need to ask in order to get at specific behavioral examples.

| | sophistication & aspiration | |
|---|---|---|
| name | group a questions | group b questions |
| | 1. Why do you think you will be successful at Abercrombie & Fitch?<br>2. What things are you successful at? *Please give me an example.*<br>3. How have you typically reacted when things were not going your way? *What did you do?* | 1. How would you describe the Abercrombie style?<br>2. What distinguishes the Abercrombie brand from other brands?<br>3. How do you think Abercrombie wants to be perceived by its customers? |
| **1.** | | |
| **2.** | | |
| **3.** | | |
| **4.** | | |

section III: interview questions & notes

## continued from previous page

| | sophistication & aspiration | |
|---|---|---|
| **name** | **group a questions (repeated)** | **group b questions (repeated)** |
| | 1. Why do you think you will be successful at Abercrombie & Fitch?<br>2. What things are you successful at? *Please give me an example.*<br>3. How have you typically reacted when things were not going your way? *What did you do?* | 1. How would you describe the Abercrombie style?<br>2. What distinguishes the Abercrombie brand from other brands?<br>3. How do you think Abercrombie wants to be perceived by its customers? |
| **5.** | | |
| **6.** | | |
| **7.** | | |
| **8.** | | |

## Closing statement (Read to candidates)

Before we finish, there are some expectations of a model position I'd like to go over briefly.

### Tag lines:
We expect our Models to be friendly, positive, energetic, helpful and comfortable greeting customers with "tag lines." Tag lines are statements we use to greet our customers. I'd like to give you all a chance to practice saying a tag line now. I will give you the tag line and I'd like each of you to repeat it back to me as if I were a customer in the store. The current tag line is: <insert current tag line here>. [Have each candidate repeat the tag line back to you. Please record any notes in the Outgoing & Promotes Diversity section.]

### Look Policy:
To ensure that associates consistently represent the brand, we have a policy that addresses the grooming and style of our associates called the "Look Policy." Men must be clean shaven for every shift. For women, if makeup or nail polish is worn at all, it must be a natural color. Hairstyles must appear to be neat, clean, natural, kempt, and classic. Hair color and highlights should appear natural. There are some hairstyles that are not permitted, including mohawks, mullets and corn-rows. Also, hairstyles that require excessive styling product so that the hair no longer appears soft and natural are not permitted. Headwear of any kind is not permitted. Jewelry must be limited to a watch or ring. Other than single stud earrings for women, visible piercings are not permitted. Associates are not required to purchase our clothing, but clothing worn at work must be either our clothing or clothing that is consistent with our fit, style and current fashion season. Clothing must be well-styled and have no clearly visible competitor labels, logos, or identifiable characteristics. There are additional conditions under our Look Policy that are detailed in our Associate Handbook.

### Professional environment:
We also expect our associates to be at work on time and ready to go every scheduled shift.
Lastly, we pride ourselves on being a really cool, fun place to work, but it is also a business and we need all of our associates to behave professionally at work and treat each other and our customers with respect at all times.

### Questions?
Please see me after the interview for any questions you might have on these expectations.
Before we wrap up, does anyone have any final questions for me?

### When you will hear from us:
If you are selected to be a Model, we will call you within a week. If you do not hear from us within a week, it means that we are unable to offer you this position at this time. However, please feel free to apply for other positions. These other positions are described in the electronic application, or job descriptions are available upon request. Thank you all for your interest in Abercrombie & Fitch.

The interviewer should close the interview by:

- answering candidates' questions regarding the position, company or the application process;
- providing correct information in cases where the candidates have misperceptions of the position.

Immediately after completing the interview, review your notes and make a rating for each dimension.

*Note: if candidates ask about pay, please inform that pay will be discussed when an offer is made, and do NOT get into a discussion about it during the interview.*

## Make sure to appropriately record your hiring recommendation in the Application Management System

## outgoing & promotes diversity

| 3 - outstanding | 2 - meets expectations | 1 - below expectations |
|---|---|---|
| ▪ Is extraordinarily extroverted, fun, friendly, active, and social<br>▪ Is humorous and clever | ▪ Is friendly and social<br>▪ Actively interacts with others<br>▪ "Is talkative" | ▪ Is introverted and quiet<br>▪ Is not fun or friendly<br>▪ Does not fully participate in conversations |
| ▪ Demonstrates tremendous enthusiasm, positive demeanor, and passion and enjoyment for life<br>▪ Creates an inclusive atmosphere for others, by respecting what others have to say | ▪ Is positive, enthusiastic, and optimistic about actions and events<br>▪ Contributes to creating an inclusive atmosphere for others, by respecting what others have to say | ▪ Has tendency to be negative and pessimistic about actions and events<br>▪ Leads a complacent or inactive lifestyle<br>▪ Does not contribute to creating an inclusive atmosphere for others, and/or does not respect what others have to say |
| ▪ Is aware of, and sensitive to, others' diverse ethnic and cultural backgrounds and styles<br>▪ Is actively willing and able to promote diversity in the store<br>▪ Embraces opportunities to work with others from diverse ethnic and cultural backgrounds, and considers these opportunities to be valuable experiences | ▪ Is sensitive to others' diverse ethnic and cultural backgrounds and styles<br>▪ Is willing and able to help promote diversity in the store<br>▪ Is comfortable working with others with diverse ethnic and cultural backgrounds | ▪ Lacks sensitivity to others' diverse ethnic and cultural backgrounds and styles<br>▪ Is not willing and/or able to promote diversity in the store<br>▪ Shows some apprehension and/or concern working with others from diverse ethnic and cultural backgrounds |

## sophistication & aspiration

| 3 - outstanding | 2 - meets expectations | 1 - below expectations |
|---|---|---|
| ▪ Presents oneself with poise, exceptional maturity, and high self-confidence when interacting with others<br>▪ Thinks positively and enthusiastically about experiences and goals and anticipates the best possible outcomes even when facing adversity<br>▪ Has strong conviction and passion that he/she will be successful in all endeavors | ▪ Displays maturity and confidence when interacting with others<br>▪ Thinks positively about experiences and goals<br>▪ Believes in own abilities and success | ▪ Displays timid, insecure, inappropriate, and/or immature behavior when interacting with others<br>▪ Thinks pessimistically or negatively about experiences and goals<br>▪ Does not fully believe own actions will be successful when working toward a goal |
| ▪ Demonstrates a clear understanding of, and can clearly articulate, the Abercrombie style and image<br>▪ Excited about the opportunity of representing the brand | ▪ Demonstrates an understanding of the Abercrombie style and image<br>▪ Excited about the brand | ▪ Does not clearly understand the Abercrombie style and image<br>▪ Lacks understanding on others' aspiration to dress in Abercrombie brand clothing |

## appearance & sense of style

| 3 - outstanding | 2 - meets expectations | 1 - below expectations |
|---|---|---|
| • Has exceptional personal attractiveness that is classic, natural, diverse | • Has personal attractiveness that is classic, natural, diverse | • Personal attractiveness is below expectations, is **not** classic, natural, diverse |
| • Spends time and effort into presenting oneself attractively and is impeccably well groomed | • Is well groomed | • Is unkempt or not well groomed, and does not seem to care about own appearance |
| • Wears exceptionally attractive, stylish, fashionable clothes and hairstyle, make-up, and accessories that enhance the Abercrombie brand and brand lifestyle | • Wears attractive, stylish, fashionable clothes and hairstyle, make-up, and accessories that are consistent with the Abercrombie brand | • Does not wear attractive, stylish, fashionable clothes and hairstyle, make-up, and accessories; or wears clothes that are inconsistent with the Abercrombie brand |

Section VI: interview rating sheet

**Instructions**: Indicate each candidate's competency rating in the appropriate columns below, and then add the ratings together across the row to determine each candidate's total score.  After adding the ratings across competencies, indicate with an "X" the Hiring Recommendation based on the range within which the candidate's score falls.

| Be sure to be consistent in your ratings. Review the evaluation standards carefully and ensure you are holding all candidates to the same standards regardless of race, gender, age, etc. | | | | | hiring recommendation | | |
|---|---|---|---|---|---|---|---|
| candidate name | | confident & respectful | appears sense... | | | ...der | ...t recommended |
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |
| 8. | | | | | | | |

| hiring recommendation | scores |
|---|---|
| outstanding / highly recommended | appearance = 2 or 3 and total score = 8 or 9 |
| meets expectations / recommended | appearance = 2 or 3 and total score = 6 or 7 |
| below expectations / not recommended | appearance = 1 or total score = 3 to 5 |

**Exhibit 10**

# IMAGE BOOK PACKET

**diversity & inclusion week**

**ALL managers need to review the attached Image Book during today's management meeting. then complete the attached Image Book activity.**

**after the management meeting, locate the Recruiting Binder and <u>ADD</u> today's Image Book pages behind the current Image Book.**

A & F 0 0 4 5 4
CONFIDENTIAL

# IMAGE BOOK ACTIVITY

review the Image Book and then complete this activity with your management staff.

## FALL 2009 IMAGE BOOK

the Image Book is a representation of the great-looking, smart, confident and diverse models from across the globe that represent our image.  this book reflects our hiring standard and is used to educate managers on our company's definition of great-looking models.  sixty two percent of the associates in the book are self identified as a person of color.  our job in stores is to recruit and hire aspirational models that define our image, represent our culture and drive our business.  add these 15 pages to the Image Book sent during our last diversity week in march.  going forward, you will receive additional Image Book pages to add to the Recruiting Binder and activity pages to complete during management meetings.

### does your staff resemble ours?

*example:*

☐  look at your diversity scorecard. identify the area(s) where your store is under-hiring.  *African Americans*

☐  each manager needs to select two pages from the Image Book.  *pages 3 and 4*

☐  select a person from each page that you would want to add to your staff.  *Cherie Tucker and Drew Love*

☐  how do you consistently implement our hiring standard across all racial/ethnic categories?
*refer to the Image Book when making your hiring decision*

☐  what is the name of the recruiter for your store (if you do not have a city recruiter, use the senior recruiter for your area)?
*Jose Sanchez*

☐  what is his/her extension?  use your recruiter as a resource for any questions you might have when it comes to your application and hire rate. *72018*


### activity/role plays:

☐  look at your diversity scorecard.  identify the area(s) where your store is under-hiring. _____

☐  each manager needs to select two pages from the Image Book.

☐  select a person from each page that you would want to add to your staff. _____

☐  how do you consistently implement our hiring standard across all racial/ethnic categories?

_____

☐  what is the name of the recruiter for your store (if you do not have a city recruiter, use the senior recruiter for your area)?

_____

☐  what is his/her extension? use your recruiter as a resource for any questions you might have when it comes to your application and hire rate.

_____

A & F 0 0 4 5 5
CONFIDENTIAL

# IMAGE BOOK ACTIVITY - 11.10.09

review the two Image Book page additions and then complete this activity with your management staff.

## IMAGE BOOK

the Image Book is a representation of the great-looking, smart, confident and diverse models from across the globe that represent our image. this book reflects our hiring standard and is used to educate managers on our company's definition of great-looking models. our job in stores is to recruit and hire aspirational models that define our image, represent our culture and drive our business. **add these two pages to the Image Book sent during our last diversity week two weeks ago.**

## does your staff resemble ours?

*example:*

☐ look at your diversity scorecard. identify the area(s) where your store is under-hiring. *Hispanics and Asians*

☐ what are your current holiday model staffing needs? *we need to hire 15 models*

☐ select a person from each page that you would want to add to your staff. *Helen Oh and Alejandra Perez*

☐ how do you consistently implement our hiring standard across all racial/ethnic categories?

   *refer to the Image Book when making your hiring decision*

☐ who do you have to submit to your DM for the next Image Book submission? *list one of your newly hired models*


## activity/role plays:

☐ look at your diversity scorecard.  identify the area(s) where your store is under-hiring. _____

☐ what are your current holiday model staffing needs? _____

☐ select a person from each page that you would want to add to your staff. _____

☐ how do you consistently implement our hiring standard across all racial/ethnic categories?

   _____

☐ who do you have to submit to your DM for the next Image Book submission?  _____

A & F 0 0 5 2 9
CONFIDENTIAL

Abercrombie and Fitch

# — IMAGE BOOK —

**Standard**

The image book, published by the Office of Diversity is designed as a tool to support stores in hiring great looking girls and guys from all backgrounds. This resource also allows stores to showcase their great looking associates.

- The Image book will be published twice a year, at the end of each benchmark period.
- The Image book will be sent over the controller to stores once completed, and live on the Recruiting clipboard. (Once the Recruiting binder is rolled out to stores, it will live there).
- The Image book can be found in the *Link* library.

**Process**

Store Management should work with their District Manager and City Recruiter, (if applicable) to identify individuals from their stores who are the best looking out there.

- Pictures MUST include all racial backgrounds; African American, Asian, Hispanic, Native American, Pacific Islander, Two or More, and White.
- Photos MUST be digital
- Look policy MUST be 100% compliant and meet current season style
- No shirtless photos
- Associates must be a current associate that has worked for the company at least 1 pay period or 2 weeks (and is expected to remain employed for the foreseeable future)

Communication will go out in the Stores Program, and DM Recap DMs will submit photos to their RMs.

- RMs will submit photos to Shawn Knapp in the Office of Diversity
- All photos need to be received by Shawn Knapp in the Office of Diversity by October 6th, 2008.

**Audit**

Photos will be pre-selected by Shawn Knapp and Ericka Jones before submitting to the Directors for approval.

Approved photos will be submitted to Amy Zehrer for publication of the Image Book.

Once the photos are approved they will be published in the Stores Program, DM Recap, and be available on the Link.

**Timeline**

Photos Due by October 6th

Release October 31st

A & F 0 1 6 8 3
CONFIDENTIAL

Abercrombie and Fitch

# — IMAGE BOOK SUBMISSIONS —

At Abercrombie and Fitch, we are known for our great looking staff which you can find in any one of our brands!  The image book represents individual models that represent our standard for hiring great looking guys and girls of all backgrounds.

### *Where do we go from here?*
This image book is a top priority for the company as a whole because it allows us to demonstrate how successful we are as a whole in building our brand around our people and image opposed to just a product. Accordingly:

> Pictures MUST include all racial backgrounds; African American, Asian, Hispanic, Native American, Pacific Islander, Two or More, and White.
> Photos MUST be digital
> Look policy MUST be 100% compliant and meet current season style
> No shirtless photos
> Associates must be a current associate who has worked for the company at least 1 pay period or 2 weeks (and is expected to remain employed for the foreseeable future)

 

### *What are the photo standards?*
> Framing the head shot:
> Model posture: Face needs to be perpendicular to the camera.  No head tilts!
> All models should appear friendly in all photos
> Girls:  one or both hands on hip/s. "t-stand"
> Guys:  Feet shoulder width apart, hands by side
> All associates that come in for the photo must clock in and out for the time they are there
> Do not take any other pictures than what is required or deviate from the requirements

### *Where should I take the photos?*
Abercrombie and Fitch Adult/Kids: Model stands 2 ft. in front of marketing centered within vestibule marketing frame (out of track lighting)

Hollister Co: Model stands on the steps of the porch

Ruehl 925: Model stands on steps in front of 923

For Gilly Hicks: Model stands on the steps of the porch

### *How do you submit photos?*
Work with your DM to schedule a time to take the photos. All photos should be taken by your District Manager or Recruiter.  Three photos of each person should be submitted along with their: First and Last name, Employee ID Number, Store name and number.

### *When are the photos due?*
Photos should be submitted each Friday. RMs, Recruiters, and the Talent Scout will be responsible for getting all photos to the Diversity Department. All photos are due by October 6, 2008.

A & F 0 1 6 8 4
CONFIDENTIAL

**Exhibit 11**

Case 3:03-cv-02817-SI   Document 229-1   Filed 04/29/11   Page 174 of 174

https://iknowledge.elementk.com - Launch Course - Microsoft Internet Explorer

# Abercrombie & Fitch

# People Selection Program

MENU

Conducting an Interview ▸ The Benefits of Notes ▸ Appearance Phrases

**If someone meets the brand appearance standard you can say:**

"APPEARANCE AND SENSE OF STYLE MEETS EXPECTATIONS"
"STYLISH OUTFIT"
"STYLISH HAIRSTYLE"
"NATURAL MAKEUP"

**If someone does not meet the brand appearance standard you can say:**

"APPEARANCE AND SENSE OF STYLE DOES NOT MEET EXPECTATIONS"
"NOT WELL GROOMED"
"DID NOT PUT AN EFFORT INTO GROOMING"
"FULL BEARD"
"BIG HAIR, TEASED AND HAIRSPRAYED"
"SPARKLY EYESHADOW"

Click next to continue

## Appearance Phrases

Shown here are some examples you can write in your notes concerning a candidate's appearance.

Terms like these should be used over simple phrases such as "good looking." That's because statements like these are more descriptive and strictly are observations. For candidates with an outstanding overall appearance or sense of style, you can write "Has outstanding appearance and sense of style," or "Has great, classic style" or "Has excellent, natural look." For candidates that meet our appearance expectations, your notes could say "Appearance and sense of style meets expectations," or "Has classic style," or "Has natural look." And for candidates whose overall appearance and sense of style is below expectations, your notes could say "Appearance and sense of style does not meet expectations," or "Unnatural look or style" or "Not classic style." This keeps the assessment focused on the candidate's fit for the job.

You can also see things listed that should not be

Page 25 of 29          ◀ BACK          NEXT ▲

Internet

3:13 PM
Monday
8/16/2010

Done